# EXHIBIT 1

*1-Tom-Plumber*

**FRANCHISE AGREEMENT**

**between**

**1 TOM PLUMBER GLOBAL INC.**

**and**

**BLUE RIDGE PLUMBING AND DRAIN, LLC**

---

Operating Area:

See Attachment A for Territory Map and Zip Codes.

---

4851-6808-8118 v4

2932541-000001 06/01/2017
JRB3 4839-5087-0229
2950761-000001

# TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | Definitions | 1 |
| 2. | Grant of Franchise | 1 |
| 3. | Operating Area | 2 |
| 4. | Term | 2 |
| 5. | Fees & Security Interest | 3 |
| 6. | Franchised Unit Development | 5 |
| 7. | Our Obligations | 8 |
| 8. | Your Obligations | 10 |
| 9. | Technology, Communications And Internet | 14 |
| 10. | E-Mail Communication | 17 |
| 11. | Covenants Not to Compete | 17 |
| 12. | Confidential Information | 18 |
| 13. | Franchised System Management | 19 |
| 14. | Reports and Records | 21 |
| 15. | Inspection, Testing and Audit | 22 |
| 16. | Market Introduction Plan, Annual Marketing Plan & Local Marketing | 22 |
| 17. | Advertising Cooperative | 23 |
| 18. | Promotional Programs | 23 |
| 19. | Brand Fund | 23 |
| 20. | Publicity and Promotional Materials | 24 |
| 21. | Insurance | 24 |
| 22. | Assignments & Transfers | 26 |
| 23. | Rights of First Refusal and Purchase Option | 27 |
| 24. | Business Entity Franchisee | 28 |
| 25. | Death or Appointment of Guardian or Conservator of a Principal | 28 |
| 26. | Temporary Disability of An Owner | 29 |
| 27. | Securities Offerings | 29 |
| 28. | Termination by You | 29 |
| 29. | Termination by Us for Incurable Defaults | 30 |
| 30. | Termination by Us for Curable Defaults | 31 |
| 31. | Termination by Us for Commercial Impracticability | 31 |
| 32. | Certain Waivers | 32 |
| 33. | Obligations Upon Termination or Expiration | 32 |
| 34. | Injunctive Relief | 33 |
| 35. | Indemnification by Franchisee | 34 |
| 36. | Force Majeure | 35 |
| 37. | Relationship of Parties | 35 |
| 38. | Employment Decisions | 36 |
| 39. | Holidays | 36 |
| 40. | Entire Agreement | 36 |
| 41. | Disclaimer Limitation | 36 |
| 42. | Approvals and Waivers | 37 |
| 43. | Notice | 37 |
| 44. | Cumulative Rights | 37 |
| 45. | Survival | 37 |
| 46. | Governing Law | 38 |
| 47. | Venue | 38 |
| 48. | Legal Fees | 38 |
| 49. | Construction | 38 |
| 50. | Severability | 38 |
| 51. | Counterparts | 38 |
| 52. | Amendment | 38 |
| 53. | Third Party Beneficiaries | 38 |
| 54. | Definitions | 38 |

(i)

55.     Your Representations, Warranties and Acknowledgements.........................................................41

Attachment A      -      Transaction Details
Attachment B      -      Automated Clearing House Payment Authorization
Attachment C      -      Guaranty and Restriction Agreement
Attachment D      -      Management Confidentiality and Non-Competition Agreement
Attachment E      -      Lease Rider
Attachment F      -      Receipt of Operations Manual and Confidentiality Agreement
Attachment G      -      SBA Addendum

JRB3 4839-5087-0229
2950761-000001

**FRANCHISE AGREEMENT**

This Franchise Agreement (this "Agreement") is made and entered into as of the Effective Date, by and between 1 Tom Plumber Global Inc., an Ohio corporation ("we," "us," "Franchisee" or "our"), as franchisor, and Blue Ridge Plumbing and Drain, LLC, a North Carolina limited liability company ("you," "Franchisee" or "your"), as franchisee. For good and valuable consideration, the receipt and sufficiency of which the parties mutually acknowledge, the parties mutually agree as follows:

1. **DEFINITIONS. WORDS AND PHRASES USED IN INITIALLY-CAPITALIZED FORM IN THIS AGREEMENT HAVE THE MEANINGS ASSIGNED IN SECTION 54 OF THIS AGREEMENT UNLESS THE CONTEXT INDICATES OTHERWISE.**

2. **GRANT OF FRANCHISE.**

(a) Grant. Subject to the terms and conditions in this Agreement, we grant to you the right, license and privilege to operate a Unit, only at the location of your Central Office for the Franchised Unit, and the right, license and privilege to use and employ the Franchised System, the Proprietary Marks, and the Intellectual Property to provide the Plumbing Services to residential and commercial addresses in the Operating Area during the Term.

(b) Reservation of Rights. We and our Affiliates reserve the rights to engage or authorize others to engage in any business activity at any location within or outside the Operating Area under the Proprietary Marks or otherwise except as expressly limited under this Agreement. There are no implied covenants or obligations regarding territorial rights arising from this Agreement or any other agreement or arrangement between us and you. You have no right to participate in or benefit from any such other business activity. In addition, we reserve all rights of ownership, control, modification, revision, updating and termination with regard to the Franchised System. Your only rights with regard to the Franchised System are limited to the license as we expressly grant to you under this Agreement during the Term, and the parties intend that no implied covenants or rights attach or arise under the license you accept in this Agreement.

(c) Designation of Owner-Operator. Unless you operate as a sole proprietorship, you will designate one person from among the list of Owners with at least five percent of your outstanding equity on Attachment A who will be your "Owner-Operator." In such capacity, the Owner-Operator shall devote his or her full time and attention to the management, supervision and operation of the Franchised Unit. We may rely upon communications and decisions of the Owner-Operator as fully authorized by all necessary corporate action and legally binding on you. You may designate another Owner to serve as Owner-Operator by written notice to us as long as designee owns at least the required percentage of your equity as listed on Attachment A at the time of designation.

(d) National Accounts. We shall have the right, on behalf of ourselves and/or our other licensees and franchisees, to negotiate and enter into National Account Client Agreements ("NACA") with National Account Clients to provide Plumbing Services to multiple National Account Client locations within or outside of the Operating Area. If we do, you may be asked to service National Account Clients. You shall notify us within ten (10) business days after we send an NACA to you if you decline to provide the Plumbing Services to the National Account Client within the Operating Area under such NACA. Otherwise, you shall be deemed to accept and assume the obligations and benefits of the NACA. In that event, should you then fail to provide such Plumbing Services to the National Account Client in a manner that is both satisfactory to us and the National Account Client and in conformity with the NACA, we shall

1

have the right, exercisable in our sole discretion and without violating or breaching this Agreement, ourselves or through an Affiliate, to:

        1.      Provide such Plumbing Services to the National Account Client at location(s) within the Operating Area according to a NACA utilizing the Proprietary Marks and the Franchised System; and/or

        2.      Contract with another party to provide such Plumbing Services to the National Account Client within the Operating Area under a NACA, utilizing the Proprietary Marks, or any other brand of staffing and placement service provider.

3.      **OPERATING AREA.**

(a)      When you sign this Agreement, unless you have selected and we have accepted the Central Office for the Franchised Unit, we will designate an area defined by zip codes, a map or other means (the "Target Area") described on <u>Attachment A</u>. You must find a location for the Central Office acceptable to us within the Target Area during the period of 60 days after you sign this Agreement. During this period, we will not grant a Unit franchise to any other party and our Affiliates will not open or develop another Unit within the Target Area. When we accept the location for your Central Office within the Target Area you propose, we will fix location of the Central Office and the boundaries of a "Operating Area" for the Franchised Unit by unilaterally completing and sending you the notice appended to <u>Attachment A</u>. Your Operating Area will be limited to the boundaries that we unilaterally set in <u>Attachment A</u>. Your signature is not required for that notice to be effective and binding on you.

(b)      We and our Affiliates will not locate another central office within the Operating Area. You acknowledge and agree that we and our Affiliates will have the right to operate, to franchise and license other Persons to operate a Unit at any location outside of the Operating Area.

(c)      You may only market and solicit to residential or commercial customers for the Plumbing Services offered by your Unit that are located within the Operating Area. There are no restrictions on your solicitation or acceptance of customers from any area that is not designated as the Operating Area of another franchisee; provided, however, we may, at our discretion, by written notice to you restrict your solicitation, acceptance and fulfillment of Plumbing Services to your Operating Area.

(d)      You also acknowledge and agree that we have the right (a) to market and sell the same and similar services and products as those offered under the Franchised System under trademarks, service marks, and commercial symbols different from the Proprietary Marks through the same, similar or different distribution channels; (b) to market and sell the same services and products as those offered as part of the Franchised System through alternate distribution channels; (c) to supplement the services you are providing in your Operating Area in the event of a major weather disaster; and (d) to advertise, market and sell those services and products on the Internet and otherwise. These rights include the offer and sale of Plumbing Services and related services under the Proprietary Marks in commercial or residential channels or in NACA, within and outside the Operating Area.

4.      **TERM.** **THE "TERM" CONSISTS OF THE INITIAL TERM AND THE SUCCESSOR TERMS DESCRIBED BELOW.**

(a)      <u>Initial Term</u>. This Agreement shall be effective as of the Effective Date and shall continue for an "Initial Term" of ten (10) years from the Opening Date, unless terminated earlier under this Agreement.

2

(b)     <u>Successor Terms</u>.  We may require that you may enter into a successor Franchise Agreement that will succeed this Agreement to continue the affiliation of your business as a Franchised Unit as a condition to begin each of two (2) additional "Successor Terms" of five (5) years each, subject to satisfaction of the conditions for succession in this Section.  The successor Franchise Agreement may have materially different terms, conditions and fees.  THERE ARE NO OTHER RENEWAL RIGHTS OR OBLIGATIONS UNDER THIS AGREEMENT.

(c)     <u>Succession Notice & Eligibility</u>.  If you intend to enter into a successor Franchise Agreement, you must give us written notice of your intent at least 6 months before the end of the Initial Term and the Successor Term, if any.  You will be eligible to continue affiliation if at the time you must give notice of your intent to continue affiliation and at all times through the end of the Term then ending, (i) you and your Affiliates are not and have not been in default under this Agreement or any other agreement with us or one of our Affiliates; (ii) you and your Affiliates have satisfied all monetary obligations then due and owing to us and our Affiliates, to suppliers and to the landlord of the Lease; (iii) the Franchised Unit is not in the bottom quartile of franchised Units for Gross Sales for the preceding fiscal year (taking into consideration population differences); (iv) you have not suffered more than one material default under any agreement with us or any Affiliate that occurred during the first year such agreement was in effect; (v) you have not suffered more than one cured or uncured material default under any franchise agreement or any other agreement with us during any 24 month period; and (vi) we are offering franchised Units.  You agree that the failure to satisfy the succession eligibility criteria constitutes good cause not to offer you succession at the end of the Initial Term or the first Successor Term.  We will notify you within 30 days after we receive your succession notice if you are not eligible to continue affiliation.  We may waive, in our sole discretion, any disqualifications for any Franchised Unit or franchisee to enter into a succession franchise agreement for its franchise.  No such waiver will provide or confer any right or benefit on any Person except the affected franchisee.  If you are not eligible for a successor Franchise Agreement, we may permit you to transfer your Franchised Unit in accordance with this Agreement.

(d)     <u>Additional Conditions</u>.  Our consent will be further conditioned on maintaining eligibility to renew through the end of each Term, and on your satisfaction of the following conditions: You and your Owners must, at the times we specify, (i) at our request and after any disclosure required by law, execute our then current form of franchise agreement and personal guaranty as the successor Franchise Agreement; (ii) perform the remodeling, repairs and renovations described below that we may require; (iii) upgrade to our current equipment package and install our current point-of-sale system and other equipment; (iv) complete, at your expense, any retraining program we may require; and (v) execute a general release of any and all claims you, your Owners and any guarantor may have against us and our Affiliates as of that time, except for such claims as may not be released in advance under applicable law.  At the end of the fifth year of the Initial Term, the Initial Term, and each Successor Term, you must upgrade your Unit and/or Vehicles to our current entry standards and design elements, complete any retraining we require, upgrade to our current equipment package and install our current operating software and other equipment.

5.     **<u>FEES & SECURITY INTEREST</u>.**

(a)     <u>Initial Franchise Fee</u>.  You will pay us a non-refundable franchise fee when you sign this Agreement in the amount specified on <u>Attachment A</u>.

(b)     <u>Royalty Fee</u>.  You will pay us a "Royalty Fee" equal to 6.00% of the Gross Sales of the Franchised Unit during the preceding week, provided that upon the first anniversary of the opening of the Central Office, you must pay us a minimum monthly Royalty Fee of $2,500.

(c)     Population Fee.  You will pay us a monthly "Population Fee" in the amount specified on Attachment A.  We may unilaterally adjust the Population Fee, at our sole discretion, upon an adjustment to your Operating Area.  We may also unilaterally adjust the Population Fee every five (5) years beginning on January 1, 2025, to account for changes in the US Consumer Price Index and populations in your Operating Area.  If the Population Fee is adjusted, we may unilaterally amend Attachment A.  Your signature is not required for that notice to be effective and binding on you.

(d)     Brand Fund Contribution.  You will pay us, when you pay your Royalty Fee, a Brand Fund Contribution if, as and when required under this Agreement.  You will pay the Brand Fund Contribution to us in addition to the amounts you must spend under Sections 16 and 17 of this Agreement.  The rate of the Brand Fund Contribution will be 2.00% of Gross Sales of the Franchised Unit during the preceding week.

(e)     Advertising Reallocation Fee.  We reserve the right to reallocate all marketing expenditures as determined in our sole discretion.

(f)     Technology Fee.  We do not currently impose a Technology Fee payable to us. We reserve the right to add a Technology Fee in the Operations Manual with 30 days' prior written notice to you to cover the costs and overhead of any technology provided to you, such as a license of software tools, database management, software maintenance, internet usage, and help desk support.

(g)     Relocation Fee.  If you apply to relocate the Central Office after the Opening Date, then you will reimburse us for any costs we incur in excess of the Relocation Fee to analyze and support the relocation.

(h)     Convention Fee.  If we hold a 1-Tom-Plumber brand convention, you must pay us when we invoice you for at least one convention registration whether or not you or your representative attends the convention.  As of the Effective Date, we expect the convention registration fee to be $750.  We may increase the amount that you must pay, as specified in the Operations Manual, to not more than $1,500 per attendee.  We may charge additional convention registration fees for additional attendees.

(i)     Payments.  You must pay us Royalty Fees and Brand Fund Contributions weekly based on the Gross Sales of your Franchised Unit during the preceding week.  You must report weekly Gross Sales to us each Tuesday and make the weekly payments by electronic funds transfer on Wednesday for Gross Sales reported for the previous week, which ends on the close of business Saturday.  All other monthly payments are made with the first weekly payment each month based on the Gross Sales reported for the month just ended.

(j)     Interest.  Any late payments that you make pursuant to this Agreement will bear interest from their due date until paid at a rate equal to the lower of (a) 1.50% per month or (b) the maximum interest rate allowed by applicable law.

(k)     Taxes.  You will pay us an amount equal to any federal, state, provincial or local sales, gross receipts, use, value added, excise or similar taxes assessed against us on the royalty and Marketing Contributions by the jurisdictions where your Franchised Unit is located, including any income tax, franchise or other tax levied on us for our privilege of doing business in your State.  You will pay Taxes to us when due.

(l)     EFT Payment.  You will pay all amounts due to us after your Franchised Unit opens by electronic means under the Automated Clearing House Payment Authorization attached as

4

Attachment B, or under any substitute form of authorization that we may require during the Term so that your fees will be paid by means of electronic funds transfer without the necessity of your transmitting a paper check to us.

        (m)    <u>Security Agreement and Interest</u>.  As security for the payment of the foregoing amounts and performance of your obligations under this Agreement, you grant to us, our successors and assigns a security interest in this Agreement, all signs, signage, décor items, goods, supplies, equipment, and inventory containing any of the Proprietary Marks located at the Franchised Unit.  You grant us the authority and power to file a copy of the signature page of this Agreement as part of any financing statement necessary to perfect and maintain our security interest during the Term, in any and all appropriate offices and public records.  We may notify your other creditors and lenders about the security interest and have no obligation to subordinate our interest to that of any other lender or secured creditor.

        (n)    <u>Public Service Discount on Certain Fees</u>.  We have established a program to benefit active duty and retired military and first responders (police, fire, EMS) by granting a $5,000 reduction the Initial Franchise Fee for your first franchised unit.  We may modify or discontinue this program at any time.  If you qualify, or your transferee qualifies, then we will apply the discount to the calculation of the Initial Franchise Fee for your first franchised unit payable to us.  The program details appear in our Franchise Disclosure Document and Operations Manual.

        (o)    <u>Bank Fees</u>.  If we are unable to collect your check or electronic funds transfer when due, we will invoice you for the fees and charges we pay our bank plus $25.00.  The invoice is due on receipt.

        (p)    <u>Indemnification Costs</u>.  If we incur damages, costs, or expenses from third party claims arising from your operation of the Franchised Unit, you must reimburse us for the damages, costs, or expenses that we incur, plus a twenty-five percent (25%) administration fee.  Additionally, you must pay our costs for enforcing the Franchise Agreement or any other agreement against you, plus a twenty-five percent (25%) administration fee.

        (q)    <u>Insurance Costs</u>.  If we incur damages, costs, or expenses to obtain required insurance on your behalf or to complete your post-termination obligations, you must reimburse us the damages, costs, or expenses of the insurance, plus a twenty-five percent (25%) administration fee.

        (r)    <u>Enforcement Costs</u>.  If we must enforce this Agreement against you, you must reimburse us for the damages, costs, or expenses we incur to cause your compliance with this Agreement or  to compensate us for costs we incur directly and indirectly as a result of your breach, including, but not limited to, attorneys' fees, court costs, collection costs, expert fees and costs, and discovery costs.

        (s)    <u>Joint Employment; Change of Relationship Fee</u>.  If we determine, in our sole discretion, that any legislation, regulation, arbitration or a decision of a court of competent jurisdiction holds that either (i) we are your employer, or (ii) we are a joint employer with you of your employees or results in a similar change in our relationship with you, you must reimburse us for all costs incurred by us.

    6.    **<u>FRANCHISED UNIT DEVELOPMENT.</u>**

        (a)    <u>Development Oversight</u>.  Except as specified in this Agreement and the Operations Manual, we are not obligated to provide any assistance in locating your Central Office, negotiating the lease, selecting your Vehicles conforming the premises or vehicle to local codes and ordinances, obtaining permits, constructing, remodeling, decorating, equipping, or wrapping the Central Office or your Vehicles,

<div align="center">5</div>

hiring and training employees (except for the training we provide described in training below), or providing for necessary equipment, signs, fixtures, opening inventory, supplies, tools and vehicles.

(b)     <u>Vehicle Selection</u>.  We will provide you with our standard plans, specifications, and layouts for the exterior design and wrapping, interior design, mechanical and electrical systems, equipment, décor and signs for a prototype Vehicle that we make available to franchisees.  You may purchase or lease at least one new or used truck from a third party and convert it for use as your Vehicle in compliance with System Standards.  We may, however, require that you purchase a certain number of trucks depending on the equipment package you select, and the size, geography, traffic patterns, and natural barriers of your Operating Area.

(c)     <u>Central Office Selection</u>.  We will provide you with advice and consultation in the selection of sites for the Central Office through the use of the forms, criteria and materials that we make available to franchisees. We will review the information you submit for each proposed site for the Central Office, conduct any investigation of the proposed site if we deem appropriate to evaluate the site, and accept or reject the site within 30 days after your submission of all initial and supplemental information we request regarding a proposed site.  If we accept the site, we will give you notice of any remaining conditions to that acceptance.  If we reject the site, we will give you the reasons for the rejection.  Effective upon our acceptance, you acknowledge that you have selected and we have accepted the Central Office, and that our acceptance of your selection does not guarantee or warrant that the location will be successful or that it represents the best site for the Franchised Unit from among those available to you.  You acknowledge that we may have provided you with advice and consultation in the selection of sites for your Franchised Unit through the use of the forms, criteria and materials that we make available to franchisees. We may have delivered our written review and evaluation of any proposed sites you propose.  You have had the opportunity to obtain independent advice on the site for your Franchised Unit and are not relying on our review and evaluation. We will provide you with one site approval visit.  If required by us or requested by you, additional site review visits may be arranged, subject to our availability for a fee of $500 per additional site visit in addition to all expenses associated with each site visit.

(d)     <u>Lease/Purchase Agreement</u>.  You must own or lease the Central Office at all times during the Term and provide us with a copy of the fully executed deed or lease of the Central Office within five (5) days after signing and delivering the same before commencing development of the Franchised Unit. The "Commitment Date" is the date of the fully executed lease or purchase agreement.  We must approve the form and content of any Central Office lease or the purchase agreement and any modifications or amendments thereto before you sign the document.  We will review the lease or purchase agreement, and, if applicable, any modifications or amendments to the lease, and accept or reject your lease or purchase agreement for the Central Office within 30 days after your submission of all initial and supplemental information we request regarding the proposed lease or purchase agreement.  You must obtain as part of the lease documentation a signed Lease Rider with the landlord in substantially the form attached as <u>Attachment E</u> when you provide us with a copy of the signed Central Office lease (the "Lease").  You must deliver a fully executed Lease or purchase agreement for an approved site within 60 days after the Effective Date.  You have the option to secure a single 30 day extension of the 60 day period by written notice to us that you are exercising your extension option.  The grant of any further extension of time to complete this phase of pre-opening is at our sole discretion.

(e)     <u>Plans</u>.  We will provide you with our standard renovation and finish plans, specifications and layouts for the exterior design, wrapping, interior build-out, mechanical and electrical systems, equipment, décor and signs for a prototype Unit and Vehicle that we make available to franchisees. You will design, equip, build-out, and wrap the Unit and Vehicle in strict conformity with the layout, plans, and specifications we approve.  We will review your site plan and final plans and specifications for

6

conformity to System Standards. We will not unreasonably withhold or delay our approval, which is intended only to test compliance with System Standards, and not to detect errors or omissions in the work of your architects, engineers, contractors or the like. Our review does not cover technical, architectural or engineering factors, or compliance with federal, state or local laws, regulations or code requirements. You are responsible for designing and building the Unit to meet applicable requirements of the Americans with Disabilities Act, state and local government laws, and related regulations governing the service of Persons with disabilities in public accommodations. We will not be liable to your lenders, contractors, employees, customers, others or you on account of our review or approval of your plans, drawings or specifications, or our inspection of the Franchised Unit before, during or after renovation or construction.

(f)     <u>Construction and Build-Out of Franchised Unit and Vehicles</u>. You will complete the construction, build-out, or remodeling of the Franchised Unit and Vehicles within the time specified on <u>Attachment A</u>. You will construct or remodel the Franchised Unit and Vehicles in strict conformity with the site layout, plans and specifications we approve. If we determine (before the Opening Date) that you have not constructed, built-out, or remodeled the Franchised Unit or Vehicles in strict conformity with the site layout, plans and specifications we approved, we may terminate this Agreement for cause, or obtain an injunction from a court of competent jurisdiction against the opening of the Franchised Unit and to compel you to specifically perform your obligation to construct, build-out, or remodel the Franchised Unit or Vehicles in strict conformity with the approved site layout, plans and specifications, in addition to any other remedies available to us at law or in equity, without any obligation to furnish any bond or security. You will bear the expense of all engineering and architectural services incurred for your final construction plans and for obtaining approvals by the appropriate governmental authorities required under applicable law to construct, remodel, use and occupy the Franchised Unit and Vehicles.

(g)     <u>Furnishings, Fixtures, Equipment, and Other Personalty</u>. You will install in and about the Franchised Unit and Vehicles equipment, fixtures, furnishings and other personal property that strictly conform to System Standards, and specifications we specify in the Operations Manual or otherwise. You will not display any other sign or advertising at the Franchised Unit or in your Vehicles without our consent other than as permitted under the Operations Manual.

(h)     <u>Technical Services</u>. You may engage any architect, construction manager or contractor to assist you in developing the Franchised Unit as long as the party you engage is duly licensed in the state of the Central Office. You shall secure for us and our agents the right to inspect the construction site and related materials stored off site at any reasonable time. You shall correct, upon our request and at your expense, any deviation from the approved site plans and specifications. You shall furnish to us a copy of the certificate of occupancy and a certificate from your architect that the Franchised Unit was built in accordance with the approved final plans and specifications, and in compliance with all applicable building codes and in compliance with all applicable local, state and federal laws, ordinances and regulations, including but not limited to the Americans with Disabilities Act and related regulations.

(i)     <u>Opening</u>. The Franchised Unit shall be opened to the public at the Central Office on the Opening Date only after you receive our authorization to do so, which you must request in writing on or after the date you receive the certificate of occupancy and at least 7 days in advance of the desired date for such opening. In addition to and not in lieu of your other advertising obligations, you will conduct local advertising and promotion for the Franchised Unit's grand opening (the "Market Introduction Plan") described below. You will not open the Franchised Unit without our prior written authorization. We will have the right to withhold that authorization until (i) you complete (to our satisfaction) the construction or remodeling of the Franchised Unit and furnish copies of all governmental approvals required before opening under applicable law, (ii) you have acquired, equipped and wrapped your first Vehicle and we have inspected such Vehicle, either in person or electronically with the information you provide, and determined

7

it satisfies the System Standards, (iii) you complete preparation of the Franchised Unit and Vehicles for the commencement of operations per the Operations Manual, (iv) your management personnel and unit personnel to be employed on the Opening Date complete the initial training program as required in this Agreement, (v) your furnish copies of permits and licenses for Unit operation; (vi) you deliver to us proof of insurance required under this Agreement, (vii) you have paid or reimbursed us for all amounts due for pre-opening expenses, (viii) you have the required inventory, equipment and supplies for the Unit, and (ix) you are not otherwise in default under this Agreement or any other agreement with us. You will notify us when you open for business. We will confirm the Opening Date in writing for the purpose of fixing the expiration date of the Initial Term.

7. <u>**OUR OBLIGATIONS**</u>. **DURING THE TERM, WE WILL PROVIDE YOU WITH THE FOLLOWING SERVICES:**

(a) <u>Training</u>.

1. We will provide you (or if you are an entity, your Owner-Operator) and your General Manager with two weeks of 1-Tom-Plumber manager training ("1TP"), covering the Franchised System and methods of operating a Franchised Unit. This training is conducted at our corporate offices, currently located in Milford, Ohio, or at another location designated by us. Additionally, this training is provided to you and your General Manager after the mandatory completion of pre-training modules as set forth in the Operations Manual. This training and information will include a standard chart of accounts for use in the daily and periodic accounting of the Franchised Unit. We will provide orientation training for no additional tuition fee to your Owners who are not your Owner-Operator if this is their first Unit franchise at the times and places and for the duration we may designate. The initial 1TP program is mandatory for the Owner-Operator and the proposed General Manager and is to be completed at a minimum of four weeks prior to the Franchised Unit Opening Date. Upon the final week of the 1TP program, our Training Director and/or Operations Director will conduct a thorough evaluation of the trainees as outlined in the Operations Manual. Each manager trainee must score 90% or better on the evaluation to be "certified." We may modify an Opening Date you propose based upon the projected date of successful completion of the 1TP program by the General Manager and/or the Owner-Operator.

1. We require that you must always have a certified manager in Franchised Unit and/or be in the process of having a manager certified by attending and passing the 1TP program. We will provide training at the times and places and for the duration we may designate for replacement managers. We may charge tuition that reflects our costs for training for replacement managers and for retraining of existing managers. You must pay the tuition for training in advance, and we will not refund the tuition if the replacement manager does not attend the training session.

2. We may charge you reasonable tuition and reimbursement of our expenses if we provide additional training at your request in your Franchised Unit, or an Additional Training Fee plus expenses as described in Section 8(a). We currently do not charge for training material, but we may do so in the future. We may publish in the Operations Manual the fees and charges for additional training.

(b) <u>Operations Manual</u>. We will grant you access rights to our Operations Manual located on our secure Website for franchisees. Access to our Operations Manual will be limited to authorized-personnel that have signed the Confidentiality Agreement in <u>Attachment G</u>. You may not duplicate the manual and may not provide pass codes to unauthorized personnel.

8

(c)     Products, Services and Suppliers.

1.     Products; Alternative Suppliers.  We shall reveal the specifications, formulas, and product preparation instructions to you and provide you with the list of Products that you must manufacture, purchase, use, offer for sale, sell and promote, and maintain in stock at Franchised Unit in quantities needed to meet reasonably anticipated consumer demand, certain products, equipment, furniture, signage and other merchandise.  We may designate certain of these disclosures as Confidential Information.  You shall have the obligation to purchase certain Products solely from suppliers selected in our sole discretion of which we give you notice.  If you wish to use an alternative supplier, you must provide us with prior written notice and we must approve, in our sole discretion, the alternative supplier.  Along with the notice, you must submit sufficient information, specifications and/or samples for us to determine whether the product or service complies with our System Standards or the supplier meets our approved supplier criteria.  To compensate us for our evaluation process, you will reimburse us for the costs of the evaluation or testing, including, but not limited to, wages, travel, and expenses of our employees or designees.  This payment is due when you request our approval for a supplier not then on our approved supplier list.  You shall not place a new order for any Products with a supplier after receiving written notice of changes in the Products' specifications or that our approval of the supplier has been withdrawn or revoked.  We may, in our discretion, as frequently as we deem necessary, change the identity, specifications, formulas, product preparation instructions, inventory requirements and designations, and add new products and delete existing products, from the items that we designate as Products.  You shall conform to all changes immediately upon written notice from us unless our written notice specifies a later implementation date.

2.     Supplier Lists & Changes.  We will publish a list of approved suppliers and their respective Products in the Operations Manual and/or in other written or electronic communications to you.  As new suppliers, products and services become available, we will amend that list.  We may also publish in the Operations Manual the procedures and fees for obtaining approval of any supplier you wish to nominate to become an approved supplier.  We may deny approval of any nominee in our sole discretion.

3.     Supply Benefits.  We or an Affiliate may be the sole approved suppliers for Products, or for goods and services we deem to be integral parts of the Franchised System that must be supplied on a consistent, uniform basis to all franchisees.  We or our Affiliates may earn a profit from providing purchasing and procurement services, including receipt of fees from third party suppliers.

(d)     Staffing Assistance.  We will provide you staffing standards for the required dress and appearance of your employees, which you and your employees must follow.  We will provide suggestions for staffing models and job descriptions that you are free to follow or not in your discretion.

(e)     Opening Assistance.  We will provide you with the services of one or more trainers for a period of up to five days before and after opening to assist you with the opening of the Franchised Unit at no fee to you.  You must reimburse us for reasonable travel and living expenses of the trainers while performing this service.  Subject to availability, we will provide the trainer services for additional days to continue to assist you with the opening of the Franchised Unit at a per diem charge per trainer that we establish, which will be no more than the Additional Training Fee described in Section 8(a) then in effect.

(f)     Call Routing; Website.  We will operate a call routing system for fulfilling requests to provide Plumbing Services.  All clients will call our toll-free phone number or interact with our web site,

9

and we will forward the customer to you for Plumbing Services if the zip code for the service location is within your Operating Area. If the Plumbing Services are to be performed in a zip code that is not in your Operating Area or are not in the Operating Area of a franchisee, we will assign the Plumbing Services, in our sole discretion, to a franchisee whom we deem capable to perform the Plumbing Services.

(g)     Marketing Assistance.  We will provide you with the merchandising, marketing and advertising research data and advice that we develop from time to time and deem helpful in the operation of a Unit using the Franchised System.  We may establish minimum and maximum prices for products and services, engage in limited time offers affecting the price or quantity of products offered at the Unit, and establish unilateral policies on minimum and maximum advertised prices of Unit products and services.

(h)     Evaluation Program.  We will conduct periodic field evaluations and standards assessment inspections and reviews of the Franchised Unit to test and promote its compliance with System Standards and quality control.  We may implement customer evaluation and feedback programs, mystery Unit per programs, and independent inspection programs.  We may publish the results of our tests and evaluations.

(i)     Advice & Communications.  We will provide you with periodic individual or group advice, consultation and assistance by personal visit, by telephone, electronic communication, or by newsletters or bulletins that we may make available to our franchisees from time to time.  We will provide you with any other materials in any medium that we may develop to communicate new developments, techniques, and improvements in the Franchised System and our plans, policies, research, developments and activities to franchisees.

(j)     Customer Complaints.  You will provide customers with the ability to send comments and complaints to us. Upon receipt of any consumer comments, we will send to the consumer an automatic response as determined by legal counsel. We will review all consumer comments internally. With limited exception all complaints received will be immediately forwarded to franchisees for their review. As independent business owners, you will be required by our System Standards to communicate with the consumer and independently resolve all consumer complaints.

(k)     Other Assistance.  We will provide you with the other resources and assistance that we may develop and make generally available to all of our other franchisees.

8.     **YOUR OBLIGATIONS.  DURING THE TERM, YOUR OBLIGATIONS ARE AS FOLLOWS:**

(a)     Training.

1.     You will not open or operate the Franchised Unit without having at least one individual working full time at the Franchised Unit who has completed our 1TP program.  If a certified manager leaves your employment for any reason, you must hire a replacement manager within 30 days who must attend the next 1TP training program slot we make available.  You must pay any tuition and additional fees for materials we charge for training of additional operators after the first two attendees, at a rate of up to $500.00 per Person.   As of the Effective Date, we charge an "Additional Training Fee" of $500.00 per day plus travel, lodging and meals for trainers we provide at your request for additional training at your Franchised Unit.  We may change the amount of this Fee at any time in the Operation Manual.   You are responsible to pay all compensation, benefits, travel expenses, living expenses, and any other personal expenses for your designees

10

enrolled in the 1TP program. You must furnish proof of worker's compensation insurance coverage for such Persons before their training begins. Your trainees will not be considered borrowed servants of ours or our Affiliates for any purpose, and they will at all times remain under your control and supervision. Any of your employees who attend our operators training must sign a Management Confidentiality and Non-Competition Agreement before such training starts in substantially the form attached as <u>Attachment D</u>.

      2.    If you require or request additional training and operational support beyond the standard training and opening assistance that we provide, we may charge and "Additional Training Fee", which is currently Five Hundred Dollars ($500.00) per day plus the trainer's travel, lodging, and meal expenses for additional training and support. The Operations Manual specifies the basis on which we will determine the daily charge. We reserve the right to change this fee at any time or to charge a reasonable amount for any optional additional training we make available after you open the Franchised Unit.

      3.    If you hire a manager to replace the initial managers trained, or after a transfer and the new manager and new Owner-Operator has to complete the 1-Tom-Plumber training program, you must pay us tuition when you request a training reservation for the replacement manager. You also pay the replacement manager's compensation, benefits, travel, lodging, meals, and incidental costs during training. The tuition for the In-Term Training Program is up to $5,000 for a replacement manager for your Unit.

      4.    If you or any of your managers or trainers need to repeat our initial training program, you must pay a remedial training fee set forth in the Operations manual, currently set at $5,000 for each repeating attendee before retraining begins.

      5.    If your representative fails to attend any scheduled training and a substitute trainee is not found to replace the representative, you shall reimburse our out-of-pocket costs.

    (b)    <u>Operation of Franchised Unit</u>.

      1.    You will maintain and operate the Franchised Unit under the Franchised System in strict conformity with System Standards and policies, all as amended. You will maintain the Central Office and the Franchised Unit in clean, safe and sanitary condition, consistent with sound health and sanitation practices. You will use and comply with the System Standards for customer service and satisfaction, which may include money back guarantees and no-question refunds.

      2.    You will use the site of the Franchised Unit exclusively for the purpose of operating a Unit. You will not engage in any business or offer any Plumbing Services or services at the Franchised Unit not a part of the Franchised System without first obtaining our written consent. We may withdraw such consent in our sole discretion. All Plumbing Services, Products and other goods and services you offer and sell shall be of the highest quality and sold only in containers and with packaging and other materials approved by us. You shall not use or sell any ingredients or Plumbing Services that are outdated or unsafe for human use. You will offer and sell all Plumbing Services, ancillary products and services we designate in the Operations Manual as mandatory and you may sell products and services we designate in the Operations Manual as optional at your discretion. You set the service prices, terms and conditions of sale subject to our established maximum and minimum prices where permitted by law, and any limited time mandatory offers we establish to market products and services.

<center>11</center>

3.      You understand and agree that the Franchised System may include, in our sole discretion, requirements concerning organization, graphics, use of brand names and other product descriptions, illustrations and other design and content features. We may implement changes in (among other things) for Plumbing Services, Products, and other goods and services at selected 1-Tom-Plumber Units or within selected regions, all in our sole discretion. We may, from time to time, authorize any franchisee to test new product items, methods and product preparation instructions of manufacture, goods or other services and you agree to cooperate in any test marketing programs in compliance with our guidelines, without reimbursement or compensation of any kind beyond your retention of your related Gross Sales, net of the Royalty Fee.

4.      If a client contacts you directly about performing Plumbing Services within your Operating Area, you may perform the work and report on the Plumbing Services as we require in the Operations Manual. If you receive a request for Plumbing Services to be performed at a service location in the Operating Area of another franchisee or our Affiliate, you must report the request to us when you receive it and you may perform the Plumbing Services, but we reserve the right to assign future requests for Plumbing Services at the same service location to the other franchisee or our Affiliate that serves that Operating Area.

5.      You shall, at your sole expense, conform to all changes implemented by us to Franchised System immediately upon written notice from us unless our written notice specifies a later implementation date.  You shall not offer for sale or sell any other kind of products, merchandise or services, or otherwise deviate from our current System Standards or specifications for services, products or merchandise, except with our prior written consent.

6.      You shall conform to our prescribed inventory control procedures, including, without limitation, using prescribed proprietary systems to document inventory sold, remaining inventory levels and other information pertinent to inventory and restocking.  Such information shall be conveyed to us electronically and, upon request, in writing.

7.      You shall operate the Franchised Unit on all of the days and during the hours prescribed in the Operations Manual, unless you obtain our written approval of different days or hours or your Lease provides for different hours of operation.  Before the Opening Date, you shall advise us about operating hours required or limited by the Lease.  You shall prominently disclose the operating hours to the public in the manner required by the Operations Manual.  You shall open the Franchised Unit and be fully prepared to conduct business during all posted operating hours.

8.      You will maintain and operate the Franchised Unit in compliance with all applicable governmental laws, rules, regulations and ordinances. Any conflict between System Standards and any applicable governmental requirement will be resolved in favor of the more stringent standard.  You will obtain as and when needed all governmental permits, licenses and consents required by law to construct, acquire, renovate, operate and maintain the Franchised Unit and to offer all products and services you advertise or promote.  You will pay when due or properly contest all federal, state and local payroll, withholding, unemployment, beverage, permit, license, property, ad valorem and other taxes, assessments, fees, charges, penalties and interest, and will file when due all governmental returns, notices and other filings.  You will comply with all applicable federal, state and local laws, regulations and orders applicable to you and/or the Franchised Unit, including those combating terrorism such as the USA Patriot Act and Executive Order 13224.

(c)     Approved Products, Services and Suppliers.  You will follow the System Standards and specifications we establish for Products, and other goods, products and services procured for and in the operation of the Franchised Unit.  We will have the right to require you to obtain any product or service used in the operation of the Franchised Unit from us, our Affiliates, or suppliers we approve.  We reserve the right to require you to participate in a national or regional approved purchasing cooperative for the area in which the Franchised Unit operates.  You acknowledge that this agreement allows the System to maintain uniformity and consistency in Franchised Unit products, services, technology, support and management information systems.  We may discontinue or terminate the System requirement to use these vendors and allow such agreements to expire without succession or be terminated consistent with their respective terms, at our discretion.

(d)     Telephone Listings, Domain Names, and Web Pages.  You will not establish or maintain a published telephone listing for the Franchised Unit in all telephone books that we designate. You will not register, acquire or maintain control over any domain name or web page that describes or advertises the Franchised Unit or otherwise contains uses or displays our Proprietary Marks or Intellectual Property, or links to our websites, without our prior consent.

(e)     Franchised Unit Condition.  If the Franchised Unit suffers physical damage, you will restore the Franchised Unit to reflect the then current image, design and specifications of a Unit.  If a casualty substantially destroys the Franchised Unit and your Lease terminates or you are permitted to terminate the Lease, you may elect to terminate this Agreement when you terminate the Lease in lieu of restoring the Franchised Unit unless your financing obligates you to restore and operate the Franchised Unit.

(f)     Vehicle Condition.  If your Vehicles suffer physical damage, you will restore the Vehicles to reflect the then current image, design and specifications of a 1-Tom-Plumber vehicle.

(g)     Upgrades of Franchised Unit or Vehicle.  We may require you to upgrade your Franchised Unit or Vehicles to conform to changes in our System Standards, which may include new signage, image, décor, equipment, technology and image standards for new 1-Tom-Plumber Units or Vehicles.  We will not require any such upgrade within 2 years before the expiration date of the Initial Term or the Successor Term.  At the end of the fifth year of the Initial Term, the Initial Term, and each Successor Term, you must upgrade your Unit and/or Vehicles to our current entry standards and design elements, complete any retraining we require, upgrade to our current equipment package and install our current operating software and other equipment.  We may encourage you at any time to make a voluntary upgrade because of economic circumstances, competition, technological advances, brand imaging opportunities, or other compelling events or circumstances.  Your voluntary agreement to perform an upgrade in those cases will not constitute a required upgrade under this paragraph.

(h)     Your Employees.  You must recruit, hire, train, schedule, equip, dress, discipline, manage and supervise a competent, conscientious staff to meet our System Standards, compliant with such uniforms and/or dress code as we may prescribe in the Operations Manual, and take such steps as are necessary to ensure that your employees preserve good customer relations and the goodwill of the Franchised System.

(i)     Life Safety.  You must operate and maintain the Franchised Unit and Vehicles to meet the health and life safety standards and ratings applicable to the operation.  You must furnish to us, within five days after receipt thereof, a copy of all inspection reports, warnings, citations, certificates and/or ratings resulting from inspections conducted by any federal, state or municipal agency with jurisdiction over the Franchised Unit.  The Franchised Unit's or Vehicle's failure of any health, sanitation, life safety

13

inspection is a material breach of this Agreement and must be remedied within the time frame specified in the applicable regulations or code.

(j)     Material Contracts.  You must timely comply with your payment and performance obligations under the Lease and any note, indebtedness, mortgage, deed of trust, security deed, equipment lease, supply agreement for Products, utility contract, service agreement and other material contracts ("Material Contracts") applicable to you or the Franchised Unit and necessary to operate the Franchised Unit in compliance with System Standards.  You shall furnish to us, within 10 days after your receipt, a copy of all notices, letters, warnings, or any other communications from the counterparty of any Material Contract regarding any default under or termination of any Material Contract.  You must furnish a copy of any amendment, modification, replacement or supplement to the Lease.

(k)     Compliance with Laws & Regulations.  You must operate the Unit in compliance with applicable laws and regulations.  We will provide instructions on compliance with laws applicable to Plumbing Services in the Operations Manual.  If you obtain competent advice that you must effect compliance in a manner that differs from our instructions, or local laws require that you deviate from the instructions, then you are free to do so and you will not be in violation of this Agreement.

(l)     Meetings and Conventions.  We may conduct meetings and annual conventions to promote and support franchisees, provide information on the 1-Tom-Plumber brand and matters of mutual interest to Unit franchisees and managers, and to provide mandatory and optional training to Owners, Operating Principals and General Managers.  We may charge you a Convention Registration Fee for one or more attendees in the amount specified herein, which is payable when invoiced and not refundable, even if you or your representative do not attend the convention.  We may charge additional fees and tuition for additional attendees you are required or have the option to send to the event.

(m)     No Outsourcing, Subcontracting. You shall not hire third party or outside vendors or contractors other than our Affiliates to perform any services or obligations related to the Plumbing Services.

9.     **TECHNOLOGY, COMMUNICATIONS AND INTERNET.**

(a)     Computer Systems and Required Software.  We have the right to specify in the Operations Manual or otherwise in writing that you acquire and use in the operation of the Franchised Unit electronic data collection, storage, reporting, exchange and  interchange capability and services, including certain brands, types, makes and models of communications, hardware and software systems, peripherals and equipment, including without limitation: (i) back office accounting, inventory and management systems, (ii) storage, retrieval and transmission systems for data, audio, video and voice files, (iii) point of sale systems or such other types of cash registers as we may designate or approve ("Cash Register Systems"), (iv) physical, electronic and other security systems and procedures, (v) archival back-up systems, (vi) internet access capability and connectivity, and (vii) customer-facing marketing, ordering, entertainment, audio, video, internet access points and service systems (together, the "Technology").  We have the right, but not the obligation, to develop or have developed for us, or to designate computer software programs and accounting system software that you must use as part of the Technology ("Required Software").  You shall install, learn, use and integrate all updates, supplements, modifications or enhancements to the Required Software when we so require.  We may specify in the Operations Manual or otherwise the tangible media upon which you shall record data, the database file structure of the Technology and the requirements to ensure your compliance with legal and payment card industry security standards.  You must enter all transactions at the Franchised Unit on the Cash Register System as and when they occur.  You shall implement and periodically make upgrades and other changes to the Technology as we request

14

in writing (together, "Technology Upgrades") for all Franchised System Units. We may be the sole supplier of proprietary Technology or Technology Upgrades that we develop or acquire for use at all Franchised Units.

(b)     Data.   We may specify in the Operations Manual or otherwise in writing the information that you shall collect and maintain on the Technology.   You will maintain your Cash Register System and management systems on-line so that we may access them remotely at our discretion, copy stored data, update software, and view all records, files and reports available on or from those systems.  You shall not purge data unless so permitted under the Operations Manual.  You shall provide to us such reports as we may reasonably request from the data so collected and maintained.  All data you provide to us, transfer to us from your Technology and download from us to your Technology will be owned exclusively by us or the data source we identify.  We will have the right to use such data in any manner that we deem appropriate without compensation to you.  All other data you capture, create or collect in the operation of the Franchised Unit or from your affiliation with us (including, without limitation, consumer and transaction data), is and will be owned exclusively by us during the Term of, and following termination or expiration of, this Agreement.  You must provide to us in the format we require copies or original files of such data at our request.  We license the use of such data back to you, at no additional cost, solely for the Term and solely for your lawful use in the business franchised under this Agreement or in any other business that you own.  You may not lease, sell or rent such data to others.

(c)     Privacy & Security.   You shall abide by all applicable laws and payment card industry standards pertaining to the privacy and security of consumer, employee and transactional information ("Privacy Laws").   You shall comply with our System Standards and policies pertaining to Privacy Laws.  If there is a conflict between our System Standards and policies pertaining to Privacy Laws and applicable law, you shall: (a) comply with the requirements of applicable law; (b) immediately give us written notice of said conflict; and (c) promptly and fully cooperate with us and our counsel to determine the most effective way, if any, to meet our System Standards and policies pertaining to Privacy Laws within the bounds of applicable law.   You shall not publish, disseminate, implement, revise or rescind a data privacy policy without our prior written consent.   You shall encrypt personally identifiable information about customers and employees as required by Privacy Laws or the Operations Manual and follow all notification requirements, with a copy of all of your outbound notices to us, if any data breach, hack or unauthorized access event occurs.

(d)     Extranet.   We may, but are not required to, establish a dedicated Website with secure access for communication with and among franchisees and to offer information content relevant to operation of the Franchised Unit (the "Extranet").  If we establish an Extranet, then you shall comply with our requirements set forth in the Operations Manual or otherwise in writing for connecting to the Extranet and utilizing the Extranet in the operation of the Franchised Unit.  The Extranet may include, without limitation, and if so, will satisfy our obligations under this Agreement to provide to you, the Operation Manual, training and other assistance materials, and management reporting solutions (both upstream and downstream, as we may direct). You shall pay any fee imposed from time to time by us, or a third party service provider, in connection with hosting such Extranet, as set forth in the Operations Manual.

(e)     Websites.   Unless we otherwise approve in writing, you shall not establish a separate Website (the term "Website" is defined to mean a group of related documents that can be accessed through a common internet address), but shall only have one or more references or webpage(s), as we designate and approve in advance, within our Website.  However, you may request to establish a separate Website and shall submit to us with your request, for our prior written approval, a sample of the proposed Website domain name, format, visible content (including, without limitation, proposed screen shots) and non-visible content (including, without limitation, meta tags) in the form and manner we may reasonably

15

require. You may activate the Website only if we so approve in advance in writing (which we are not obligated to approve and which approval we have the right to revoke at any time), in which case then the following conditions shall apply:

> 1. Any Website owned or maintained by or for your benefit shall be deemed "advertising" under this Agreement, and will be subject to (among other things) our approval of content and appearance under Section 16.

> 2. You may not add inbound or outbound hyperlinks to or from, or modify the Website without our prior written approval as to such proposed hyperlinks or modification.

> 3. You shall comply with System Standards for Websites that we may prescribe in the Operations Manual or otherwise in writing.

> 4. You will establish such hyperlinks to our Website and others as we may request in writing.

> 5. You will not permit the entry, acceptance or confirmation of delivery or orders on the Website that would violate Section 3.

> (f)     Online Use of Marks and E-mail Solicitations. You shall not use the Proprietary Marks or any abbreviation or other name associated with the Franchised System or us as part of any e-mail address, domain name and/or other identification of you or your Owners in any electronic medium. You will not transmit or cause any other party to transmit on your behalf advertisements or solicitations by e-mail or other electronic media without first obtaining our written consent as to: (a) the content of such e-mail advertisements or solicitations and (b) your plan for transmitting such advertisements. You shall be solely responsible for compliance with any laws pertaining to sending e-mails including but not limited to the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003, as amended (known as the "CAN-SPAM Act of 2003"). Under no circumstances shall you send any e-mail to a Person or address outside the United States.

> (g)     Internet & Social Media Use. We reserve the right to establish, modify and terminate policies and procedures about Internet marketing, publicity, social media, blogging and other activity as part of System Standards included in the Operations Manual. You shall not register, purchase or obtain the right to control content that includes any Proprietary Mark offered under any domain name or Website except as authorized under our marketing program then in effect or with our consent. You may generate, post, modify and withdraw content for social media accounts at your discretion and without our specific consent so long as the content is consistent with our marketing program then in effect and the applicable System Standards. We reserve the right to establish policies and to control your access to social media for accounts related to the Franchised Unit, including without limitation the right to hold administrative privileges and rights for password and access control and to post and remove all photographs on such accounts. We may deny, suspend or revoke your access to such accounts if you are in default under this Agreement or you violate our System Standards regarding social media content and use. Under no circumstances shall you use social media accounts associated with the Franchised Unit to defame or disparage us, any of our Affiliates, any other franchisee or their Affiliates, any supplier or any customer or patron of your Franchised Unit, or engage in any publication or activity that is unlawful or detrimental to the goodwill of the Proprietary Marks, 1-Tom-Plumber brand or the Franchised System.

> (h)     Prohibitions. You are prohibited from using the Proprietary Marks, including "1-Tom-Plumber" to: (i) incur any obligation or indebtedness on behalf of yourself or us; and (ii) be all or part

16

of your entity name or other legal name, or as part of any e-mail or other electronic media address, domain name, URL, social media identifier, user name or other identification of you or your Owners in any electronic medium, or as a metatag, paid search term, or in any search engine optimization program, except as we expressly authorize in writing, in the Operations Manual or in any policy we issue regarding Internet advertising, marketing, social media, email and other on-line activity. You are also prohibited from engaging in any "gray market" transactions in which you buy from or sell to any Person outside the United States without our prior written consent. You are also prohibited from engaging in any transaction in which you know, or reasonably should know, that the products sold by you or the Unit are purchased for wholesale purposes or are intended for resale to consumers inside or outside the United States.

(i)     No Outsourcing without Prior Written Approval. You shall not hire third party or outside vendors other than our Affiliates to perform any services or obligations related to the Technology, Required Software, or any other of your obligations under this Section, without our prior written approval. We may condition our consideration of any proposed outsourcing vendor(s) upon, among other things, such third party or outside vendor's entry into a confidentiality agreement with us and you in a form we provide.

(j)     Changes to Technology. The parties acknowledge that technology used in the Unit business is dynamic and not subject to predictable patterns of development and change. To keep pace with technological needs and opportunities and to support the competitiveness of the Franchised System, you acknowledge that we shall have the right to establish, in writing, new and revised System Standards for the implementation of technology as part of the System. You shall abide by those new or revised System Standards as promulgated by us for implementation in all Franchised System Units.

10.     **E-MAIL COMMUNICATION. YOU ACKNOWLEDGE THAT WE ARE ENTITLED TO RELY UPON E-MAIL TO COMMUNICATE WITH YOU AS PART OF THE ECONOMIC BARGAIN UNDERLYING THIS AGREEMENT. TO FACILITATE THE USE OF E-MAIL TO EXCHANGE INFORMATION BETWEEN YOU AND US, YOU WILL MAINTAIN E-MAIL CAPABILITIES AS SPECIFIED IN THE OPERATIONS MANUAL. YOU AUTHORIZE THE TRANSMISSION OF E-MAIL FROM AND TO US, VENDORS AND OUR AFFILIATES ON MATTERS PERTAINING TO THE BUSINESS CONTEMPLATED UNDER THIS AGREEMENT. YOU WILL PROVIDE US WITH THE CURRENT E-MAIL ADDRESS, AND SHALL IMMEDIATELY NOTIFY US OF ANY CHANGE OF E-MAIL ADDRESS AND ANY TECHNICAL PROBLEMS WITH THE E-MAIL ACCOUNT OF YOU AND YOUR OWNERS THAT WOULD MAKE COMMUNICATIONS DELAYED OR IMPOSSIBLE. IF ANY SUCH E-MAIL ACCOUNT BECOMES DISABLED FOR ANY REASON, YOU SHALL IMMEDIATELY PROVIDE US WITH AN ALTERNATIVE E-MAIL ADDRESS. YOU WILL CAUSE YOUR OFFICERS, DIRECTORS, MEMBERS AND EMPLOYEES (AS A CONDITION OF THEIR ASSOCIATION OR POSITION WITH YOU) TO GIVE THEIR CONSENT (IN AN E-MAIL, ELECTRONICALLY, OR IN A PEN-AND-PAPER WRITING, AS WE MAY REASONABLY REQUIRE) TO TRANSMISSION OF OUR E-MAILS TO THEM, AND SUCH PERSONS SHALL NOT OPT-OUT, OR OTHERWISE ASK TO NO LONGER RECEIVE E-MAILS FROM US DURING THE TIME THAT SUCH PERSON WORKS FOR OR IS AFFILIATED WITH YOU. YOU ACKNOWLEDGE THAT IF YOU OPT-OUT, OR OTHERWISE ASK TO NO LONGER RECEIVE E-MAILS FROM US DURING THE TERM YOU WILL BE IN MATERIAL BREACH OF THIS AGREEMENT.**

11.     **COVENANTS NOT TO COMPETE. YOU ACKNOWLEDGE THAT THE NATURE OF THE PLUMBING SERVICES BUSINESS PERMITS A LICENSED PLUMBER TO PROVIDE THEM TO BUSINESS AND RESIDENTIAL CUSTOMERS IN A LARGE GEOGRAPHIC AREA FROM A SINGLE CENTRAL OFFICE. DURING THE TERM, YOU MAY**

17

**NOT ENGAGE, EITHER DIRECTLY OR INDIRECTLY THROUGH ANY FINANCIAL OR BENEFICIAL INTEREST IN ANY OTHER PERSON, IN ANY COMPETING BUSINESS, OTHER THAN A UNIT LICENSED BY US. FOR A PERIOD OF TWO YEARS AFTER THE TERMINATION OR EXPIRATION OF THIS AGREEMENT FOR ANY REASON, YOU MAY NOT ENGAGE IN ANY COMPETING BUSINESS, OTHER THAN A UNIT LICENSED BY US, WITHIN YOUR OPERATING AREA, WITHIN 25 MILES FROM THE NEAREST BOUNDARY OF YOUR OPERATING AREA IF YOU HAVE FEWER THAN 5 YEARS OF PLUMBING EXPERIENCE, OR WITHIN 40 MILES FROM THE NEAREST POINT OF YOUR OPERATING AREA IF YOU HAVE MORE THAN 5 YEARS OF PLUMBING EXPERIENCE, OR WITHIN ANY FRANCHISEE'S OPERATING AREA EXISTING OR THEN BEING DEVELOPED AT THE TIME OF TERMINATION, AS THEN LISTED ON OUR WEBSITE, AVAILABLE FROM US IN WRITING OR IN THE MANUAL, OR ANY DIRECTORY WE PROVIDE TO YOU. WE MAY REDUCE THE DURATION AND/OR GEOGRAPHIC SCOPE OF THIS PROVISION BY WRITTEN NOTICE TO YOU FOR APPLICABLE LAW. YOU WILL NOT EMPLOY OR SEEK TO EMPLOY ANY INDIVIDUAL WHO, AT THE TIME, CURRENTLY WORKS OR WORKED DURING THE PRECEDING THREE MONTHS FOR ANY OF OUR OTHER LICENSEES OR FRANCHISEES OR FOR US, EXCEPT WITH THE CONSENT OF THE AFFECTED LICENSEE OR FRANCHISEE OR WITH OUR CONSENT (AS APPLICABLE). WE WILL NOT EMPLOY OR SEEK TO EMPLOY ANY INDIVIDUAL WHO, AT THE TIME, CURRENTLY WORKS OR WORKED DURING THE PAST THREE MONTHS FOR YOU, EXCEPT WITH YOUR CONSENT.**

12. **CONFIDENTIAL INFORMATION. YOU ACKNOWLEDGE YOU HAVE NO INTEREST WHATSOEVER IN THE FRANCHISED SYSTEM EXCEPT THE LICENSE IN THIS AGREEMENT. YOU ACKNOWLEDGE THAT THE FRANCHISED SYSTEM CONSTITUTES OUR PROPRIETARY INFORMATION INCLUDING SOME CONFIDENTIAL INFORMATION AND THAT THE USE OR DUPLICATION OF THE FRANCHISED SYSTEM OTHER THAN AS PERMITTED UNDER THIS AGREEMENT WILL CONSTITUTE AN UNFAIR METHOD OF COMPETITION. YOU WILL NOT USE THE FRANCHISED SYSTEM IN ANY BUSINESS OR ANY CAPACITY FOR THE BENEFIT OF ANY PERSON EXCEPT AS PERMITTED UNDER THIS AGREEMENT OR ANOTHER WRITTEN AGREEMENT WITH US. YOU WILL TAKE ALL APPROPRIATE ACTIONS TO PRESERVE THE CONFIDENTIALITY OF ALL CONFIDENTIAL INFORMATION. ACCESS TO CONFIDENTIAL INFORMATION SHOULD BE LIMITED TO PERSONS WHO NEED THE CONFIDENTIAL INFORMATION TO PERFORM THEIR JOBS AND ARE SUBJECT TO YOUR GENERAL POLICY ON MAINTAINING CONFIDENTIALITY AS A CONDITION OF EMPLOYMENT OR WHO HAVE FIRST SIGNED A CONFIDENTIALITY AGREEMENT IN THE FORM ATTACHED TO THIS AGREEMENT, INCLUDED IN THE OPERATIONS MANUAL OR OTHERWISE ACCEPTABLE TO US. YOU WILL NOT PERMIT COPYING OF CONFIDENTIAL INFORMATION (INCLUDING, AS TO COMPUTER SOFTWARE, ANY TRANSLATION, DECOMPILING, DECODING, MODIFICATION OR OTHER ALTERATION OF THE SOURCE CODE OF SUCH SOFTWARE). YOU WILL USE CONFIDENTIAL INFORMATION ONLY FOR THE UNIT AND TO PERFORM UNDER THIS AGREEMENT. UPON TERMINATION (OR EARLIER, AS WE MAY REQUEST), YOU SHALL RETURN TO US ALL ORIGINALS AND COPIES OF THE OPERATIONS MANUAL, POLICY STATEMENTS AND CONFIDENTIAL INFORMATION "FIXED IN ANY TANGIBLE MEDIUM OF EXPRESSION," WITHIN THE MEANING OF THE U.S. COPYRIGHT ACT, AS AMENDED. YOUR OBLIGATIONS UNDER THIS SUBSECTION COMMENCE WHEN YOU SIGN THIS AGREEMENT AND CONTINUE FOR TRADE SECRETS (INCLUDING COMPUTER SOFTWARE WE LICENSE TO YOU) AS LONG AS THEY REMAIN SECRET AND FOR OTHER CONFIDENTIAL INFORMATION, FOR AS LONG AS WE CONTINUE TO USE THE**

18

**INFORMATION IN CONFIDENCE, EVEN IF EDITED OR REVISED, PLUS THREE YEARS. WE WILL RESPOND PROMPTLY AND IN GOOD FAITH TO YOUR INQUIRY ABOUT CONTINUED PROTECTION OF ANY CONFIDENTIAL INFORMATION.**

13. **FRANCHISED SYSTEM MANAGEMENT.**

(a) <u>Ownership</u>. We represent with respect to the Proprietary Marks that we, or one of our Affiliates, is the owner of all rights, title and interests in and to the Proprietary Marks. We and our Affiliates have taken and will take all steps reasonably necessary to preserve and protect the ownership and validity in and of the Proprietary Marks.

(b) <u>Display of Marks</u>. Your use and display of the Proprietary Marks will be subject to the following: (i) You shall use only the Proprietary Marks we designate, and use such Proprietary Marks only in the manner we authorize and permit; (ii) you shall use the Proprietary Marks only for the operation of the Franchised Unit at the Central Office authorized under this Agreement and Vehicles, or in advertising for the Franchised Unit; (iii) unless we otherwise authorize or require, you shall operate and advertise the Unit only under the name "1-Tom-Plumber," without prefix or suffix; (iv) during the Term, you shall identify yourself (in a manner reasonably acceptable to us) as the owner of the Franchised Unit when you make any use of the Proprietary Marks, including, but not limited to, uses on invoices, order forms, receipts and contracts, as well as the display of a notice in such content and form and at such conspicuous locations on the Vehicles and premises of the Central Office as we may designate in writing; (v) your right to use the Proprietary Marks is limited to such uses as are authorized under this Agreement and the Operations Manual, and any unauthorized use thereof shall constitute an infringement of the rights of the owner of the Proprietary Marks; and (vi) you shall execute any documents deemed necessary by us or our counsel to obtain protection for the Proprietary Marks or to maintain their continued validity and enforceability.

(c) <u>Infringements</u>. You shall promptly notify us of any suspected infringement of the Proprietary Marks, any known challenge to the validity of the Proprietary Marks, or any known challenge to our ownership of, or your right to use, the Proprietary Marks we license to you. You acknowledge that we shall have the sole right to direct and control any civil, administrative or other proceeding involving the Proprietary Marks, including any settlement. We shall also have the sole right, but not the obligation, to take action against uses by others that may constitute infringement of the Proprietary Marks. If we undertake the defense or prosecution of any litigation relating to the Proprietary Marks, you shall execute any and all documents and do such acts and things as may, in the opinion of our counsel, be necessary to carry out such defense or prosecution, including, without limitation, becoming a nominal party to any legal action.

(d) <u>Our Defense of You</u>. If you use the Proprietary Marks in compliance with this Agreement, we will defend you at our expense against any third party claim, suit or demand involving the Proprietary Marks arising out of your proper use thereof. We will reimburse you for your out-of-pocket costs in doing what we request under this Section, excluding the compensation costs of your employees, and we will pay the costs of any judgment or settlement. If such litigation is the result of your use of the Proprietary Marks in a manner not in compliance with this Agreement, you shall reimburse us for the costs of such litigation, including, without limitation, our attorney's fees and the cost of any judgment or settlement.

(e) <u>Reservation of Property Rights</u>. You expressly understand and acknowledge that: (i) we and our Affiliates are the owners of all rights, title and interests in and to the Proprietary Marks and the goodwill associated with and symbolized by them; (ii) the Proprietary Marks are valid and serve to identify the Franchised System and those who are authorized to operate under the Franchised System; (iii)

19

neither you nor any of your Owners shall directly or indirectly contest the validity or the ownership of the Proprietary Marks, nor shall you, directly or indirectly, seek to register the Proprietary Marks with any government agency, except with our express prior written consent; (iv) your use of the Proprietary Marks does not give you any ownership interest or other interest in or to the Proprietary Marks, except the license granted by this Agreement; (v) any and all goodwill arising from your use of the Proprietary Marks shall inure solely and exclusively to our benefit, and upon expiration or termination of this Agreement and the license granted under this Agreement, no monetary amount shall be assigned as attributable to any goodwill associated with your use of the System or the Proprietary Marks; and (vi) the right and license of the Proprietary Marks granted to you is not exclusive, and we have and retain the rights, among others:

    1.  To use the Proprietary Marks ourselves to offer and sell products and services;

    2.  To grant other licenses for the Proprietary Marks, in addition to those licenses already granted to existing franchisees; and

    3.  To develop and establish, or to become affiliated with, other systems using the same or similar Proprietary Marks, or any other proprietary marks, and to grant licenses or franchises thereto without providing any rights therein to you.

    (f)  <u>Substitute Marks</u>.  We reserve the right to substitute different Proprietary Marks for use in identifying the Franchised System and the Unit businesses operating thereunder if our currently owned Proprietary Marks no longer can be used, or if we determine that substitution of different Proprietary Marks will be beneficial to the Franchised System.

    (g)  <u>Control of Franchised System</u>.  We will control and establish requirements for all aspects of the System.  We may, in our discretion, change, delete from or add to the Franchised System, including any of the Proprietary Marks or System Standards, in response to changing market conditions. We may, in our discretion, permit deviations from System Standards, based on local conditions and our assessment of the circumstances.

    (h)  <u>Improvements</u>.  All present and future distinguishing characteristics, improvements and additions to or associated with the Franchised System by us, you or others, including, without limitation, all new and improved methods, product or service instructions, and preparation instructions for Plumbing Services, ingredients, new Plumbing Services and the like, and all present and future service marks, trademarks, copyrights, patents, and service mark and trademark registrations used and to be used as part of the Franchised System, and the associated goodwill, shall be our property and will inure to our benefit.  You acknowledge that System Standards include non-functional trade dress that is an integral part of the System, and you covenant that you will not, directly or indirectly through an Affiliate, use the trade dress in any structure that is not the Franchised Unit.  You also acknowledge that such Intellectual Property includes any product or service instructions, ideas, inventions, concepts, instructions, techniques of manufacture, preparation, display or service, or other know-how developed, marketed, or licensed as part of the Franchised System, whether created by us, an Affiliate, a predecessor, licensor or by you with our approval as outlined in the Operations Manual.  You grant to us a non-exclusive, perpetual, royalty-free worldwide license of all product or service instructions, concepts, instructions, ideas, inventions, techniques of manufacture, preparation, display or service, or other know-how, advertising materials and trade secrets created by or for you for use in, by or for the Franchised Unit, and you acknowledge that we and our Affiliates may incorporate, modify, supplement, sublicense or otherwise commercialize such information as part of the Franchised System or in any other manner.  At our request and expense, we may require you to execute and deliver an assignment of the ownership rights to any such

20

Intellectual Property or such other writing as we may request to transfer ownership to us, or pursue registration or other legal protection for such Intellectual Property.

(i)    Operations Manual.  During the Term, we will provide you with access to the Operations Manual, in a format we choose (including, without limitation, paper, CD/DVD or online).  We may from time to time revise the contents of the Operations Manual, and you will follow our instructions to make corresponding revisions to all of your copies of the Operations Manual and to comply with each change in any System Standard.  If there is any dispute as to the contents of the Operations Manual, the master copy of the Operations Manual we maintain in our home office shall be controlling.

(j)    Manual Controls.  The Operations Manual shall at all times remain our sole property regardless of format and shall at all times be kept, and the access codes and procedures for electronic versions shall be kept, in a secure place on the Franchised Unit premises.  You shall at all times treat the Operations Manual, any other written material created for or approved for use in the operation of the Franchised Unit and the information contained therein as confidential and shall use all reasonable efforts to maintain such information as proprietary and confidential.  Except for those portions of the Operations Manual that we designate in writing as appropriate for copying and use at the Franchised Unit, you shall not at any time copy, duplicate, record or otherwise reproduce the foregoing materials, in whole or in part, nor otherwise make the same available to any unauthorized Person.

14.    **REPORTS AND RECORDS.  WE WILL HAVE ACCESS TO YOUR FINANCIAL INFORMATION, INCLUDING YOUR GROSS SALES NUMBERS, THROUGH THE SOFTWARE APPLICATIONS AND TECHNOLOGY WE UTILIZE FOR JOB TRACKING AND BILLING.  UPON OUR REQUEST YOU WILL DELIVER TO US: COMPLETE QUARTERLY PROFIT AND LOSS STATEMENTS FOR THE FRANCHISED UNIT (AND ANY OTHER STATISTICAL REPORTS WHICH WE MAY REQUIRE UNDER THE OPERATIONS MANUAL); A COPY OF EACH MONTHLY PROFIT AND LOSS STATEMENT; AND A COPY OF ALL SALES TAX RETURNS FILED FOR THE FRANCHISED UNIT AS AND WHEN FILED WITH EACH APPROPRIATE TAXING AUTHORITY. WITHIN 90 DAYS AFTER THE END OF EACH FISCAL YEAR, YOU WILL, WITHOUT REQUEST, DELIVER TO US A COMPLETE PROFIT AND LOSS STATEMENT COVERING THE OPERATIONS OF THE FRANCHISED UNIT FOR THE PRECEDING FISCAL YEAR AND A BALANCE SHEET DATED AS OF THE CLOSE OF THAT FISCAL YEAR.  WE MUST OBTAIN THIS INFORMATION TO COMPLY WITH OUR LEGAL RESPONSIBILITIES.  YOU WILL KEEP ALL RECORDS OF THE FRANCHISED UNIT FOR AT LEAST SEVEN YEARS AFTER THE END OF THE FISCAL YEAR IN WHICH THEY ARE CREATED IN A MANNER AND FORM SATISFACTORY TO US AND WILL DELIVER ANY ADDITIONAL FINANCIAL, OPERATING AND OTHER INFORMATION AND REPORTS WHICH WE MAY REQUEST IN THE MANNER WE PRESCRIBE IN THE OPERATIONS MANUAL OR IN ANOTHER REASONABLE FORMAT. WE WILL HAVE THE RIGHT TO ASSEMBLE AND DISSEMINATE TO THIRD PARTIES FINANCIAL AND OTHER INFORMATION REGARDING YOU AND OTHER FRANCHISEES TO THE EXTENT REQUIRED BY LAW OR TO THE EXTENT NECESSARY OR APPROPRIATE TO FURTHER THE INTERESTS OF THE FRANCHISED SYSTEM AS A WHOLE.  WE WILL HAVE THE RIGHT TO DISCLOSE YOUR BUSINESS NAME, ADDRESS AND TELEPHONE NUMBER AS THEY APPEAR IN OUR RECORDS IN OUR FRANCHISE DISCLOSURE DOCUMENTS AND TO ANY PERSON MAKING INQUIRY AS TO THE OWNERSHIP OF THE FRANCHISED UNIT.  WE WILL NOT DISCLOSE SPECIFIC FINANCIAL INFORMATION REGARDING YOU OR THE FRANCHISED UNIT TO ANY PERSON WITHOUT (A) YOUR CONSENT OR (B) COMPULSION OF LAW.**

JRB3 4839-5087-0229
2950761-000001

15. **INSPECTION, TESTING AND AUDIT.**

(a)    Inspections.    We will have the right to inspect your Franchised Unit at any time during or immediately before or after regular business hours during the Term, with or without notice to you as part of our evaluation and quality assurance programs.  You will also permit us or our agents, at any reasonable time, to remove samples of Plumbing Services from your inventory, or from the Franchised Unit, without payment for such items, in amounts reasonably necessary for testing by us or an independent laboratory to determine whether said samples meet our then current System Standards and specifications. In addition to any other remedies we may have under this Agreement, we may require you to bear the cost of such testing if the supplier of the item has not previously been approved by us or if the sample fails to conform to our specifications.

(b)    Audits.    We also will have the right to audit your accounts, books of original entry, records and tax returns (including, without limitation, state and local sales tax reports and federal, state and local income tax returns) at all times during and after the Term.  You will make copies of those items available for audit at our corporate offices at your cost.  If the audit discloses that Gross Sales actually exceeded the amount you reported, you immediately must pay us any additional fees required by Section 5 plus interest at the rate specified in Section 5.  If the audit discloses that Gross Sales actually exceeded the amount reported by an amount equal to 2% of the originally reported Gross Sales or more, you also must reimburse us for our out-of-pocket costs and allocable administrative costs and overhead incurred for the audit and its enforcement.

16. **MARKET INTRODUCTION PLAN, ANNUAL MARKETING PLAN & LOCAL MARKETING.**

(a)    We will provide you with our base line Market Introduction Plan, including a budget template, at least 60 days before the anticipated opening of the Unit, including our market introduction materials, which are intend to facilitate the introduction of the Brand to the market and support the opening of the Unit through a concentrated, consistent marketing commitment from you during the immediate pre-opening and post opening periods.  You will develop and submit to us, at least 30 days before the anticipated opening date, any suggested modifications to the Market Introduction Plan for our comment and acceptance or rejection.  If you do not timely receive our approval, you must follow up with us using alternative methods of communication.  The Market Introduction Plan should provide for spending at least $10,000 during this period on advertising, marketing and promotion of the Unit.  Once accepted, you must proceed to execute and complete the Market Introduction Plan according to its timeline.  We will require proof of your expenditures and execution of the Plan as accepted.  We do not guarantee that the Market Introduction Plan will cause the Unit to open successfully.

(b)    We will provide you with a template for an "Annual Marketing Plan" when we provide the Market Introduction Plan and annually thereafter if there are any changes.  The Annual Marketing Plan template may be published in the Operations Manual.  You may submit modifications to the template Annual Marketing Plan on or before November 15 each year for our review.  If you do not receive our approval of the modifications to the plan, you must follow up with us using alternative methods of communication.  Once accepted, you must execute and implement the Annual Marketing Plan, including its timeline, for the year beginning January 1, or the balance of the first year of Unit operation.

(c)    During each fiscal quarter, you shall spend at least 2.00% of Gross Sales for local marketing and promotional expenses of the Franchised Unit consistent with the Annual Marketing Plan. Local marketing and promotional expenses include the cost of direct mail solicitations, public relations activities, community events and sponsorships, newspaper advertisements, telephone book listings and

22

advertisements, and other distributed promotional materials. Local marketing and promotional expenses do not include amounts spent on sign rental, consumable paper products for use in the Unit, or packaging for Plumbing Services which may contain one or more of the Proprietary Marks. You will conduct all marketing and promotional activities that use the Proprietary Marks or refer to the Franchised Unit in a dignified manner and in compliance with the System Standards and requirements we specify. You will submit for our approval samples of all advertising and promotional materials that you wish to use at least 30 days before making any financial commitment to use the materials. If we do not provide you our approval or notice of any objections to the proposed materials within 30 days after their receipt by us, the materials or content will be deemed approved. If you fail to discontinue the use of any unapproved materials within five days after notice from us, we may enter the Franchised Unit, remove any unapproved materials and hold the materials for proper disposition according to your instructions. If you do not spend at least 2.00% of Gross Sales on local marketing and advertising, you shall contribute the difference between the actual amount spent and the required amount to the 1-Tom-Plumber Brand Fund unless we have approved a lesser amount in writing.

(d) We reserve the right to establish an advisory council of franchisees that will advise us on advertising policies and other matters.

17. **ADVERTISING COOPERATIVE. WE MAY ESTABLISH ONE OR MORE ADVERTISING COOPERATIVES FROM TIME TO TIME AND, FURTHER, MAY MODIFY, TERMINATE AND REFORM ANY EXISTING ADVERTISING COOPERATIVE AT ANY TIME IN OUR SOLE DISCRETION. IF THE FRANCHISED UNIT OPERATES WITHIN A DMA FOR WHICH AN APPROVED ADVERTISING COOPERATIVE EXISTS, YOU WILL CONTRIBUTE TO THE ADVERTISING COOPERATIVE THE AMOUNTS REQUIRED BY THE COOPERATIVE UP TO 2.00% OF THE GROSS SALES OF THE FRANCHISED UNIT DURING EACH REPORTING PERIOD. UP TO 0.50% OF SUCH PAYMENTS MADE TO ANY COOPERATIVE WILL COUNT TOWARDS SATISFACTION OF YOUR MINIMUM LOCAL ADVERTISING SPENDING UNDER SECTION 16. ALL UNITS THAT WE OR OUR AFFILIATES OPERATE WILL PARTICIPATE IN ANY ADVERTISING COOPERATIVE THAT WE ESTABLISH FOR THE DMA IN WHICH THEY ARE LOCATED ON THE SAME BASIS AS THE FRANCHISED UNITS IN THE DMA. WE WILL ADMINISTER THE COOPERATIVE UNLESS WE DESIGNATE ANOTHER PARTY TO PERFORM THE ADMINISTRATIVE FUNCTIONS. THE COOPERATIVE MAY HAVE WRITTEN GOVERNING DOCUMENTS THAT WE MUST PROVIDE OR APPROVE, WHICH WILL BE AVAILABLE FOR ALL PARTICIPANTS IN THE COOPERATIVE TO REVIEW. EACH COOPERATIVE WILL MAINTAIN ACCOUNTING RECORDS AND COMPILE FINANCIAL STATEMENTS THAT WILL BE AVAILABLE FOR REVIEW BY ALL PARTICIPANTS. WE RETAIN THE POWER TO REQUIRE ANY COOPERATIVE TO BE FORMED, CHANGED, DISSOLVED OR MERGED WITH ANOTHER COOPERATIVE.**

18. **PROMOTIONAL PROGRAMS. YOU SHALL PARTICIPATE IN PROMOTIONAL PROGRAMS WE DEVELOP FOR THE FRANCHISED SYSTEM IN THE MANNER WE DIRECT IN THE OPERATIONS MANUAL OR OTHERWISE IN WRITING.**

19. **BRAND FUND. WE HAVE ESTABLISHED A BRAND FUND (THE "BRAND FUND"). YOU MUST PAY A BRAND FUND CONTRIBUTION TO US IN AN AMOUNT EQUAL TO 2.00% OF THE GROSS SALES OF THE FRANCHISED UNIT DURING THE PRECEDING WEEK IN ADDITION TO ANY DIFFERENCE REQUIRED UNDER SECTION 16(C). WE WILL ACCOUNT FOR ALL BRAND FUND CONTRIBUTIONS WE COLLECT IN A SEPARATE ACCOUNT. WE ALSO MAY DEPOSIT THE MARKETING, PROMOTIONAL AND OTHER**

23

PAYMENTS WE RECEIVE FROM SUPPLIERS INTO THE BRAND FUND. WE WILL DISBURSE THE BRAND FUND TO PAY FOR MARKETING, ADVERTISING, PROMOTIONAL, PUBLIC RELATIONS, AND OTHER SIMILAR ACTIVITIES INTENDED TO BENEFIT 1-TOM-PLUMBER UNITS, AND THEIR ADMINISTRATION. THOSE ACTIVITIES MAY INCLUDE (WITHOUT LIMITATION) (A) MARKET RESEARCH, (B) MARKETING TECHNOLOGY DEVELOPMENT AND IMPLEMENTATION, (C) CUSTOMER SERVICE, LOYALTY AND REWARD PROGRAMS, (D) MEDIA PURCHASES, (E) ADVERTISING PRODUCTION, (F) ADVERTISING AND PUBLIC RELATIONS AGENCY FEES AND EXPENSES, AND (G) PRODUCT RESEARCH AND DEVELOPMENT. WE ALSO MAY USE THE BRAND FUND TO PAY OR REIMBURSE US FOR OUR ADMINISTRATIVE OVERHEAD INCURRED FOR ACTIVITIES SUPPORTED BY THE BRAND FUND. ANY MONEYS IN THE BRAND FUND NOT SPENT AT THE END OF EACH FISCAL YEAR WILL REMAIN IN THE BRAND FUND, PROVIDED THAT AMOUNTS CONTRIBUTED TO THE BRAND FUND MAY BE USED TO PAY TAXES ASSOCIATED WITH UNSPENT AMOUNTS ON DEPOSIT IN THE BRAND FUND. WE WILL HAVE THE SOLE AND EXCLUSIVE DISCRETION TO DIRECT ALL ACTIVITIES AND PROGRAMS FUNDED BY THE BRAND FUND. WE GENERALLY WILL ADMINISTER THE BRAND FUND FOR THE BENEFIT OF ALL UNITS. YOU ACKNOWLEDGE THAT WE HAVE NO OBLIGATION EXPEND BRAND FUND AMOUNTS FOR YOUR BENEFIT EQUIVALENT OR PROPORTIONATE TO YOUR BRAND FUND CONTRIBUTIONS, AND WE DO NOT WARRANT OR GUARANTEE THAT YOU WILL RECEIVE OR DERIVE ANY BENEFIT FROM BRAND FUND ACTIVITIES. WE WILL MAKE ALL STUDIES AND REPORTS PRODUCED BY THE BRAND FUND AVAILABLE TO YOU AT NO COST AS CONFIDENTIAL INFORMATION. WE WILL MAKE COPIES OF ALL MATERIALS PRODUCED BY THE BRAND FUND FOR FRANCHISEE USE AVAILABLE TO YOU AT YOUR EXPENSE. WE WILL NOT USE THE BRAND FUND FOR ADVERTISING AND PROMOTION TO PROMOTE FRANCHISE RECRUITMENT ONLY, BUT WE MAY INCLUDE FRANCHISE RECRUITMENT LANGUAGE IN PUBLIC RELATIONS MATERIALS, GENERAL SOCIAL MEDIA, THE 1-TOM-PLUMBER WEBSITE AND CONSUMER MARKETING MATERIALS AND CONTENT. WE MAY SUSPEND, TERMINATE AND REINSTATE THE BRAND FUND AT ANY TIME. THE BRAND FUND WILL NOT TERMINATE, HOWEVER, UNTIL WE HAVE SPENT ALL MONEYS IN THE BRAND FUND FOR THE PURPOSES SET FORTH ABOVE.

20. **PUBLICITY AND PROMOTIONAL MATERIALS.** WE WILL HAVE THE RIGHT TO PHOTOGRAPH THE FRANCHISED UNIT OR VEHICLES AND TO USE THE PHOTOGRAPHS IN ANY OF OUR PUBLICITY OR ADVERTISING PROGRAMS. YOU CONSENT TO SUCH PHOTOGRAPHY AND USE, AND COVENANT TO COOPERATE IN SECURING THE PHOTOGRAPHS AND THE CONSENTS OF ANY INDIVIDUALS PICTURED. YOU WILL PLACE FRANCHISE RECRUITMENT ADVERTISING AND PROMOTIONAL MATERIALS FOR 1-TOM-PLUMBER FRANCHISES IN THE FRANCHISED UNIT AND ON OR IN THE VEHICLES IF AND WHEN WE SO REQUEST.

21. **INSURANCE.**

(a) Before opening the Franchised Unit, you must obtain and thereafter maintain during the Term the following minimum amounts and policy forms of insurance from a responsible carrier or carriers authorized to write coverage in your state having an A.M. Best rating of at least A-VI and that we find acceptable. The type of coverage includes:

24

1. Commercial General Liability coverage ($1 million single limit per occurrence; $2 million general aggregate limit, for both general liability and products /completed operations liability) for personal injury and property damage, including premises, independent contractors, products and completed operations, contractual, personal and advertising liability, on an occurrence basis, with coverage on a 1986 or later ISO commercial general liability form policy;

2. "All Risk" property coverage including a property damage limit for the full cost of replacement of the Franchised Unit and business interruption coverage for up to twelve months of projected earnings;

3. Business Automobile Liability covering liability arising out of any auto (including owned, hired and non-owned autos), with a minimum of $1 million combined single limit each accident;

4. Workers' Compensation or legally appropriate alternative covering all employees and contractors working at the Franchised Unit for statutory limits and Employers Liability with minimum limits of $500,000 bodily injury for each accident, $500,000 bodily injury by disease for each employee and $500,000 bodily injury disease aggregate;

5. A $1 million Umbrella Policy on an occurrence basis excess of covering excess of the underlying insurance described in (1), (3) and (4) above which is at least as broad as each and every underlying policy, provided that you may purchase more underlying coverage and less umbrella coverage under such policies as long as you maintain the total amount of the limits specified for each coverage area;

6. Products/completed operations insurance with an aggregate limit of $2 million;

7. Personal and advertising injury insurance with a limit of $1 million;

8. Fire damage legal liability limit insurance with a limit of $300,000;

9. Business income coverage insurance of 50% of annual Gross Sales;

10. Cyber coverage insurance of $250,000;

11. Professional liability insurance with a limit of $1 million per occurrence and $2 million aggregate;

12. Other insurance as may be required by the state or locality of the Franchised Unit;

13. Employment practices liability insurance with a limit of $500,000; and

14. Employee Dishonesty/Fidelity insurance with a limit of $100,000.

(b) Other Provisions. All of the liability insurance policies, other than Workers' Compensation, must name us, 1 Tom Plumber Global Inc., 1 Tom Plumber Brand Inc., 1 Tom Plumber Supply Inc. and their respective officers, directors, members, shareholders, partners and employees as additional insureds on a primary basis for operations of the Franchised Unit. The form of additional insured

25

endorsement will be ISO CG 2010 11 85 Form B or its equivalent. If the additional insured has other insurance applicable to a loss, it will be on an excess or contingent basis. The additional insured's insurance coverage will not be reduced by the existence of such other insurance. Your policies must constitute primary policies of insurance with regard to other insurance, must contain a waiver of subrogation provision in favor of us as it relates to the operation of the Franchised Unit, and must provide for at least 30 days' notice to us prior to cancellation, non-renewal or amendment. Your policies may provide the minimum limits set forth above through a single policy or through the combination of primary and umbrella policies. We may modify the policy limits, policy requirements and coverage types during the Term in the Operations Manual.

(c)     Certificate of Insurance. Before you commence renovation or construction of the Franchised Unit, you must furnish us with certificates of insurance evidencing that you have obtained the required insurance in the forms and amounts as specified above. You must deliver evidence of the continuation of the required insurance policies at least 30 days prior to the expiration dates of each existing insurance policy. If you fail to acquire and maintain the required insurance coverage, we will have the right (but not the obligation), at your expense, to acquire and administer the required minimum insurance coverage on your behalf. We may end all of our duties with respect to the administration of any required insurance policies by giving you 10 days' notice.

(d)     Remedial Insurance. If you, for any reason, shall fail to procure or maintain the insurance required by this Agreement and the Operations Manual, we shall have the right and authority (without any obligation to do so) immediately to procure such insurance and to charge the cost to you, together with a reasonable fee for acquiring each policy. You shall pay the same to us immediately upon notice.

22.     **ASSIGNMENTS & TRANSFERS.**

(a)     Our Assignments. We may assign, delegate or subcontract all or any part of our rights and duties under this Agreement, including by operation of law, without notice and without your consent. You are not the third party beneficiary of any contract with a third party to provide services to you under this Agreement, but we are responsible for the performance of all of our obligations to you under this Agreement. We may dissolve, terminate and wind up our business under applicable law but we will transfer the System and this Agreement to a party that will perform the franchisor's obligations and that will assume this Agreement in writing. We will have no obligations to you after you are notified that our transferee has assumed our obligations under this Agreement except those that arose before we assign this Agreement.

(b)     Your Assignments. This Agreement is personal to you (and your Owners if you are an entity). We are relying on your experience, skill and financial resources (and that of your Owners and the Guarantors, if any) to sign this Agreement with you. You may not directly or indirectly transfer, assign, grant a security interest in, or pledge any direct or indirect interest in this Agreement, the Franchised Unit, the Vehicles, the Central Office or in you to any Person without our prior consent, which we may withhold or condition in our sole discretion.

(c)     Transfer Conditions. We condition our consent to a transfer or assignment on satisfaction of one or more of the following: (i) the proposed transferee must satisfy all of the requirements and conditions then being used to qualify as a new franchisee of ours; (ii) the proposed transferee must comply with Section 24; (iii) you must satisfy all of your monetary obligations then due and owing to us and our Affiliates; (iv) you must cure all existing defaults under this Agreement; (v) you and your guarantors must execute and deliver a general release of all claims and causes of action against us and our

26

Affiliates; (vi) the transferee must execute and deliver our then current form of franchise agreement with the same Royalty Fee and the same expiration date and remaining Successor Term (if any) as set forth in this Agreement; (vii) you must pay us a "Transfer Fee" equal to 25% of the then current initial franchise fee for the Franchised Unit if you transfer this Agreement or the Franchised Unit, or in the event of an ownership change involving a change of Control unless the transfer is (1) an initial transfer of the Franchised Unit and this Agreement from an individual to an entity owned by the individual or (2) equity interests conveyed to any of your existing owners or any member of your immediate family; and (viii) the purchase price paid by the proposed transferee must not negatively impact the viability of the Unit in our sole discretion. If you are an individual, then in the event of your death, permanent disability or appointment of a guardian for you, this Agreement will terminate 6 months after your death, permanent disability or appointment of a guardian unless we give our consent within that 6-month period to the assignment of this Agreement to a successor by law. The Transfer Fee is not refundable once paid.

(d)    <u>Transfer to Preferred Transferee</u>.  The Transfer Fee will be waived if the transaction meets the following criteria for transfer to a "Preferred Transferee," which we define as any of the following: (i) any entity controlled by the transferor franchisee, (ii) an entity or wholly owned subsidiary of an entity that has been a System franchisee for at least five years prior to the transfer date and has had, during such five year period, no defaults that remained uncured after the expiration of the cure period and no events that would have allowed us to terminate without a right to cure under any Franchise Agreement with us, (iii) an entity that is owned and subject to Control by a Person who has owned or managed a 1-Tom-Plumber Unit for a period of at least five years, or (iv) the transfer occurs as a result of the death or disability of an Owner and the steps required in Section 25 are observed. The transferee will be required to take and pay for 1TP at our then current tuition charge, which as of the Effective Date is $5,000.

23.    <u>**RIGHTS OF FIRST REFUSAL AND PURCHASE OPTION.**</u>

(a)    Prior to the sale or transfer of any interest that constitutes Control (the "Offered Interest") of the Franchised Unit, of one of your Vehicles, or of you, you must notify us of the proposed sale or transfer and deliver to us the name and address of the proposed purchaser or transferee, the proposed purchase price, and all other terms and conditions of the proposed sale or transfer of the Offered Interest. In addition, you must deliver to us one photocopy of all proposed purchase agreement, if any and all other agreements and instruments signed and to be signed in the transaction, and copies or electronic access to all diligence, offering and other materials furnished to the proposed purchaser as part of the selling process. Within 30 days after we receive the foregoing notice and materials, we will have the right and option to send notice to you that we intend to acquire the Offered Interest on the same terms and conditions as contemplated by the third party. If we do not send notice of our intent to acquire the Offered Interest within the 30-day period, you may proceed with the sale or transfer as disclosed to us, subject to our rights as set forth in Section 22 of this Agreement, as long as the terms and conditions of the sale or transfer stay identical to those as originally disclosed to us. If we do not exercise our right of first refusal, you have 60 calendar days or as stipulated by law to complete the sale. Our failure to exercise our right of first refusal will not constitute a waiver of any other provision of this Agreement, or our right of first refusal as to any subsequent proposed sale or transfer. Any material change in the terms of the proposed sale or transfer prior to closing will constitute a new sale or transfer, subject to the same right of first refusal by us as for the initial sale or transfer. Any sale or transfer attempted without first giving us the right of first refusal specified in this Section 23 will render the attempted sale or transfer null and void. We may utilize the remedy of specific performance to enforce this right.

(b)    Within thirty (30) days before or after the termination or expiration of this Agreement, we have the right and option to purchase the Franchised Unit tangible assets and assume the Lease for the Central Office. We will give you notice of our intent to purchase within this time frame, and

27

in response you will provide us with current copies of the Lease for the Central Office, a complete schedule of the Franchised Unit's tangible assets and their book value, a profit and loss statement for the twelve full months preceding the date of the notice and a copy of all federal and state sales and income tax returns and tax payment verification of the Franchised Unit and your franchisee entity filed during or for that period, a list of employees and their current compensation, and a list of all vendors and suppliers for the Franchised Unit. We will send you a written offer to purchase the assets at fair market value within ten (10) days after we receive all of this information, together with conveyancing documents. If you do not accept the offer within that time, you may make a counter offer within ten (10) days after you receive our offer. If we do not accept the offer and we elect to proceed with the transaction, than the purchase price for the tangible assets will the greater of (i) the book value of the tangible assets shown on the schedule you send us, or (ii) three (3) times the earnings before interest, taxes, depreciation and amortization shown on the profit and loss statement you sent to us. We will hold back from the purchase price an amount equal to unpaid state sales taxes for the months you have not paid plus two months' average sales tax payments until you provide a state sales tax clearance letter from your state. We will close the transaction within ten (10) days after the purchase price has been determined or agreed, subject to your first obtaining consent of the landlord of the location to assignment of the Lease. If that consent has not been obtained within twenty (20) days after the price has been determined, then we may abandon the transaction at any time before the consent is obtained. We will cooperate to obtain such consent, but will not agree to modification of the Central Office Lease or providing a personal guaranty as a condition to such consent.

24. **BUSINESS ENTITY FRANCHISEE. IF YOU CONSTITUTE A BUSINESS ENTITY, EACH OF YOUR OWNERS MUST EXECUTE THE GUARANTY AND RESTRICTION AGREEMENT ATTACHED AS ATTACHMENT C. YOUR CERTIFICATE OF INCORPORATION, SHAREHOLDERS' AGREEMENT, PARTNERSHIP AGREEMENT, TRUST AGREEMENT, OPERATING AGREEMENT, OR OTHER SIMILAR AGREEMENT (A "CORE AGREEMENT") MUST PROVIDE THAT YOUR PURPOSE WILL CONSIST ONLY IN THE DEVELOPMENT, OWNERSHIP, OPERATION AND MAINTENANCE OF 1-TOM-PLUMBER UNITS. THE CORE AGREEMENT MUST PROHIBIT THE ISSUANCE OF ANY ADDITIONAL EQUITY OWNERSHIP INTERESTS OR THE TRANSFER, ASSIGNMENT OR PLEDGE OF ANY ISSUED EQUITY OWNERSHIP INTERESTS WITHOUT OUR CONSENT AND MUST PROVIDE THAT EACH CERTIFICATE OR DOCUMENT ISSUED TO EVIDENCE ANY EQUITY OWNERSHIP INTEREST WILL CONTAIN A LEGEND DISCLOSING THE FOREGOING RESTRICTION. IN GIVING OUR CONSENT UNDER SECTION 22 TO ANY ISSUANCE OR TRANSFER OF YOUR EQUITY INTERESTS, WE MAY IN OUR DISCRETION IMPOSE ONE OR MORE CONDITIONS, INCLUDING (WITHOUT LIMITATION) THE REQUIREMENT THAT THE INDIVIDUAL BENEFICIAL OWNER OF THE EQUITY OWNERSHIP INTEREST EXECUTE THE FORM OF GUARANTY AND RESTRICTION AGREEMENT ATTACHED AS ATTACHMENT C OR A SUPPLEMENT TO THE ORIGINAL SUCH AGREEMENT ACCEPTABLE TO US IN FORM AND SUBSTANCE ADDING SUCH PERSON AS A "GUARANTOR." YOU MUST DELIVER TO US ALL OF THE DOCUMENTS DEMONSTRATING COMPLIANCE WITH THIS SECTION WHEN WE SO REQUEST.**

25. **DEATH OR APPOINTMENT OF GUARDIAN OR CONSERVATOR OF A PRINCIPAL. UPON THE DEATH OF AN OWNER, OR THE APPOINTMENT OF A PERMANENT GUARDIAN OR CONSERVATOR TO MANAGE THE OWNER'S AFFAIRS, THE OWNER'S TRUSTEE, CONSERVATOR OR OTHER PERSONAL REPRESENTATIVE MAY HOLD THE DECEASED'S EQUITY INTEREST IN THE FRANCHISEE ENTITY FOR UP TO SIX MONTHS AND MAY ONLY TRANSFER THE DECEASED'S INTEREST FROM THE ESTATE, A TESTAMENTARY TRUST OR INTER VIVOS TRUST TO A THIRD PARTY WE APPROVE UNDER THE PROCEDURES SET FORTH IN THIS AGREEMENT. IF THE OWNER**

28

WAS THE OWNER-OPERATOR, THEN WE MAY TREAT THE PERSONAL REPRESENTATIVE, TRUSTEE OR CONSERVATOR AS THE OWNER-OPERATOR UNTIL YOU APPOINT SOMEONE ELSE. ANY FAILURE TO COMMENCE ADMINISTRATION OF THE DECEDENT'S ESTATE WITHIN 90 DAYS AFTER DEATH OR ANY DISTRIBUTION OF THE DECEDENT'S EQUITY INTEREST IN THE FRANCHISEE ENTITY WITHOUT OUR CONSENT IF SUCH DISTRIBUTION OPERATES AS AN ASSIGNMENT, IS A MATERIAL BREACH OF THIS AGREEMENT.

26. **TEMPORARY DISABILITY OF AN OWNER.** IF A PHYSICIAN, COURT OR ADMINISTRATIVE AGENCY DETERMINES THAT AN OWNER-OPERATOR OR AN OWNER OWNING A CONTROLLING INTEREST IN YOU HAS BECOME TEMPORARILY DISABLED AND INCOMPETENT TO MANAGE HIS OR HER OWN AFFAIRS, WE HAVE THE RIGHT TO REQUIRE THAT A DIFFERENT OWNER-OPERATOR BE APPOINTED UNTIL THE OWNER'S PERMANENT STATUS IS DETERMINED. WE MAY REQUIRE THAT THE OWNER'S EQUITY INTEREST BE TRANSFERRED TO A THIRD PARTY ACCEPTABLE TO US FOLLOWING THE ASSIGNMENT CONDITIONS AND PROCEDURES IN THIS AGREEMENT IF THE TEMPORARY DISABILITY DOES NOT RESOLVE WITHIN SIX MONTHS AFTER THE TEMPORARY DISABILITY IS DETERMINED.

27. **SECURITIES OFFERINGS.** IF YOU INTEND TO ENGAGE IN A PUBLIC OR PRIVATE OFFERING OF YOUR EQUITY INTERESTS, THEN YOU MUST SUBMIT FOR OUR REVIEW YOUR OFFERING MATERIALS OR PROSPECTUS BEFORE YOU FILE THE DOCUMENT OR COMMENCE ITS USE. NO OFFERING BY YOU OR ANY AFFILIATE SHALL IMPLY (BY USE OF THE PROPRIETARY MARKS OR OTHERWISE) THAT WE ARE PARTICIPATING IN AN UNDERWRITING, ISSUANCE OR OFFERING OF YOUR SECURITIES OR THOSE OF AFFILIATES. OUR REVIEW OF ANY OFFERING MATERIAL SHALL BE LIMITED SOLELY TO THE RELATIONSHIP BETWEEN YOU AND US (AND ANY OF OUR AFFILIATES, IF APPLICABLE), AN ACCURATE DESCRIPTION OF OUR SYSTEM, AND THE ABSENCE OF ANY DISCLOSURE OF CONFIDENTIAL INFORMATION ABOUT US OR THE SYSTEM. WE MAY, AT OUR OPTION, REQUIRE THAT THE OFFERING MATERIALS MAKE A WRITTEN STATEMENT WE PRESCRIBE ABOUT THE LIMITATIONS STATED IN THE PRECEDING SENTENCE. YOUR INDEMNIFICATION OBLIGATIONS IN SECTION 35 INCLUDE CLAIMS RELATING TO YOUR SECURITIES OFFERING, DISCLOSURE MATERIALS AND COMPLIANCE WITH APPLICABLE LAWS AND REGULATIONS. FOR EACH PROPOSED OFFERING, YOU SHALL PAY US A NON-REFUNDABLE FEE $10,000 WHEN YOU REQUEST OUR PARTICIPATION. WE RESERVE THE RIGHT TO CHANGE YOU SUCH GREATER AMOUNT AS IS NECESSARY TO REIMBURSE US FOR OUR REASONABLE COSTS AND EXPENSES (INCLUDING LEGAL AND ACCOUNTING FEES) FOR REVIEWING THE PROPOSED OFFERING MATERIALS. YOU MUST SUBMIT YOUR OFFERING MATERIALS FOR OUR REVIEW AT LEAST 30 DAYS IN ADVANCE OF THE ANTICIPATED FILING OR RELEASE DATE. ANY SUCH OFFERING SHALL BE SUBJECT TO OUR APPROVAL AS TO THE STRUCTURE AND CONTROL OF THE OFFEROR (AND YOU, IF YOU ARE NOT THE OFFEROR) AFTER THE FINANCING IS COMPLETED. YOU SHALL REIMBURSE US FOR OUR REASONABLE COSTS AND EXPENSES (INCLUDING LEGAL AND ACCOUNTING FEES) FOR REVIEWING PERIODIC REPORTS FILED BY YOU AS ISSUER OR REGISTRANT.

28. **TERMINATION BY YOU.** IF WE SUBSTANTIALLY FAIL TO PERFORM ANY OF OUR MATERIAL OBLIGATIONS TO YOU UNDER THIS AGREEMENT, YOU MUST GIVE US WRITTEN NOTICE OF NON-PERFORMANCE AND AT LEAST 60 DAYS TO CURE THE

**FAILURE. IF THE FAILURE CONTINUES AT THE END OF SUCH 60-DAY CURE PERIOD, YOU MAY TERMINATE THIS AGREEMENT ON WRITTEN NOTICE TO US DELIVERED AT ANY TIME BEFORE WE CURE THE FAILURE. YOU MAY NOT WITHHOLD THE PAYMENT OF ANY FEES DUE UNDER THIS AGREEMENT DURING THE PENDENCY OF CURE PERIOD, AND ANY PAYMENT BY YOU OF FEES ACCRUING AFTER THE EXPIRATION OF THE CURE PERIOD WILL BE DEEMED A WAIVER OF OUR DEFAULT BY YOU.**

29. **TERMINATION BY US FOR INCURABLE DEFAULTS. WE MAY TERMINATE THIS AGREEMENT EFFECTIVE IMMEDIATELY (OR AT THE EARLIEST TIME ALLOWED UNDER APPLICABLE LAW, OR AFTER A CURE PERIOD WHICH WE MAY ALLOW IN OUR SOLE DISCRETION) UPON WRITTEN NOTICE TO YOU FOR ANY OF THE FOLLOWING EVENTS:**

(a)     You close or abandon the Franchised Unit or a Vehicle for a period of (i) three consecutive business days, (ii) five days in any 12-month period, (iii) during the hours and days of required Unit operation under the Operations Manual, except for any closure, remodeling or vacation we approve in advance, and except during the pendency of any force majeure event beyond your control;

(b)     You or any of your Owners who is a Guarantor request the appointment of a receiver or have a receiver appointed for the Franchised Unit, you or any of your or their assets;

(c)     You or any of your Owners who is a Guarantor become insolvent or make a general assignment for the benefit of your or their creditors;

(d)     You or any of your Owners who is a Guarantor commence a case for relief or have an order for relief entered for you or them under the United States Bankruptcy Code or any foreign equivalent, or file or have filed against you a case for reorganization that is not dismissed within 60 days after filing;

(e)     You or any of your Owners suffer a conviction for, or plead guilty or *nolo contendere* to a crime involving moral turpitude or any other offense, or an incident occurs at or involving the Unit or an off-premises service provided by the Unit, reasonably likely, in our opinion, to have an adverse effect on the goodwill of the Proprietary Marks or name and reputation with the consuming public of 1-Tom-Plumber Units;

(f)     We discover a material inaccuracy in any of your representations in this Agreement or in any application you submitted to us to become a franchisee, or make materially false statements to us or any of our Affiliates;

(g)     You underreport Gross Sales for any calendar quarter or calendar year (i) by two percent or more at least three times in any 36-month period, or (ii) by at least five percent for any Reporting Period or calendar year;

(h)     You maintain false books or records or submit materially false reports to us or any of our Affiliates, including submission of false tax returns and forms or you have collected from customers for taxes and fail to turn over such amounts, unless you are properly contesting your obligation to pay or the amount of taxes due;

(i)     You fail to obtain our advance written permission when required under this Agreement;

30

(j)  You breach the same provision of this Agreement on three occasions within any 12-month period, with our having given you the required notice of the first two breaches (whether or not timely cured by you);

(k)  You violate any of Sections 8(b), 9(h), 11, 12, 22, 23, 25, 26, or 27, or commit a breach which, by its nature, you cannot cure or with regard to which you notify us that you do not intend to cure;

(l)  A court, administrative tribunal, health department having jurisdiction over the Franchised Unit or an independent laboratory determines that a preventable incident of illness is attributable to the Franchised Unit, and we determine in good faith that such incident resulted from your breach of System Standards or this Agreement;

(m)  You operate the Franchised Unit, or allow the Franchised Unit to be used, in a manner that, in our sole discretion, in any way jeopardizes the safety or welfare of customers, the public or the Unit staff, violates applicable law, or is damaging or potentially damaging to the goodwill, reputation and good name of the Proprietary Marks and the 1-Tom-Plumber brand;

(n)  You default under any indebtedness with an outstanding principal amount of at least $100,000, such indebtedness is accelerated and you do not repay, refinance or cause the reversal of the acceleration of the indebtedness to restore its original payment terms within 30 days;

(o)  You fail to either (1) (i) gain our acceptance of your proposed Central Office, and (ii) sign a lease we approve as to form, or a purchase agreement for the accepted Central Office within 60 days (or 90 days if you exercise your extension option) after the Effective Date, or (2) open your completed Franchised Unit with our authorization under Section 6(i) within 180 days after the Commitment Date;

(p)  Your Franchised Unit fails to have a minimum annual Gross Sales of $500,000 beginning after the second anniversary of the opening of the Central Office; or

(q)  You fail to complete the initial training to our satisfaction.

30.  **TERMINATION BY US FOR CURABLE DEFAULTS. WE MAY TERMINATE THIS AGREEMENT IF YOU FAIL TO CURE ANY MONETARY DEFAULT AFTER AT LEAST FIVE BUSINESS DAYS' NOTICE OF THE MONETARY DEFAULT. WE MAY TERMINATE THIS AGREEMENT IF YOU FAIL TO CURE ANY NON-MONETARY DEFAULT AFTER AT LEAST 30 DAYS' NOTICE OF THE NON-MONETARY DEFAULT. A MONETARY DEFAULT MEANS YOUR FAILURE TO MAKE ANY PAYMENTS AS AND WHEN DUE TO US OR TO OUR AFFILIATES, OR TO MAINTAIN THE INSURANCE REQUIRED UNDER THIS AGREEMENT. A NON-MONETARY DEFAULT MEANS (A) ANY DEFAULT IN THE PERFORMANCE OF ANY OF YOUR OTHER OBLIGATIONS UNDER THIS AGREEMENT OR ANY OTHER AGREEMENT WITH US OR OUR AFFILIATES, OTHER THAN THE FAILURE TO MAKE ANY PAYMENTS AS AND WHEN DUE TO US OR OUR AFFILIATES; OR (B) ANY CONDITION WHICH MAKES THE CONTINUED OPERATION OF THE FRANCHISED UNIT MORE LIKELY THAN NOT A DANGER TO PUBLIC HEALTH OR SAFETY. NOTWITHSTANDING THE FOREGOING, WE WILL NOT TERMINATE THIS AGREEMENT SOLELY BECAUSE YOU OR AN AFFILIATE DEFAULTS UNDER ANOTHER WITH US.**

31.  **TERMINATION BY US FOR COMMERCIAL IMPRACTICABILITY. THE PARTIES AGREE THAT THE COMMERCIAL PURPOSE OF THIS AGREEMENT IS FOR US**

31

**TO LICENSE THE FRANCHISED SYSTEM SPECIFIED BY US TO YOU FOR USE IN OPERATING THE FRANCHISED UNIT STRICTLY IN ACCORDANCE WITH THE OPERATIONS MANUAL, IN EXCHANGE FOR PAYMENT OF THE FEES AND UNDER THE CONDITIONS SET FORTH IN THIS AGREEMENT. THIS AGREEMENT INTENDS FOR YOU TO CONTROL THE TERMS AND CONDITIONS OF EMPLOYMENT FOR THE EMPLOYEES OF THE FRANCHISED UNIT, AND TO SUPERVISE SUCH EMPLOYEES AS THEIR EMPLOYER, AS SET FORTH IN SECTION 38, WITHOUT CONSTITUTING US AS A JOINT EMPLOYER OF YOU OR YOUR EMPLOYEES. YOU ACKNOWLEDGE THAT WE ARE NOT IN THE BUSINESS OF OWNING AND OPERATING ANY FRANCHISED UNIT, AND YOU HAVE INDEPENDENTLY DECIDED TO ENTER INTO THIS AGREEMENT TO OBTAIN THE RIGHT TO USE THE FRANCHISED SYSTEM SO AS TO ENTER INTO THE TRADE AND BUSINESS CONTEMPLATED BY THE FRANCHISED SYSTEM. WE MAY TERMINATE THIS AGREEMENT BY WRITTEN NOTICE TO YOU WITHOUT PENALTY AND WITHOUT PAYMENT OF ANY REFUNDS OR DAMAGES TO YOU, AND YOU WILL FOLLOW YOUR POST-TERMINATION OBLIGATIONS UNDER SECTION 33 AT YOUR EXPENSE, IF WE DETERMINE IN OUR SOLE DISCRETION THAT EITHER (I) A LAW OR REGULATION IS ENACTED, PROMULGATED, REPEALED, MODIFIED OR AMENDED, (II) A JUDICIAL OR ADMINISTRATIVE TRIBUNAL OR ADMINISTRATIVE AGENCY HAS ISSUED, PUBLISHED OR RELEASED A DECISION, RULING OR OPINION IN A MATTER NOT INVOLVING THE PARTIES DIRECTLY OR INDIRECTLY THAT WE REASONABLY EXPECT WILL AFFECT APPLICABLE LAW OR ITS INTERPRETATION, OR (III) AN ADMINISTRATIVE AGENCY, ARBITRATOR OR JUDGE HAS ISSUED AN INTERIM OR FINAL DECISION IN A MATTER IN WHICH THE PARTIES ARE INVOLVED DIRECTLY OR INDIRECTLY, WHICH (A) FRUSTRATES OR ADVERSELY AFFECTS OR COULD REASONABLY BE EXPECTED TO AFFECT ADVERSELY THE PURPOSES OF THIS AGREEMENT, (B) MAKES PERFORMANCE OF THIS AGREEMENT COMMERCIALLY IMPRACTICABLE, (C) EFFECTIVELY MODIFIES THE ALLOCATION OF RISK, BENEFITS AND BURDENS AGREED BY THE PARTIES, (D) DEPRIVES ANY PARTY OF ITS BENEFITS OF THE BARGAIN STRUCK BY THE PARTIES, AS ORIGINALLY SET FORTH IN THIS AGREEMENT, OR (E) DETERMINES THAT AN EMPLOYMENT OR A JOINT EMPLOYMENT RELATIONSHIP EXISTS BETWEEN US AND YOU.**

32. **CERTAIN WAIVERS.**

(a)     You and we waive the right to pursue and receive any exemplary and punitive damages against the other party in any dispute arising under this Agreement or relating to the franchise relationship, whether asserted as a related or independent tort, as a breach of contract, or as any other claim or cause of action based on constitutional, statutory or common law.

(b)     THE PARTIES WAIVE THE RIGHT TO A JURY TRIAL IN ANY ACTION RELATED TO THIS AGREEMENT OR THE RELATIONSHIP BETWEEN THE FRANCHISOR, THE FRANCHISEE, ANY GUARANTOR, AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS.

33. **OBLIGATIONS UPON TERMINATION OR EXPIRATION.**

(a)     Upon the termination or expiration of this Agreement for any reason, all of your rights under this Agreement will terminate and you will (a) abide by the non-competition and confidentiality provisions contained in Sections 11 and 12 of this Agreement; (b) promptly pay us and our Affiliates all amounts then due us and them; (c) not use or adopt the Franchised System or any of the Proprietary Marks or Intellectual Property; (d) remove from the Franchised Unit and Vehicles all signs, emblems and displays

32

using any Proprietary Marks or identifying it as associated with the Franchised System; (e) cease to use and return to us the Operations Manual and other proprietary materials delivered to you under this Agreement; (f) change the exterior and interior design and decor of the Franchised Unit and Vehicles and make any and all changes in signs, buildings and structures which we direct to distinguish the building from its former appearance as a Unit or 1-Tom-Plumber vehicle; (g) cease to hold yourself out in any way as our franchisee or to do anything which would indicate any relationship between you and us, except pursuant to the terms of a separate agreement with us; (h) change the exterior and interior design and décor of the Franchised Unit and Vehicles and make all changes in signs, buildings and structures which we direct to distinguish the building from its former appearance as a Franchised Unit or 1-Tom-Plumber vehicle; and (i) transfer to us all telephone listings, domain names, and web pages for the Franchised Unit or which contain, use or display any of our Proprietary Marks or Intellectual Property. You will complete all modifications within 30 days after the termination or expiration of this Agreement. If you fail to complete such modifications or fail to transfer or return such property within 30 days as contemplated above in this Section, or should you indicate at such time earlier than 30 days that you do not intend or are unable to comply with this Section, you appoint us as your attorney-in-fact to perform such acts in your stead and for your account. You will reimburse us for all of our costs and expenses, including without limitation administrative overhead and employee salaries, that we may incur in acting as your attorney-in-fact to perform such acts.

(b)     You acknowledge that the parties cannot determine the exact amount of damages resulting from termination prior to the expiration of a Term. If this Agreement terminates for any reason other than our material breach and our failure to cure the breach within a reasonable time after you give us written notice of the breach but not less than 60 days, then in addition to any and all other remedies and causes of action available to us, you will pay us Liquidated Damages in addition to amounts due to us accruing under this Agreement prior to termination. You and we agree that Liquidated Damages as defined herein is a reasonable estimate of the actual damages which we will sustain as a result of the termination and is not a penalty. Payment of Liquidated Damages will constitute neither a waiver of your obligation to comply with the foregoing post-termination requirements nor a license to use the Franchised System.

34.     **INJUNCTIVE RELIEF. ANY PARTY HAS THE RIGHT IN A SITUATION WHERE THERE IS AN IMMINENT THREAT OF HARM TO THE LEGAL RIGHTS OF A PARTY AND DAMAGES WOULD NOT BE ADEQUATE RELIEF TO SEEK A TEMPORARY RESTRAINING ORDER AND TEMPORARY OR PRELIMINARY INJUNCTIVE RELIEF FROM A COURT OF COMPETENT JURISDICTION. YOU ACKNOWLEDGE THAT MONEY DAMAGES MAY NOT BE SUFFICIENT TO COMPENSATE US FOR THE IRREPARABLE HARM CAUSED BY LOSS OF CERTAIN RIGHTS, PROPERTY, BENEFITS AND PRIVILEGES RESERVED TO US UNDER THIS AGREEMENT AS A RESULT OF YOUR BREACH OF THIS AGREEMENT, INCLUDING WITH LIMITATION YOUR BREACH OF SECTIONS 5(L), 6(I), 8(C), 8(D), 8(H), 9, 11, 12, 13, 15, 22, 23, 27, AND 33. IF YOU BREACH OR WE REASONABLY ANTICIPATE THAT YOU MAY BREACH ANY OF THESE PROVISIONS OR ANY OTHER PROVISION OF THIS AGREEMENT, THEN YOU COVENANT, ACKNOWLEDGE AND AGREE THAT WE HAVE THE RIGHT TO SEEK AND OBTAIN INJUNCTIVE RELIEF IN ANY COURT OF COMPETENT JURISDICTION TO ENFORCE, OBSERVE AND PRESERVE THE TERMS, CONDITIONS AND PROCEDURES SPECIFIED IN THIS AGREEMENT WITHOUT POSTING ANY BOND OR SECURITY. IF THE COURT SHALL REQUIRE BOND OR SECURITY, YOU AGREE THAT THE PRINCIPAL SUM OF $1,000 POSTED AS A BOND OR SECURITY IS SUFFICIENT. THIS COVENANT IS INDEPENDENT, SEVERABLE AND ENFORCEABLE NOTWITHSTANDING ANY OTHER RIGHTS OR REMEDIES THAT ANY PARTY MAY HAVE.**

JRB3 4839-5087-0229
2950761-000001

35.    **INDEMNIFICATION BY FRANCHISEE.**

(a)    You will, at all times, indemnify and hold harmless to the fullest extent permitted by law, us, our parent entity (member), our Affiliates, the respective shareholders, members, directors, officers, employees, agents and representatives of each of them, and their respective successors and assigns, from all Losses and Expenses incurred in any action, suit, proceeding, claim, demand, investigation or inquiry (formal or informal), or any settlement thereof (whether or not a formal proceeding or action has been instituted) which arises out of or is based upon any of the following:

1.    Warranty claim resolutions relating to your Plumbing Services;

2.    Your infringement, alleged infringement or any other violation or alleged violation of any trademark, copyright, patent, or other proprietary right owned or controlled by third parties;

3.    Your violation, breach or alleged violation or breach (i) of any contract, federal, state or local law, regulation, ruling, standard or directive or (ii) arising out of your business activities hereunder;

4.    Libel, slander or any other form of personal injury by you or arising out of your business activities hereunder;

5.    Your violation or breach of any warranty, representation, agreement or obligation in this Agreement, including without limitation your obligation to obtain and maintain insurance, and to perform your in-term and post-term obligations; or

6.    Acts, errors or omissions of you or any of your agents, servants, employees, contractors, Owners, partners, Affiliates or representatives.

(b)    Notice of Claims.  You will give us notice of any such action, suit, proceeding, claim, demand, inquiry or investigation.  At your expense and risk, we may elect to assume (but under no circumstance is obligated to undertake), the defense and/or settlement of any such action, suit, proceeding, claim, demand, inquiry or investigation. Such an undertaking by us shall, in no manner or form, diminish your obligations under this Section.

(c)    Risk of Loss.  All Losses and Expenses incurred under this Section shall be chargeable to and paid by you as your obligations of indemnity under this Section, regardless of any actions, activity or defense undertaken by us or the subsequent success or failure of such actions, activity or defense.

(d)    No Assumption of Liability.  The Persons or parties indemnified do not assume any liability whatsoever for acts, errors, or omissions of those with whom Franchisee may contract, regardless of the purpose.  Franchisee's hold harmless and indemnity obligation shall include all Losses and Expenses that may arise out of any acts, errors or omissions of these third parties.

(e)    Remedial Action.  In order to protect Persons or property, or its reputation or goodwill, or the reputation or goodwill of others, we may, at any time and without notice, as we, in our Reasonable Business Judgment deem appropriate, order, consent or agree to settlements or take such other remedial or corrective action as it deems expedient with respect to any action, suit, proceeding, claim, demand, inquiry or investigation if, in our sole judgment, there are reasonable grounds to believe that:

34

1.      Any of the acts or circumstances enumerated in this Section have occurred; or

2.      Any act, error or omission of yours may result directly or indirectly in damage, injury or harm to any Person or any property.

(f)      <u>Survival.</u>  This Section shall survive expiration or earlier termination of this Agreement without regard to the cause of termination.

36.      **FORCE MAJEURE.  IF AN ACT OF NATURE PREVENTS A PARTY FROM PERFORMING ANY OBLIGATION UNDER THIS AGREEMENT DESPITE THE PARTY'S EXERCISE OF REASONABLE DILIGENCE, THE ACT OF NATURE WILL TOLL THE DUE DATE FOR THE PERFORMANCE OF THAT OBLIGATION FOR THE DURATION OF THE ACT OF NATURE AND FOR A REASONABLE TIME THEREAFTER.  NO FORCE MAJEURE SHALL EXCUSE THE TIMELY PAYMENT OF AMOUNTS DUE UNDER THIS AGREEMENT. SHOULD THE FRANCHISED UNIT CLOSE FOR ANY REASON RELATING TO NATURAL DISASTER, ACCIDENT OR OTHER UNFORESEEABLE EVENTS, YOU WILL VIGOROUSLY PURSUE REOPENING AT THE SAME OR A NEW LOCATION IN THE OPERATING AREA THAT WE FIRST APPROVE.  IF YOU HAVE NOT RESUMED OPERATIONS WITHIN 180 DAYS AFTER CLOSING, WE MAY TERMINATE THIS AGREEMENT WITHOUT PENALTY TO YOU SO LONG AS YOU HAVE PAID US A ROYALTY ON YOUR BUSINESS INTERRUPTION INSURANCE PROCEEDS AND HAVE NOT BREACHED THE COVENANTS IN SECTION 11.**

37.      **<u>RELATIONSHIP OF PARTIES.</u>**

(a)      <u>Limitations.</u>  Neither this Agreement nor the performance of the obligations set forth in this Agreement will operate to make you our partner or agent.  Neither party will have the authority to act or contract on behalf of the other.  Neither party will have any responsibility for the obligations of the other party.  The relationship created by this Agreement is that of an independent contractor, and no fiduciary relationship is created or intended.  You must indicate clearly the independent ownership of your business in all public records and in all of your dealings with third parties.

(b)      <u>Franchisor's Reserved Rights.</u>  Whenever we reserved in this Agreement a right to take or withhold an action, or are deemed to have a right and/or discretion to take or withhold an action, or to grant or decline to grant you a right to take or omit an action, except as otherwise expressly and specifically provided in this Agreement, we may make our decision or exercise our rights, on the basis of the information readily available to us and our judgment of what is in our best interests and/or in the best interests of the our franchise network, at the time the decision is made, without regard to whether: (i) other reasonable alternative decisions or actions could have been made by us; (ii) our decision or action will promote our financial or other individual interest; (iii) our decision or the action we take applies differently to you and one or more other franchisees or our company-owned operations; or (iv) our decision or the exercise of our right or discretion is adverse to your interests.  In the absence of an applicable statute, we will have no liability to you for any such decision or action.  We and you intend that the exercise of our right or discretion will not be subject to limitation or review.  If applicable law implies a covenant of good faith and fair dealing in this Agreement, the parties acknowledge that such covenant shall not imply any rights or obligations that are inconsistent with a fair construction of this Agreement and that this Agreement grants us the right to make decisions, take actions and/or refrain from taking actions not inconsistent with your rights and obligations hereunder.

35

(c)     Reasonable Business Judgment.     You and we agree that we may use our Reasonable Business Judgment in the exercise of our rights, obligations and discretion under this Agreement except where otherwise indicated.    "Reasonable Business Judgment" means that our determination shall prevail even in cases where other alternatives are also reasonable so long as we intend to benefit or its actions or omissions could benefit the Franchised System.  Examples of benefits to the Franchised System would include, without limitation, protecting or enhancing the value of the Proprietary Marks, promoting economic efficiency or gain for the Franchised System Units, increasing customer satisfaction, increasing brand identification, or minimizing possible customer brand or location confusion. We shall not be required to consider your particular economic or other circumstances when exercising our Reasonable Business Judgment.  At no time are you or any third party (including, but not limited to other franchise owners or any trier of fact) entitled to substitute your or its judgment for a judgment, which has been made by or on behalf of us which meets the definition of Reasonable Business Judgment.  You and we agree that the long-term goals of a franchise system, and the long-term interests of both us and all the franchisees, taken together, require that we have the latitude to exercise our Reasonable Business Judgment.

(d)     Time.  Time is of the essence of this Agreement.

38.     **EMPLOYMENT DECISIONS.  YOU HAVE AND WILL CONTINUE TO HAVE SOLE RESPONSIBILITY FOR RECRUITMENT, SELECTION, TRAINING, SUPERVISION, DISCIPLINE AND TERMINATION OF YOUR EMPLOYEES, ALL ACTS AND OMISSIONS OF YOUR EMPLOYEES, AND ALL EMPLOYMENT RELATED DECISIONS INVOLVING COMPENSATION, BENEFITS, HOURS OF WORK, SCHEDULING, RECORD KEEPING, AND ALL OTHER TERMS AND CONDITIONS OF EMPLOYMENT.**

39.     **HOLIDAYS.  IF THE DUE DATE FOR ANY PAYMENT OF FUNDS UNDER THIS AGREEMENT FALLS ON A LEGAL HOLIDAY, THE DUE DATE FOR THE PAYMENT WILL EXTEND UNTIL THE NEXT BUSINESS DAY.**

40.     **ENTIRE   AGREEMENT.     THIS   AGREEMENT   (INCLUDING   ALL ATTACHMENTS, EXHIBITS AND SCHEDULES) CONSTITUTES THE ENTIRE AGREEMENT OF THE PARTIES WITH REGARD TO THE SUBJECT MATTER OF THIS AGREEMENT AND REPLACES AND SUPERSEDES ALL OTHER PRIOR WRITTEN, ELECTRONIC AND ORAL AGREEMENTS AND STATEMENTS OF THE PARTIES RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT.  NEITHER PARTY IS RELYING ON ANY WRITING TO ENTER INTO THIS AGREEMENT OTHER THAN AS SET FORTH IN THIS AGREEMENT AND   THE   FRANCHISE   DISCLOSURE   DOCUMENT   DELIVERED   TO   YOU.     THIS AGREEMENT SHALL SUPERSEDE AND BE CONTROLLING IN THE EVENT OF ANY CONFLICT BETWEEN THE FRANCHISE DISCLOSURE DOCUMENT (INCLUDING ITEMS 1 THROUGH 22 AND THE EXHIBITS) YOU OR YOUR OWNERS RECEIVED AND THIS AGREEMENT.**

41.     **DISCLAIMER   LIMITATION.     NOTWITHSTANDING   THE   FOREGOING, NOTHING IN THIS AGREEMENT OR ANY OTHER AGREEMENT WITH US SHALL DISCLAIM OR REQUIRE YOU TO WAIVE RELIANCE ON ANY REPRESENTATION THAT WE MADE IN THE MOST RECENT FRANCHISE DISCLOSURE DOCUMENT (INCLUDING ITS   EXHIBITS   AND   AMENDMENTS)   THAT   WE   DELIVERED   TO   YOU   OR   YOUR REPRESENTATIVE, SUBJECT TO ANY AGREED-UPON CHANGES TO THE CONTRACT TERMS AND CONDITIONS DESCRIBED IN THAT FRANCHISE DISCLOSURE DOCUMENT AND REFLECTED IN THIS AGREEMENT (INCLUDING ANY RIDERS OR ADDENDA SIGNED AT THE SAME TIME AS THIS AGREEMENT).**

36

42. **APPROVALS AND WAIVERS. YOU MUST REQUEST ANY PRIOR APPROVAL OR CONSENT REQUIRED UNDER THIS AGREEMENT FROM US BY MEANS OF A TIMELY WRITTEN REQUEST. ANY SUCH APPROVAL OR CONSENT MUST BE OBTAINED IN WRITING. NO DELAY, WAIVER, OMISSION OR FORBEARANCE ON OUR PART TO EXERCISE ANY RIGHT, OPTION, DUTY OR POWER ARISING OUT OF ANY BREACH OR DEFAULT BY YOU UNDER THIS AGREEMENT SHALL CONSTITUTE A WAIVER BY US TO ENFORCE ANY RIGHT, OPTION, DUTY OR POWER AS AGAINST YOU, OR SHALL APPLY AS TO SUBSEQUENT BREACH OR DEFAULT BY YOU. SUBSEQUENT ACCEPTANCE BY US OF ANY PAYMENTS DUE TO US HEREUNDER SHALL NOT BE DEEMED TO BE A WAIVER BY US OF ANY PRECEDING BREACH BY YOU OF THIS AGREEMENT. THE FAILURE OF A PARTY TO INSIST IN ANY ONE OR MORE INSTANCES ON THE PERFORMANCE OF ANY TERM OR CONDITION OF THIS AGREEMENT WILL NOT OPERATE AS A WAIVER OF ANY FUTURE PERFORMANCE OF THAT TERM OR CONDITION.**

43. **NOTICE. EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT, WHEN THIS AGREEMENT REQUIRES NOTICE, THE SENDING PARTY MUST DELIVER OR ADDRESS THE NOTICE TO THE OTHER PARTY BY CERTIFIED MAIL, TELECOPY, OR DELIVERY SERVICE WITH RECEIPTED DELIVERY, OR BY ELECTRONIC MAIL FOLLOWED BY TRANSMITTAL OF THE ORIGINAL BY FIRST CLASS UNITED STATES MAIL, TO THE FOLLOWING ADDRESS OR TELECOPY NUMBER:**

|       |                                      |
|-------|--------------------------------------|
| Us:   | 1 Tom Plumber Global Inc.            |
|       | 24 Whitney Drive, Suite E,           |
|       | Milford, Ohio 45150                  |
|       | Email: kameron@1tomplumber.com       |
|       |                                      |
| You:  | Blue Ridge Plumbing and Drain, LLC   |
|       | 174 Bradley Branch Rd.. Ste. 3       |
|       | Arden, North Carolina 28704          |
|       | Email: josh@warrenrestoration.com    |

All notices will be deemed delivered and received if transmitted to the proper address on the earlier of (a) the date that the other party receives or refuses delivery of the notice or (b) three business days after the party places the notice in the United States mail, first class postage prepaid. Each party may change the party's address by giving written notice to the other party.

44. **CUMULATIVE RIGHTS. NO RIGHT OR REMEDY CONFERRED UPON OR RESERVED TO US OR YOU BY THIS AGREEMENT IS INTENDED TO BE, NOR SHALL BE DEEMED, EXCLUSIVE OF ANY OTHER RIGHT OR REMEDY IN THIS AGREEMENT OR BY LAW OR EQUITY PROVIDED OR PERMITTED, BUT EACH SHALL BE CUMULATIVE OF EVERY OTHER RIGHT OR REMEDY. THE PARTIES RETAIN ALL RIGHTS AND REMEDIES AVAILABLE AT LAW OR IN EQUITY.**

45. **SURVIVAL. THE PROVISIONS OF THIS AGREEMENT WHICH, BY THEIR TERMS, SURVIVE THE TERMINATION OR EXPIRATION OF THIS AGREEMENT WILL SURVIVE THE TERMINATION OR EXPIRATION OF THIS AGREEMENT FOR ANY REASON.**

JRB3 4839-5087-0229
2950761-000001

46. **GOVERNING LAW**. THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF OHIO (WITHOUT REGARD TO ANY CONFLICTS OF LAW PRINCIPLES).

47. **VENUE**. EXCEPT FOR ANY THIRD PARTY DISPUTE IN WHICH THE PARTIES MAY BE INVOLVED SUBJECT TO SECTION 35, THE PROPER, SOLE AND EXCLUSIVE VENUE AND FORUM FOR ANY ACTION ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT SHALL IN THE FEDERAL AND STATE COURT DISTRICTS IN WHICH WE THEN HAVE OUR PRINCIPAL PLACE OF BUSINESS. AS OF THE EFFECTIVE DATE, THE PROPER VENUE IS IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO AND HAMILTON COUNTY, OHIO. EACH PARTY TO THIS AGREEMENT HEREBY CONSENTS TO ANY OF THOSE COURTS' EXERCISE OF PERSONAL JURISDICTION OVER THE PARTY IN THAT TYPE OF ACTION AND EXPRESSLY WAIVES ALL OBJECTIONS THE PARTY OTHERWISE MIGHT HAVE TO THAT EXERCISE OF PERSONAL JURISDICTION.

48. **LEGAL FEES**. YOU WILL REIMBURSE US FOR OUR OUTSIDE AND INSIDE ATTORNEYS' FEES AND COSTS RELATED TO ARBITRATION OR LEGAL ACTION TO ENFORCE THIS AGREEMENT, IN ADDITION TO ANY OTHER RELIEF OBTAINED BY US.

49. **CONSTRUCTION**. THE RULE OF CONSTRUCTION REQUIRING THE RESOLUTION OF ANY AMBIGUITIES IN THIS AGREEMENT AGAINST THE DRAFTING PARTY WILL NOT APPLY TO THE CONSTRUCTION OF THIS AGREEMENT.

50. **SEVERABILITY**. IF ANY PROVISION OF THIS AGREEMENT (OTHER THAN SECTION 5) IS HELD TO BE INVALID OR INEFFECTIVE WITH RESPECT TO ANY PERSON OR CIRCUMSTANCE, THE HOLDING WILL NOT AFFECT THE REMAINDER OF THIS AGREEMENT OR THE APPLICATION OF THIS AGREEMENT TO ANY OTHER PERSON OR CIRCUMSTANCE.

51. **COUNTERPARTS**. THE PARTIES MAY EXECUTE THIS AGREEMENT IN COUNTERPARTS, EACH OF WHICH WILL CONSTITUTE AN ORIGINAL AND ALL OF WHICH, WHEN TAKEN TOGETHER, WILL CONSTITUTE ONE AND THE SAME INSTRUMENT.

52. **AMENDMENT**. NO AMENDMENT TO THIS AGREEMENT WILL BECOME EFFECTIVE OR BINDING ON THE PARTIES, UNLESS IT IS IN WRITING AND SIGNED BY ALL OF THE PARTIES; PROVIDED, THAT WE MAY MODIFY OR CHANGE THE FRANCHISED SYSTEM OR OPERATIONS MANUAL UNILATERALLY AT ANY TIME, EFFECTIVE 30 DAYS AFTER NOTICE OF THE CHANGE OR MODIFICATION IS SENT TO YOU, UNLESS HEALTH AND SAFETY CONCERNS COMPEL US TO PROVIDE A SHORTER NOTICE PERIOD.

53. **THIRD PARTY BENEFICIARIES**. EXCEPT FOR THE BENEFITS RESERVED FOR OUR PARENT, 1 TOM PLUMBER BRAND INC AND OUR AFFILIATES, THERE ARE NO THIRD PARTY BENEFICIARIES FOR THIS AGREEMENT.

54. **DEFINITIONS**. UNLESS THE CONTEXT OF THEIR USE IN THIS AGREEMENT REQUIRES OTHERWISE, THE FOLLOWING WORDS AND PHRASES HAVE THE FOLLOWING MEANINGS WHEN USED IN INITIALLY-CAPITALIZED FORM IN THIS AGREEMENT.

JRB3 4839-5087-0229
2950761-000001

(a)  1-Tom-Plumber  Unit or the Unit means a Unit operating under the Franchised System using 1-Tom-Plumber name and mark, or such other name and mark as we may specify under the Operations Manual, as amended.

(b)  Affiliate means (1) any Person who Controls, is Controlled by, or is under common Control with a Person, and (2) any Owner of any Person.

(c)  Central Office means the address identified in Attachment A as the site from which you operate your Franchised Unit.

(d)  Competing Business means any business that (i) offers for sale Plumbing Services; or (ii) in its entirety so resembles the trade dress, service style and products that comprise the distinguishing features of the Franchised System so as to create a likelihood of consumer confusion or dilution of the Proprietary Marks.

(e)  Confidential Information means any trade secrets we own or protect and other proprietary information not generally known to the plumbing services industry including confidential portions of the Operations Manual and information we otherwise impart to you and your representatives in confidence.  Confidential Information includes product and service instructions, product and service preparation instructions, proprietary software and other valuable property.

(f)  Control means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities or governance rights, by contract, or otherwise.

(g)  DMA means a Designated Market Area, as defined by Nielsen Media Research or its successors in interest from time to time.  We may designate a substitute independent source for providing the boundaries of a single television advertising market in the Operations Manual.

(h)  Effective Date means the date we enter immediately below our signature block on this Agreement as the date on which you and we are legally bound under this Agreement, provided that if no such date is entered, then the Effective Date shall be the date on which we execute and deliver this Agreement.

(i)  Franchised System means the distinctive, unique and Proprietary Marks and trade dress, products, presentation styles and services, know-how, methods of operation, identification, décor, furnishings, equipment, training, service, production, technology, marketing, advertising, promotion and development that we may designate in written or electronic form or through usage from time to time that define and distinguish a Unit, including (without limitation) (1) plans and specifications for interior and exterior signs, designs, layouts and color schemes; (2) methods, techniques, formats, systems, product and service preparation instructions, specifications, procedures, information, trade secrets, sales and marketing programs; (3) methods of business operations and management; (4) System Standards; (5) the Operations Manual; and (6) knowledge and experience regarding the operation and franchising of 1-Tom-Plumber Units.

(j)  Franchised Unit or Unit means the 1-Tom-Plumber Unit you establish and operate at the Central Office.  Franchised System Units or Units means all Units authorized to use the Franchised System.

(k)     <u>General Manager</u> means the on-premises manager who will be primarily responsible for the day-to-day operation and supervision of the Franchised Unit.

(l)     <u>Gross Sales</u> means the aggregate amount of revenues generated from the sale of Plumbing Services, goods, products, and merchandise received by you.  Gross Sales are reduced by the amount of any discount given to customers, or to employees or their family members if taken at the time of sale so that the purchaser pays an amount net of the discount.  Gross Sales also excludes the following:  (i) the amount of returns, credits, allowances, and adjustments; (ii) the amount of taxes collected and paid over to taxing authorities; (iii) the amount of any shipping, freight, or similar expense charged to customers; (iv) proceeds from insurance with respect to property damage or liability; (v) proceeds from any civil forfeiture, condemnation, or seizure by governmental entities; and (vi) uncollectible amounts, subject to the limitation that uncollectible amounts cannot exceed 0.5% of Gross Sales for any fiscal year of the Franchisee, and subsequent collections of charged off amounts must be included in Gross Sales when they are collected.

(m)     <u>Intellectual Property</u> means the Proprietary Marks, patents, copyrights, copyrightable material, ideas, concepts, inventions, know-how, trade secrets, Confidential Information, and other proprietary information that we designate in written or electronic form or through usage from time to time as part of or prescribed for use with the Franchised System.

(n)     <u>Liquidated Damages</u> means the present value of combined Royalty Fee, Population Fee, and Brand Fund Contribution for the unexpired portion of the Term, based on your average monthly Royalty Fee and Brand Fund Contribution payable during the one-year period preceding termination; assuming payment at the end of each month in the period, using monthly compounding at the discount rate equal to the sum of (i) the Applicable Federal Rate published by the Internal Revenue Service for the period ending closest to the end of the Term, plus (ii) 200 basis points.

(o)     <u>Losses and Expenses</u> means, without limitation, all losses, compensatory, exemplary or punitive damages, penalties, fines, charges, costs and expenses of investigation, defense and resolution, lost profits, attorneys' fees, court costs, settlement amounts, judgments, compensation for damages to our and our Affiliates' reputation and goodwill, costs of or resulting from delays, financing, costs of advertising material and media time/space, and costs of changing, substituting or replacing the same, and any and all expenses of recall, refunds, compensation, public notices and other such amounts incurred in connection with the matter described.

(p)     <u>National Account Clients</u> means clients designated by us for whom Plumbing Services are performed or to be performed by us, our licensees or franchisees, at locations both within and outside the Operating Area.

(q)     <u>Opening Date</u> means the date on which you open your Franchised Unit for business, after receiving our consent to open.

(r)     <u>Operating Area</u> means the geographic area described on <u>Attachment A</u>.

(s)     <u>Operations Manual</u> means the manual or collection of materials in written or electronic form which we designate from time to time as containing the System Standards, specifications, procedures, policies, methods of operating the Franchised Unit, other elements of the Franchised System and any information designated in this Agreement for inclusion or modification in the Operations Manual.

(t)     <u>Owner</u> means any Person that holds a direct or indirect equity ownership interest (including beneficial and record interests) in you.

40

(u)     Owner-Operator means the Owner who has a significant equity ownership position in you (if you constitute a business entity) of at least 5%, as you designate in writing to us in Attachment A or otherwise.

(v)     Person means any individual or business entity, including (without limitation) corporation, joint venture, general partnership, limited partnership, limited liability company, or trust.

(w)     Plumbing Services means the design, installation, construction, replacement, service, repair, alteration, or modification of pipes and fixtures and drain cleaning for commercial and residential properties.

(x)     Products means, collectively, any products, supplies, apparel, equipment, and any other merchandise or property that you must use or sell to operate the Franchised Unit in accordance with the Franchised System.

(y)     Proprietary Marks means the registered and unregistered distinctive and characteristic trade names, domain names, trademarks, service marks, logotypes, and trade dress elements that we designate in written or electronic form or through usage from time to time as prescribed for use with the Franchised System.

(z)     Reporting Period means each calendar month. Our fiscal year typically ends on December 31. We may change the Reporting Period by amending the Operations Manual.

(aa)    System Standards means the standards for the Franchised Unit and using the Franchised System published in the Operations Manual and elsewhere, including but not limited to standards for design, furnishings, fixtures and equipment, use and display of the Proprietary Marks, operations, technology and any other standards, policies, rules and procedures we promulgate about Franchised System operation and usage.

(bb)    Vehicle means a vehicle you purchase or lease for the purpose of adapting it to the System Standards and using it in the operation of a Franchised Unit.

55.     **YOUR REPRESENTATIONS, WARRANTIES AND ACKNOWLEDGEMENTS. YOU REPRESENT AND WARRANT, AND ACKNOWLEDGE TO US AS FOLLOWS:**

(a)     Independent Investigation. You have conducted an independent investigation of the business contemplated by this Agreement and recognize that it involves substantial business risks, making the success of the venture largely dependent on your management skills and resources. You have not received from us or our Affiliates, and have not relied upon, any oral or written, express or implied projection, representation, warranty or guarantee regarding the potential sales, revenues, income, profits or success of the business venture contemplated by this Agreement. You have had the opportunity to consult with independent advisors of your own selection such as a lawyer or accountant before making your decision to sign this Agreement and develop and operate a Unit.

(b)     This Transaction. You and the Persons signing this Agreement for you have full power and authority and have been duly authorized, to enter into and perform or cause performance of your obligations under this Agreement. You have obtained all necessary approvals of your Owners, governing board and lenders. No executory franchise, license or affiliation agreement for the Central Office exists other than this Agreement. Attachment A accurately states your Owners. Your execution, delivery and performance of this Agreement will not violate, create a default under or breach of any charter, bylaws,

41

agreement or other contract, license, permit, indebtedness, certificate, order, decree or security instrument to which you or any of your Owners is a party or is subject or to which the Central Office is subject. Neither you nor the Central Office is the subject of any current or pending merger, sale, dissolution, receivership, bankruptcy, foreclosure, reorganization, insolvency, or similar action or proceeding on the date you execute this Agreement and was not within the three years preceding such date, except as disclosed in your franchise application. To the best of your knowledge, neither you, your Owners, your officers, directors, contractors, or employees or anyone else affiliated or associated with you, whether by common ownership, by contract, or otherwise, has been designated as, or are, a terrorist, a "Specially Designated National" or a "Blocked Person" under U.S. Executive Order 13224, in lists published by the U.S. Department of Treasury's Office of Foreign Assets Control, or otherwise.

(c)     No Misrepresentations or Implied Covenants.  All written information you submit to us about the Central Office, you, your Owners, any guarantor, or the finances of any such Person or entity, was or will be at the time delivered and when you sign this Agreement, true, accurate and complete, and such information contains no misrepresentation of a material fact, and does not omit any material fact necessary to make the information disclosed not misleading under the circumstances. There are no express or implied covenants or warranties, oral or written, between we and you except as expressly stated in this Agreement.

(d)     No Guarantees of Success.    We and our representatives have made or communicated to you no claims of assured or guaranteed success of the business contemplated by this Agreement prior to signing this Agreement.  You voluntarily enter into this Agreement and undertake all the terms and conditions thereof without any such inducements, promises, or representations.  Without limiting the foregoing, we expressly disclaim the making of, and you acknowledge that you have not received or relied upon, any representations, warranties or guarantees, express or implied, as to the potential volume, profits or success of the business venture contemplated by this Agreement, or as to the suitability of any selected or proposed Central Office as a successful location for the Franchised Unit.  No assurances are given regarding that the franchisee will earn any return on their investment.  You and your Owners acknowledge that (i) the investment in the Franchised Unit is not based on any assurance or warranty, either directly or indirectly, that the Unit will be profitable or successful, (ii) they are aware that regardless of the level of support provided by us and our Affiliates, the investment in the Unit franchise may fail, (iii) that no projections or earnings information, not included in the Franchise Disclosure Document has been received or relied upon prior to executing this Agreement.

(e)     Updating.  You and your Owners acknowledge that market for Plumbing services is a highly competitive, innovative market that requires servicers to build, maintain and update the Franchised Unit to meet changing expectations of consumers.  These updates may include changes in technology, merchandising, production methods, resource availability, governmental regulation of plumbing services, demographics, geography, and the customer experience that may require an additional investment, more operating costs, and other economic changes that could affect your business, profitability and method of operation.  Routine maintenance and repairs to maintain the Unit to our Standards is not considered updating regardless of cost.

(f)     Other Businesses and Channels of Distribution.  We and our Affiliates reserve the right to acquire other businesses, merge or sell the 1-Tom-Plumber Franchised System or distribute 1-Tom-Plumber products or services through alternative channels of distribution without restriction.

(g)     Other Transactions.  We reserve the right to vary the 1-Tom-Plumber Unit franchise terms and conditions of offering among franchisees and others, which may affect fees payable to us, exclusive territorial rights, and other attributes of a 1-Tom-Plumber Unit franchise.

42

(h)     <u>Fees</u>. Fees that are paid to us by franchisees are not in exchange for the services we provide to franchisees.  Those services are merely for the protection of the Intellectual Property licensed to franchisees and for no other reason.  The fees compensate us for granting the license of the Intellectual Property to you for the Term and any period after its early termination when we cannot replace your Unit's presence in your market area.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

43

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement, intending to be legally bound, as of the Effective Date.

**1 TOM PLUMBER GLOBAL, INC.**

By: _____

Its: _____

Effective Date: _____

**BLUE RIDGE PLUMBING AND DRAIN, LLC**

By: _____    By: _____

Its: _____    Its: _____

Date: _____    Date: _____

44

**Attachment A**

**Transaction Details**

1.    <u>Target Area Description</u>:  See Franchise Contract Data Sheet fully executed on December 28, 2022.

2.    <u>Central Office of Franchised Unit</u>: TBD.

3.    <u>Time to complete and open Franchised Unit</u>:  180 days after the Effective Date.

4.    <u>Operating Area</u>:   See Franchise Contract Data Sheet fully executed on December 28, 2022.

5.    <u>Population Fee</u>: $450.00 per month, waived for the first year of operation.

6.    <u>Address and Contact Information of Franchisee</u>:

          Blue Ridge Plumbing and Drain, LLC
          174 Bradley Rd., Ste. 3
          Arden, North Carolina 28704
          Phone: 276-393-0066


7.    <u>Initial Franchise Fee</u>:      $40,000

8.    <u>Your Owners</u>:

| Name | Address | Telephone | Email | Percentage Ownership |
|------|---------|-----------|-------|----------------------|
| *Josh Warren | 201 Brandon Rd. Henderson, NC 28739 | 817-805-6085 | josh@warrenrestoration.com | _____% |
| Toni Warren | 201 Brandon Rd. Henderson, NC 28739 | 860-670-4112 | toni@warrenrestoration.com | _____% |

* Person designated as Owner-Operator.

A-1

## NOTICE OF UNIT CENTRAL OFFICE ACCEPTANCE
## AND OPERATING AREA DESCRIPTION

To:

From:           1 Tom Plumber Global Inc.

Re:             Acceptance of Proposed Unit Central Office

Date:           _____, 20___

We refer to the Franchise Agreement dated _____, 20__ (the "Franchise Agreement") between you and us for the development of a Franchised Unit to be located in the Target Area defined therein.

You have submitted for our consideration and we have accepted as the location of the Franchised Unit the following address:

_____

We designate this address as the Central Office of the Franchised Unit under the Agreement.   The Operating Area will be _____.

This Notice amends and supplements the Agreement to fix the Central Office and to use that Central Office as the origin of the Operating Area.   No counter signature is necessary.

**1 Tom Plumber Global Inc.**

By:_____

Title:  _____

A-2

**Attachment B**

**Automated Clearing House Payment Authorization**

B-1

## ACH Authorization Form
***This form **MUST** be accompanied by a **Printed Voided Check or Bank Letter*****

Add ☐ Delete ☐       Change ☐

Company Name:_____

Address:_____

City:_____ State:_____ Zip:_____

Phone:_____

## Funds Settlement Information

Bank Name:_____

Account Owner:_____

Account Name:_____

Address:_____

City:_____ State:_____ Zip:_____

Routing # (9 digits)_____

Account #_____("Account")

_____ (hereinafter referred to as User) authorizes 1 Tom Plumber Global Inc. ("1-Tom-Plumber ") to initiate ACH transfer entries and to credit and/or debit the account identified herein. This authorization shall remain in effect unless and until 1 Tom Plumber Global Inc. receives written notification from User that this authorization has been terminated in such time and manner to allow 1 Tom Plumber Global Inc. to act. Undersigned represents and warrants to 1-Tom-Plumber that the person executing this form is an authorized signatory on the Account referenced above and all information regarding the Account and Account Owner is true and correct.

_____     ___/___/_____
Account Owner Signature                                             Date

_____
Print Name and Title

+-------------------------------------------------------+
| ATTACH PRE-PRINTED VOIDED CHECK                       |
| OR                                                    |
| BANK LETTER                                           |
|                                                       |
+-------------------------------------------------------+

B-2

**Attachment C**

**Guaranty and Restriction Agreement**

C-1

JRB3 4839-5087-0229
2950761-000001

### GUARANTY AND RESTRICTION AGREEMENT

The undersigned owners (the "Guarantors") of Blue Ridge Plumbing and Drain, LLC (the "Franchisee") enter into this Guaranty and Restriction Agreement (this "Guaranty") as of the Effective Date.

1.  Guaranty of Obligations. To induce 1 Tom Plumber Global Inc., its successors and assigns ("Franchisor") to sign the Franchise Agreement (the "Franchise Agreement") with the party named as the "Franchisee," to which this Guaranty is attached, the undersigned, jointly and severally (the "Guarantors") irrevocably and unconditionally (i) represent and warrant to Franchisor that Franchisee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Franchisee's obligations under the Agreement, including any amendments and note, will be punctually paid and performed. Upon default by Franchisee and notice from Franchisor, the Guarantors will immediately make each payment and perform or cause Franchisee to perform, each unpaid or unperformed obligation of Franchisee under the Agreement. Without affecting any of Guarantor's obligations under this Guaranty, Franchisor may without notice to the Guarantors extend, modify or release any indebtedness or obligation of Franchisee, or settle, adjust or compromise any claims against Franchisee. The Guarantors waive notice of amendment of the Agreement. Upon the death of an individual Guarantor, the estate of the Guarantor will be bound by this Guaranty for obligations of Franchisee to Franchisor existing at the time of death, and the joint and several obligations of all other Guarantors will continue in full force and effect. This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one in the same instrument.

2.  Restrictions on Transfer of Equity Ownership of Franchisee. The Guarantors will not transfer, assign or pledge any of their direct or indirect equity interests in the Franchisee to any person without the prior consent of the Franchisor, and acknowledge that Franchisor has rights of first refusal that apply to such transactions.

3.  Other Provisions. The Guarantors, as owners of the Franchisee, acknowledge that this Guaranty and the Agreement inure to the benefit of the Franchisee and to the undersigned. The Guarantors expressly adopt, ratify, incorporate into this Guaranty, and agree to be bound individually by the following provisions of the Agreement as if they were parties to such Agreement: Sections 11 (Covenants Not to Compete); 12 (Confidential Information); 22 (Assignment); 23 (Right of First Refusal); 24 (Business Entity Franchisee); 32 (Certain Waivers); 33 (Resolution of Disputes); 23 (Our Option to Purchase); 46 (Governing Law); 47 (Venue); and 48 (Legal Fees).

Executed and delivered as of the Effective Date.

The Guarantors:

By: _____

Printed Name: _Josh Warren_

By: _____

Printed Name: _Toni Warren_

C-2

**Attachment D**

**Management Confidentiality
and Non-Competition Agreement**

D-1

**MANAGEMENT CONFIDENTIALITY**
**AND NON-COMPETITION AGREEMENT**

The undersigned 1-Tom-Plumber Unit on-premises manager ("Manager"), in consideration of the access to training and confidential information he or she has received or will receive from 1 Tom Plumber Global Inc., an Ohio corporation, and/or its affiliates (collectively, the "Company") in connection with Manager's employment with the Company's franchisee named below (the "Franchisee"), hereby covenants and agrees as follows:

1.  <u>Definitions</u>.  Capitalized terms not otherwise defined in this Release shall have the meaning assigned to that term in the Franchise Agreement, including its addenda and amendments, between the Company and Franchisee, dated _____, 20___.

2.  <u>Confidentiality Agreement</u>.  Manager acknowledges that, while employed by the Franchisee, Manager has and will receive certain confidential information and knowledge concerning business of the Company which the Company wishes to protect, including (without limitation) information, knowledge, know-how, product and service instructions, product and service preparation instructions, formulae, materials, equipment, techniques, systems, and other data relating to or comprising 1-Tom-Plumber franchise system.  Confidential information includes the Operations Manual and other materials and information supplied by Company to the Franchisee that is identified as confidential at the time of disclosure or before.  Manager shall not reveal that confidential information to any other party, except the Company's or the Franchisee's independent public accountants, Manager's legal counsel (if that counsel also agrees to maintain the confidentiality of the confidential information), or as otherwise required by law.  Manager shall not use or disclose the confidential information at any time for the purpose of competition with the Company, its successors and assigns, or Franchisee.  When Manager's employment with Franchisee terminates for any reason, the Manager promptly shall surrender to Franchisee all papers, documents, writings and other property, electronic or otherwise, produced by Manager or coming into Manager's possession by or through Manager's employment with the Franchisee containing confidential information or related in any way to confidential information.  All of the foregoing materials shall remain the property of the Company, its successors, or its assigns.

3.  <u>Covenant Not to Compete</u>.  During the term of Manager's employment with the Franchisee and for a period of 24 months after the end of Manager's employment with the Franchisee regardless of which party ends the employment relationship and regardless of the reason why the employment relationship ends, Manager shall not engage in, directly or indirectly as a principal, agent, trustee, employee, consultant, independent contractor or through any corporation, partnership, association, or other entity, a Competing Business at any location within the Operating Area of the 1-Tom-Plumber Unit location at which Manager worked or within the operating area of any then-existing 1-Tom-Plumber Unit location.

4.  <u>Indemnification and Injunctive Relief.</u>  Manager shall indemnify and hold the Company and the Franchisee harmless against any losses, damages, costs, expenses, claims or actions, including attorneys' fees and costs, proximately caused by any breach of this Agreement by Manager.  Manager shall pay to the Company any compensation, profits or economic benefits realized by the Manager resulting from any breach of this Agreement.  The Company shall have the right to injunctive and other equitable relief prohibiting the Manager from any violation or threatened violation of this Agreement, without posting any bond or security. Manager acknowledges that the restrictions in this Agreement are reasonable and necessary to protect the legitimate business interests of the Franchisee, and that the violation of the foregoing restrictions will lead to immediate and irreparable harm, for which injunctive relief is necessary.

5.  <u>Governing Law</u>.  The laws of Ohio shall govern this Agreement.

D-2

6.      <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement of the parties with regard to the subject matter of this Agreement and replaces and supersedes all other written and oral agreements and statements of the parties relating to the subject matter of this Agreement.

7.      <u>Limitations</u>.  This is not a contract of employment and this creates no employment relationship between Manager and the Company.  Manager is not a third party beneficiary of any contract between the Company and the Franchisee.  Franchisee remains the sole employer of Manager and is solely responsible for the recruitment, selection, training, supervision, compensation, benefits, insurance, worker's compensation, discipline and termination of Manager.  During any period of on the job training of Manager by the Company, Franchisee shall remain the sole employer of Manager and shall be responsible for controlling all aspects of Manager's employment.

Executed and delivered this _____ day of _____, 20____.

**Manager:**

_____
Signature

_____
Printed Name

**Franchisee:** _____

By: _____

Title: _____

D-3

**Attachment E**

**Lease Rider**

E-1

**LEASE RIDER**

This "Lease Rider" is made and entered into as of _____, 20___ by and among 1 Tom Plumber Global Inc., an Ohio corporation ("Franchisor"), _____, a _____ ("Tenant/Operator") and _____, a _____ ("Landlord").

Recitals. Tenant/Operator and Landlord desire to enter into a lease (the "Lease") pursuant to which Tenant/Operator will occupy and finish the premises located at _____ (the "Premises") for use and operation of 1-Tom-Plumber Central Office (the "Central Office") authorized under a Franchise Agreement to be executed between Franchisor and Tenant/Operator prior to the opening of the Central Office (the "Franchise Agreement"). As a condition to Franchisor's approval of the Premises as the location for the Central Office, the Tenant/Operator is required under the Franchise Agreement to execute this Lease Rider along with the Landlord and Franchisor;

NOW, THEREFORE, in consideration of the mutual undertakings and commitments set forth herein, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

(1)　During the term of the Franchise Agreement, the Premises shall be used only for the operation of the Central Office.

(2)　Landlord consents to Tenant/Operator's use and display of such proprietary marks (the "Proprietary Marks") and signs, decor items, color schemes, plans, specifications and related components of 1-Tom-Plumber Franchised System (the "System") as Franchisor has prescribed, and may in the future prescribe, for the Central Office. Landlord affirms that the Lease does not prohibit the service of any product items or services of the current System, based on the product and service information provided to Landlord.

(3)　Landlord agrees to send Franchisor conformed, legible copies of any and all letters and notices sent to Tenant/Operator pertaining to the Lease and the Premises at the same time that such letters and notices are sent to Tenant/Operator.

(4)　Franchisor shall have the right, and Landlord consents to allow Franchisor, to enter the Premises during hours when the Premises is available for tenant entry to make any modification or alteration necessary to protect the Central Office, the System and Proprietary Marks or to cure any default under the Franchise Agreement, or under the Lease, without being guilty of trespass or any other crime or tort.

(5)　In the event of Tenant/Operator's default under the Lease, Franchisor may, but has no obligation, to cure the default. Franchisor shall make this determination within thirty (30) days after Franchisor receives notice of the Lease default from Landlord. If Franchisor elects to cure the default, Franchisor shall cure the default within thirty (30) days of such election or, if the default cannot be reasonably cured within such thirty (30) day period, then Franchisor shall commence and proceed to act diligently to cure the default within such time as is reasonably necessary to cure the default.

(6)　Franchisor has an option to acquire the Central Office from Tenant/Operator if the Franchise Agreement expires or terminates. If Franchisor exercises the option, it will notify Landlord when it notifies Tenant/Operator. If Franchisor so exercises its option, or makes a different arrangement with Tenant/Operator to acquire the Central Office, then Landlord shall permit Tenant/Operator to assign the Lease to Franchisor or to Franchisor's affiliated assignee or designee as successor in interest ("Successor") to Tenant/Operator, which shall be obligated to assume Tenant/Operator's obligations under the Lease.

E-2

Successor shall attorn to Landlord under the Lease and Landlord shall attorn to and agree not to disturb the tenancy of Successor. In such event Successor shall assume Tenant/Operator's occupancy rights, rights under any succession or purchase options, and the right to sublease the Premises, for the remainder of the term of the Lease including any applicable succession periods.

(7)   Landlord hereby consents to such assignment and agrees not to impose or assess any assignment fee or similar charge or increase or accelerate rent under the Lease in connection with such assignment, or require Successor to pay any rent or other financial obligation of Tenant/Operator to Landlord arising prior to the assignment.  Landlord agrees to look solely to the Tenant/Operator and its guarantors for any rents or other financial obligations owed to Landlord arising prior to such assignment.  Landlord and Tenant/Operator acknowledge that Franchisor is not a party to the Lease and shall have no liability under the Lease, unless and until the Lease is assigned to, and assumed by Franchisor as Successor.

(8)    Notwithstanding anything contained in this Lease Rider and in the Lease, Successor is expressly authorized, without the consent of the Landlord, to sublet the Premises to an authorized System franchisee, provided such subletting is specifically subject to the terms of the Lease and further provided the franchisee expressly assumes in writing all obligations of the Lease.  Franchisor agrees to notify Landlord as to the name of the franchisee within ten (10) days after such subletting.

(9)    Tenant/Operator shall not assign the Lease or renew or extend the term thereof without the prior written consent of Franchisor.

(10)    Landlord and Tenant/Operator shall not amend or otherwise modify the Lease in any manner that could materially affect any of the foregoing without the prior written consent of Franchisor.

(11)    This Lease Rider will supersede any conflicting terms of the Lease.

[Remainder of Page Intentionally Left Blank]

**IN WITNESS WHEREOF,** the parties have executed this Lease Rider as of the date first above written.

**FRANCHISOR:**

1 Tom Plumber Global Inc.

By: _____

Name: _____

Title: _____

**TENANT/OPERATOR:**

_____

By: _____

Name: _____

Title: _____

**LANDLORD:**

_____

By: _____

Name: _____

Title: _____

E-4

**Attachment F**

**Receipt of Operations Manual
and Confidentiality Agreement**

JRB3 4839-5087-0229
2950761-000001

### RECEIPT FOR OPERATIONS MANUAL

The undersigned franchisee ("Franchisee"), acknowledges receipt of 1-Tom-Plumber Operations Manual by receiving access codes and instructions to access the on-line version of the Operations Manual. The Operations Manual is being loaned, and access is being granted, to Franchisee under the Franchise Agreement between Franchisee and 1 Tom Plumber Global Inc. ("Company"). Franchisee expressly agrees as follows:

1. <u>Operations Manual</u>. If the access code granting access to the Operations Manual is misplaced, destroyed (in whole or in part), or otherwise lost, the Franchisee must pay for replacement access codes from the Company at a cost of $500.00 and must sign a new receipt. The Franchisee shall not copy or otherwise reproduce any portion of the Operations Manual. The Operations Manual shall not be removed from the premises of the Central Office identified in the Franchise Agreement. The Franchisee shall not loan or disclose the Operations Manual to any third party. The Franchisee shall not communicate, transmit, describe, summarize, or otherwise convey the information contained in the Operations Manual, in whole or in part, to any third party not employed by the Franchisee to operate the Franchised Unit. The Operations Manual shall at all times remain the property of the Company, its successors and assigns.

2. <u>Confidentiality Agreement</u>. The Franchisee acknowledges that the Franchisee will receive certain confidential information and knowledge contained in the Operations Manual that is the subject of confidentiality obligations in the Franchise Agreement. When the Franchise Agreement with the Company terminates for any reason, the Franchisee promptly shall surrender to the Company the Operations Manual identified above, along with all papers, documents, writings and other property produced to the Franchisee or coming into the Franchisee's possession by or through the relationship with the Company and related in any way to the confidential information. All of the foregoing materials shall remain the property of the Company, its successors, or its assigns.

3. <u>Indemnification and Injunctive Relief.</u> The Franchisee's obligations to indemnify the Company and accept injunctive relief described in the Franchise Agreement shall apply to breaches of Franchisee's undertakings regarding the Operations Manual.

4. <u>Supplement to Franchise Agreement</u>. This Receipt is a supplement and subject to the Franchise Agreement in all respects.

Executed and delivered this 27ᵗʰ day of January , 2023 .

Franchisee: **BLUE RIDGE PLUMBING AND DRAIN, LLC**

By: _____     By: _____

Its: _____Owner_____     Its: _____owner_____

Date: ____1/27/23_____     Date: ____1/27/23_____

F-2

JRB3 4839-5087-0229
2950761-000001

### 1 TOM PLUMBER GLOBAL INC.
### FRANCHISE CLOSING ACKNOWLEDGMENT

As you know, you (or the entity you represent) and we are entering into a Franchise Agreement to operate a Franchised Business. The purpose of this Closing Acknowledgment is to determine whether any statements or promises were made to you on which you have relied that we have not authorized or that may be untrue, inaccurate or misleading. Please review each of the following questions carefully and provide honest, accurate and complete responses to each question.

**Acknowledgments and Representations.**[*]

Did you receive a copy of our Franchise Disclosure Document ("FDD") (and all exhibits and attachments) at least 14 calendar days (or at the first personal meeting in Iowa or New York, or least 10 business days if you are in Connecticut, Michigan or New York), before you signed the Franchise Agreement? **Check one:** (✓) **Yes** (__) **No**. If no, please tell us if and when you received the FDD and when you signed the Franchise Agreement. Please explain why you signed the Franchise Agreement or Multi-Unit Operator Agreement before the 14 days expired:

_____
_____

Did you understand all the information in the FDD and your rights and obligations under the Franchise Agreement? **Check one:** (✓) **Yes** (__) **No**. If no, please comment:

_____
_____

Did you receive a copy of the Franchise Agreement at least 7 days before you signed the Agreement? **Check one:** (✓) **Yes** (__) **No**. If no, tell us when you received the Franchise Agreement and when you signed it. Please explain why you signed the Franchise Agreement when you did:

_____
_____

Have you studied and reviewed carefully our FDD and the Franchise Agreement you received? **Check one:** (✓) **Yes** (__) **No**. If no, please comment:

_____
_____

Was any oral, written or visual claim, statement, presentation or representation made to you on which you relied in making your decision to sign the Franchise Agreement that contradicted the disclosures in the

---

[*]Such representations are not intended to nor shall they act as a release, estoppel or waiver of any liability incurred under the Illinois Franchise Disclosure Act or under the Maryland Franchise Registration and Disclosure Law, if either or both such laws apply to this transaction.

F-2

FDD? **Check one: (__)Yes (✓)No.** If yes, please explain in detail the oral, written or visual statement, presentation, claim or representation:

_____

_____

Except for any financial performance representation included as Item 19 in our FDD, did any employee or other person speaking on our behalf make any oral, written or visual claim, statement, promise or representation to you that stated, suggested, predicted or projected sales, revenues, expenses, earnings, income or profit levels at any Franchised Business franchise, or the likelihood of success at your Franchised Business on which you relied in making your decision to sign the Franchise Agreement? **Check one: (__)Yes (✓)No.** If yes, please explain in detail who made and what you understand is the oral, written or visual claim, statement, promise or representation:

_____

_____

Except for any financial performance representation included as Item 19 in our FDD did any employee or other person speaking on our behalf make any statement or promise regarding the costs involved in operating a franchise that is not contained in the FDD or that is contrary to, or different from, the information contained in the FDD on which you relied in making your decision to sign the Franchise Agreement? **Check one: (__)Yes (✓)No.** If yes, please identify who made the statement or promise and what you understand are the details of the statement or promise.

_____

_____

Do you understand that the franchise granted in the Franchise Agreement (a) allows you to operate a Franchised Business only at the Franchised Location, (b) prevents us from operating or franchising another Franchised Business only in the Operating Area described in the Franchise Agreement, (c) allows us to operate or franchise a Franchised Business anywhere outside the Operating Area, and (d) allows us to open and operate or authorize any other party to open and operate a Unit adjacent to your Operating Area? **Check one: (✓)Yes (__) No.** If no, please comment:

_____

_____

Do you understand that the Franchise Agreement contains the entire agreement between you and us concerning the franchise for the Franchised Business or the development rights we grant to you, meaning that any prior oral or written statements or agreements not set out in the Franchise Agreement or the FDD will not be binding? **Check one: (✓)Yes (__) No.** If no, please comment:

_____

_____

Do you understand that the success or failure of your franchise business will depend in large part upon your skills and experience, your business acumen, the hours you work, the location you select, your management of your Franchised Business, the prices you set, the local market for a Franchised Business, interest rates, the economy, inflation, the number and competence of employees or contractors you hire and their

F-2

compensation, competition, financing terms and other economic and business factors? Further, do you understand that the economic and business factors that exist at the time you buy or open your franchise may change? **Check one:** (✓) **Yes** (__) **No.** If no, please comment:

_____

_____

The undersigned represent and warrant that the information and documents regarding the formation, existence, qualification, ownership and owners' agreement of the franchisee provided to 1 Tom Plumber Global Inc. are true, correct and complete as of the date of this instrument.

*You understand that your answers are important to us and that we will rely on them. By signing this acknowledgment, you are representing that you have considered each question carefully and responded truthfully to the above questions. If more space is needed for any answer, please continue on a separate sheet, attach it, date it and initial the sheet.*

**<u>NOTE:</u>** **IF THE FRANCHISEE IS A CORPORATION, PARTNERSHIP, LIMITED LIABILITY COMPANY OR OTHER ENTITY, EACH OF ITS GUARANTORS MUST EXECUTE THIS ACKNOWLEDGMENT.**

**BLUE RIDGE PLUMBING AND DRAIN, LLC**

By: _____  By: _____

Its: _____Owner_____  Its: _____Owner_____

Date: _____7/27/23_____  Date: _____1/27/23_____

ACCEPTED ON BEHALF OF:

1 TOM PLUMBER GLOBAL INC.

Signed: _____

Print Name: _____Leah R Hanlon_____

Title: _____VP of Sales_____

Date: _____1.27.23_____

F-2

JRB3 4839-5087-0229
2950761-000001

**Attachment G**

**SBA Addendum**

## ATTACHMENT G
## SBA ADDENDUM

### Addendum to Franchise Agreement

      **THIS ADDENDUM** ("Addendum") is made and entered into on _____ __, 20____, by and between 1 Tom Plumber Global Inc., an Ohio corporation ("Franchisor"), located at _____, and _____ ("Franchisee"), located at_____.

      Franchisor and Franchisee entered into a Franchise Agreement on _____, 20___ (such Agreement, together with any amendments, the "Franchise Agreement"). Franchisee is applying for a loan ("Loan") from a lender in which funding is provided with the assistance of the U. S. Small Business Administration ("SBA"). SBA requires the execution of this Addendum as a condition for obtaining the SBA-assisted financing.

      In consideration of the mutual promises below and for good and valuable consideration, the receipt and sufficiency of which the parties acknowledge, the parties agree that notwithstanding any other terms in the Franchise Agreement:

      1.      **<u>CHANGE OF OWNERSHIP</u>.  IF FRANCHISEE IS PROPOSING TO TRANSFER A PARTIAL INTEREST IN FRANCHISEE AND FRANCHISOR HAS AN OPTION TO PURCHASE OR A RIGHT OF FIRST REFUSAL WITH RESPECT TO THAT PARTIAL INTEREST, FRANCHISOR MAY EXERCISE SUCH OPTION OR RIGHT ONLY IF THE PROPOSED TRANSFEREE IS NOT A CURRENT OWNER OR FAMILY MEMBER OF A CURRENT OWNER OF FRANCHISEE. IF THE FRANCHISOR'S CONSENT IS REQUIRED FOR ANY TRANSFER (FULL OR PARTIAL), FRANCHISOR WILL NOT UNREASONABLY WITHHOLD SUCH CONSENT. IN THE EVENT OF AN APPROVED TRANSFER OF THE FRANCHISE INTEREST OR ANY PORTION THEREOF, THE TRANSFEROR WILL NOT BE LIABLE FOR THE ACTIONS OF THE TRANSFEREE FRANCHISEE.**

      2.      <u>Forced Sale of Assets</u>.  If Franchisor has the option to purchase the business personal assets upon default or termination of the Franchise Agreement and the parties are unable to agree on the value of the assets, the value will be determined by an appraiser chosen by both parties. If the Franchisee owns the real estate where the franchise location is operating, Franchisee will not be required to sell the real estate upon default or termination, but Franchisee may be required to lease the real estate for the remainder of the franchise term (excluding additional successions) for fair market value.

      3.      <u>Covenants</u>.  If the Franchisee owns the real estate where the franchise location is operating, Franchisor may not record against the real estate any restrictions on the use of the property, including any restrictive covenants, branding covenants or environmental use restrictions.

      4.      <u>Employment</u>.  Franchisor will not directly control (hire, fire or schedule) Franchisee's employees.

      This Addendum automatically terminates on the earlier to occur of the following: (i) the Loan is paid in full; or (ii) SBA no longer has any interest in the Loan.

JRB3 4839-5087-0229
2950761-000001

Except as amended by this Addendum, the Franchise Agreement remains in full force and effect according to its terms.

**FRANCHISOR:**                                   **FRANCHISEE:**

**1 TOM PLUMBER GLOBAL INC.**            _____


By:_____            By: _____

Print Name:_____            Print Name: _____

F-2

## ADDENDUM TO FRANCHISE AGREEMENT

This Addendum to Franchise Agreement (this "Addendum") is made and entered into this 27th day of January, 2023 by and between 1 Tom Plumber Global Inc., an Ohio corporation ("Franchisor"), and Blue Ridge Plumbing and Drain, LLC, a North Carolina limited liability company ("Franchisee").

RECITALS

A. On even date herewith, Franchisor and Franchisee have entered into a Franchise Agreement (the "Franchise Agreement") whereby Franchisor has granted to Franchisee the right to operate a 1 Tom Plumber franchised business.

B. Franchisor and Franchisee desire to modify the terms of the Franchise Agreement as set forth herein.

C. Capitalized terms contained in this Addendum shall have the meanings given to them in the Franchise Agreement unless otherwise expressly defined herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Franchisor and Franchisee hereby agree as follows:

1. Population Fee. The first sentence of Section 5(c) of the Franchise Agreement is hereby amended by deleting that sentence in its entirety and replacing it with the following:

> "Population Fee. After the date which is twelve (12) months following the opening of the Central Office, you will pay to us a 'Population Fee' in the amount specified on Attachment A."

2. Effect of Addendum. Except as modified in this Addendum, all other terms of the Franchise Agreement remain in full force and effect.

3. Counterparts. This Addendum may be executed in two counterparts, each of which will be deemed an original, but both of which together will constitute one and the same instrument.

The parties are signing this Addendum to Franchise Agreement on the Effective Date.

**1 TOM PLUMBER GLOBAL INC.**

By: _____
Its: VP of sales
Date: 1-27-23

**BLUE RIDGE PLUMBING AND DRAIN, LLC**

By: _____
Its: owner
Date: 1/27/23

By: _____
Its: owner
Date: 1/27/23

# EXHIBIT 2

### 1 TOM PLUMBER FRANCHISE TERMINATION AGREEMENT
### (Warren-Asheville/Winston Salem Locations)

This 1 Tom Plumber Franchisee Termination Agreement ("**Franchise Termination Agreement**") is made and entered into this _____ day of October, 2024, by and between 1 Tom Plumber Global Inc., an Ohio corporation ("**Franchisor**"), and Blue Ridge Plumbing and Drain, LLC, a North Carolina limited liability company  ("**Franchisee**"). Josh Warren and Toni Warren, husband and wife, have both, individually and jointly and severally, personally guaranteed **Franchisee's** performance as a **Franchisee** under terms of the **Franchise Agreement(s)** and **Addendum(s)** described hereinbelow, and have also agreed to be personally bound to the terms, conditions and obligations of this **Franchise Termination Agreement** and are also parties hereto (the said Josh Warren and Toni Warren are hereinafter collectively referred to as "**Guarantors**").  Each of Franchisor, Franchisee and the Guarantors are sometimes referred to herein as a "party" and, collectively, the "parties."

RECITALS

**WHEREAS**:

A.      On January 27, 2023, **Franchisor** and **Franchisee** entered into a Franchise Agreement (**Asheville Franchise Agreement**) wherein **Franchisor** granted to **Franchisee** the right to operate a 1 Tom Plumber franchised business within the Asheville area of North Carolina (**1 Tom Plumber business Asheville**). The parties also entered into an Addendum to Franchise Agreement on January 27, 2023 wherein they modified and/or clarified certain terms of the **Asheville Franchise Agreement (Asheville Addendum)**.  **Guarantors** also executed a Guaranty and Restriction Agreement on January 27, 2023 wherein they both individually and jointly and severally guaranteed the performance of **Franchisee** to the performance of the terms of the **Asheville Franchise Agreement** and **Asheville Addendum** (**Asheville Guaranty**).

B.      On January 18, 2024, **Franchisor** and **Franchisee** entered into a second Franchise Agreement (**Winston-Salem Franchise Agreement**) wherein **Franchisor** granted to **Franchisee** the right to operate a 1 Tom Plumber franchised business (**1 Tom Plumber business Winston-Salem**) in the Winston-Salem area of North Carolina. The parties also entered into an Addendum to Franchise Agreement on January 18, 2024 wherein they modified and/or clarified certain terms of the **Winston- Salem Agreement**  (**Winston-Salem Addendum**). **Guarantors** also executed a Guaranty and Restriction Agreement on January 18, 2024 wherein they both individually and jointly and severally guaranteed the performance of **Franchisee** to the performance of the terms of the **Winston-Salem Franchise Agreement** and **Winston Salem Addendum**. (**Winston-Salem Guaranty**).

C.      The **Asheville Franchise Agreement, Asheville Addendum, Winston-Salem Franchise Agreement** and **Winston-Salem Addendum** are hereinafter collectively referred to as the "**Franchise Agreements**". The **11 Tom Plumber business Asheville** and the **1 Tom Plumber business Winston-Salem** are herein collectively referred to as "**Franchisee's 1 Tom Plumber businesses**". The **Asheville Guaranty** and the **Winston-Salem Guaranty** are hereinafter collectively referred to as the "**Guaranties**"

D.      Following their entry into the **Franchise Agreements** and **Guaranties**, **Franchisee** breached and violated certain terms and provisions of the **Franchise Agreements**. As a direct and proximate result, **Franchisor** elected to terminate **Franchisee's** right to operate its **1 Tom Plumber businesses**, and to terminate both of  **Franchisee's** 1 Tom Plumber Franchises and the right to operate its **1 Tom Plumber Businesses**.

1

      **E.**      The parties are desirous of amicably and mutually resolving and settling all of the issues surrounding the termination of **Franchisee's 1 Tom Plumber's businesses**, and the surrender of same back to **Franchisor** (**settlement**).

      **NOW, THEREFORE**, the **Franchisor**, **Franchisee** and **Guarantors** hereby agree as follows, to wit:

1. **Franchisee** and **Guarantors** hereby irrevocably surrender any and all rights, titles or interests that they each may have in **Franchisee's 1 Tom Plumber businesses** and the Asheville and Winston-Salem franchises to **Franchisor**. **Franchisee** and **Guarantors** shall immediately cease operation of **Franchisee's 1 Tom Plumber businesses** and the Asheville and Winston-Salem franchises. **Franchisee** and **Guarantors** shall comply with all provisions set forth in the **Franchise Agreements** which, by their terms, survive the termination or expiration thereof, including but not limited to: the performance of and adherence to all non-competition and confidentiality provisions; the cessation of the use of the franchised system and any of the proprietary marks or intellectual property belonging to **Franchisor**; and the immediate removal from any property upon which **Franchisee** conducted its **1 Tom Plumber businesses** and/or from vehicles any and all signs, emblems, trade dress, and displays that contain any of **Franchisor's** proprietary marks and/or identifying the **Franchisor** and/or its business and the surrender to **Franchisor** of any marketing materials and/or other property containing signs, emblems, trade dress, and displays that contain any of **Franchisor's** proprietary marks and/or identifying the **Franchisor** and/or **Franchisor's** business.

2. **Franchisee** and/or **Guarantors** shall immediately sign, execute and deliver any further documentation or instruments necessary to carry out the terms of this **Franchise Termination Agreement**. Should **Franchisee** and/or **Guarantor**(**s**) neglect, refuse or otherwise fail to sign any document or instrument necessary for these purposes, then this **Franchise Termination Agreement** shall serve as such document and/or instrument of conveyance and shall be treated as such conclusively by all persons.

3. **Franchisee** and/or **Guarantors** shall pay **Franchisor** the sum of six thousand and 00/100 dollars ($6,000.00) on or before December 31, 2024 in order to compensate **Franchisor** for its costs and expenses incurred in connection with the termination and shutting down of **Franchisee's 1 Tom Plumber businesses** and franchises (**Franchise Termination Exit Fee**). **Franchisor** has agreed to accept the **Francise Termination Exit Fee** from **Franchisee** and/or **Guarantors** as payment in full accord and satisfaction of any and all amounts due to **Franchisor** in connection with the termination of **Franchisee's** franchises and rights to operate **Franchisee's 1 Tom Plumber** businesses, provided, however, that **Franchisee** and **Guarantors** perform all of the duties and obligations as set forth herein (e.g. in the **Franchise Termination Agreement**) and/or the original **Franchise Agreements** relating to the cessation of a franchisee's business and the winding down of the affairs of **Franchisee's 1 Tom Plumber businesses,** any and all non-competition responsibilities, payment of the **Franchise Termination Exit Fee** and confidentiality obligations. Should **Franchisee** and/or **Guarantors** fail, refuse or otherwise neglect to perform their duties as set forth herein, then in that event, **Franchisee** and **Guarantors** shall be in default *and this Franchise Termination Agreement shall be void and Franchisor shall have all rights to recover all monetary and other damages against Franchisee and Guarantors as set forth in the Franchise Agreements and Guaranties.*

4. **Franchisee** shall accept payment of the **Franchise Termination Exit Fee** as payment in full of all amounts due from **Franchisee** and/or **Guarantors** only if the full payment is received on or before

December 31, 2024. Should **Franchisee** and/or **Guarantors** fail, refuse or otherwise neglect to pay **Franchisor** the full **Franchise Termination Exit Fee** on or before December 31, 2024, as provided herein, then in that event, **Franchisee** and **Guarantors** shall be in default ***and this Franchise Termination Agreement shall be void and of no further force and effect, and Franchisor shall have all rights to recover all monetary and other damages against Franchisee and Guarantors as set forth in the Franchise Agreements and Guaranties.*** Any amounts paid prior to such default shall be credited against any amounts later determined to be due to **Franchisor** by **Franchisee** and **Guarantors**.

5. Franchisee and Guarantors, on behalf of themselves and their respective agents, officers, attorneys, owners, members, affiliates, heirs, executors, administrators, successors, predecessors and assigns (**Franchisee Released Parties**), hereby release and discharge Franchisor and its agents, officers, attorneys, owners, members, affiliates, heirs, executors, administrators, successors, predecessors and assigns (**Franchisor Released Parties**) from any and all claims, controversies, causes of action, lawsuits, demands, suits, liabilities, costs, expenses and losses, whether known or unknown, matured or unmatured, asserted or unasserted, absolute or contingent, that the Franchisee Released Parties may have, ever had and/or be entitled to bring or make against the Franchisor Released Parties other than as expressly set forth in this **Franchise Termination Agreement**.

6. The Franchisor Released Parties hereby release and discharge the Franchisee Released Parties from any and all claims, controversies, causes of action, lawsuits, demands, suits, liabilities, costs, expenses and losses, whether known or unknown, matured or unmatured, asserted or unasserted, absolute or contingent, that the Franchisor Released Parties may have, ever had and/or be entitled to bring or make against the Franchisee Released Parties other than as expressly set forth in this **Franchise Termination Agreement**.

7. Neither of the foregoing parties shall bring and/or maintain any claim, action, lawsuit or demand against the other parties for legally actionable conduct committed by either party against the other prior to the execution of this **Agreement**. However, either party shall have the right to make a claim, action, lawsuit or demand as a result any future violation of any of the terms of this **Franchise Termination Agreement** or any future torts or other wrongs committed by the other party following the date of this **Franchise Termination Agreement**. Nothing in this Franchise Termination Agreement, however, shall bar any party hereof from enforcing the terms of this Franchise Termination Agreement.

8. Should **Franchisee** and/or **Guarantors** fail to comply with the "Covenants Not to Compete" as set forth in Paragraph 11 (Page 17) of the **Franchise Agreements**, the "Confidentiality Agreement" as provided for in Paragraph 12 (Page 18) of the **Franchise Agreements**, the "Obligations Upon Termination Or Expiration" as set forth in Paragraph 33 (Page 32), any other post franchise termination obligation set forth in the **Franchise Agreements**, or any other applicable provision of this **Franchise Termination Agreement** dealing with the cessation of the **1 Tom Plumber Businesses**, **Franchisee** and **Guarantors** shall be in default, ***and this Franchise Termination Agreement shall be void and Franchisor shall have all rights to all relief and to recover monetary and other damages against Franchisee and Guarantors as set forth in the Franchise Agreements and Guaranties.***

9. To the extent possible, the circumstances surrounding the termination and surrender of **Franchisee's 1 Tom Plumber's businesses** franchise shall be kept strictly confidential and shall not be disclosed by **Franchisee** and/or **Guarantors** to any person for any reason. Nevertheless, **Franchisee** and/or **Guarantors** may acknowledge to others that their **1 Tom Plumber businesses**

3

franchise has been terminated, and that they are no longer operating a **1 Tom Plumber business** franchise and that the termination of their relationship with **Franchisor** has been amicably terminated. Moreover, **Franchisee** and **Guarantors** shall refrain from making any disparaging comments and/or communications regarding **1 Tom Plumber** and its officers and employees and the operation of the **1 Tom Plumber business** or the relationship between **Franchisor** and **Franchisee** and **Guarantors** to any other person for any reason. Should **Franchisee** and/or **Guarantors** fail to comply with this provision, **Franchisee** and **Guarantors** shall be in default, *and this Franchise Termination Agreement shall be void and Franchisor shall have all rights to all relief and monetary damages against Franchisee and Guarantors as set forth in the Franchise Agreements and Guaranties.*

10. In accordance with the terms and provisions of the **Franchise Agreements**, this **Franchise Termination Agreement** shall be governed by and interpreted pursuant to the law of the State of Ohio. As such, any controversies, challenges, suits, demand or actions involving the **Franchise Termination Agreement** shall be brought and maintained in either the United States District Court for the Southern District of Ohio and/or the Common Pleas Court of Hamilton County, Ohio.

11. Each of the parties represents and warrants to the other that there has been no assignment of any party's rights that are within the scope of this **Franchise Termination Agreement**. Each of the parties represents and warrants to the other that the person executing this **Franchise Termination Agreement** is authorized by the respective entities to enter into this **Franchise Termination Agreement** on that party's behalf.

12. This **Franchise Termination Agreement** constitutes the entire agreement between the parties and supersedes any prior understandings, whether written or oral. This **Franchise Termination Agreement** may not be modified in whole or in part without a written amendment evidencing the change(s) signed by all parties.

13. If any provision of this **Franchise Termination Agreement** is held invalid, such invalidity shall not affect other provision of this **Franchise Termination Agreement** that can be given affect without the invalid provision and to this end, the provisions of this **Franchise Termination Agreement** are declared to be severable.

14. This **Franchise Termination Agreement** may be executed in any number of counterparts, each of which will be deemed an original document, but all of which will constitute a single document; provided, however, that this **Franchise Termination Agreement** shall not be binding on or constitute evidence of a contract between the parties until such time as a counterpart of this **Franchise Termination Agreement** has been executed by each party and a copy thereof delivered via mail, commercial delivery services, e-mail, or facsimile to each party to this **Franchise Termination Agreement** or their respective counsel.

15. The parties and their respective counsel mutually contributed to the preparation of, and have had the opportunity to review and revise this **Franchise Termination Agreement**. Accordingly, no provision of this **Franchise Termination Agreement** shall be construed against any party because that party, or its counsel, drafted the provision. This **Franchise Termination Agreement** and all of its terms shall be construed equally as to all parties.

16. All other provisions of the **Franchise Agreements** shall remain in full force and effect except as they may otherwise conflict with the provisions contained herein.

4

The parties have signed this **Franchise Termination Agreement** intending to be bound by the terms thereof.

**1 TOM PLUMBER GLOBAL INC. (Franchisor)**

By: _Larry Hensley_

Its: Chairman & Founder

Date: 10/30/2024

**BLUE RIDGE PLUMBING AND DRAIN LLC (Franchisee)**

By: _Josh Warren_

Its: owner

Date: 10/30/2024

**GUARANTORS**

_Josh Warren_
**Josh Warren**

_Toni Warren_
**Toni Warren**

# EXHIBIT 3



TOM PLUMBER GLOBAL INC.
24 Whitney Drive, Suite G
Milford, OH 45150
1-866-758-6237 x00000
angie@1tomplumber.com
www.1tomplumber.com

### FRANCHISEE CONTRACT DATA SHEET

#### APPLICANT INFORMATION

| | | | |
|---|---|---|---|
| Name: Josh Warren | | | Email: Josh@warrenrestoration.com |
| Date of birth: 05/16/1981 | SSN: 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 | | Phone: 276-393-0066 |
| Current address: 201 Brandon Rd | | | |
| City: ~~Lockport~~ Hendersonville | State: NC | | ZIP Code: 28739 |
| Title: Owner | | Percentage Of Ownership: | |
| Veteran or First Responder (Police/Fire/EMT)? | Yes ☐ No ☒ | Veteran ☐  Police ☐  Fire ☐  EMT ☐ | |

#### APPLICANT INFORMATION – SPOUSE ☒ OR BUSINESS PARTNER ☐

| | | | |
|---|---|---|---|
| Name: Toni Warren | | | Email: Toni@warrenrestoration.com |
| Date of birth: 07/10/1985 | SSN: 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 | | Phone: 860-670-4772 |
| Current address: 201 Brandon Rd | | | |
| City: HVL | State: NC | | ZIP Code: 28739 |
| Title: Owner | | Percentage Of Ownership: | |
| Veteran or First Responder (Police/Fire/EMT)? | Yes ☐ No ☒ | Veteran ☐  Police ☐  Fire ☐  EMT ☐ | |

#### APPLICANT INFORMATION – SPOUSE ☐ OR BUSINESS PARTNER ☐

| | | | |
|---|---|---|---|
| Name: | | | Email: |
| Date of birth: | SSN: | | Phone: |
| Current address: | | | |
| City: | State: | | Zip Code: |
| Title: | | Percentage Of Ownership: | |
| Veteran or First Responder (Police/Fire/EMT)? | Yes ☐ No ☐ | Veteran ☐  Police ☐  Fire ☐  EMT ☐ | |

#### APPLICANT INFORMATION – SPOUSE ☐ OR BUSINESS PARTNER ☐

| | | | |
|---|---|---|---|
| Name: | | | Email: |
| Date of birth: | SSN: | | Phone: |
| Current address: | | | |
| City: | State: | | Zip Code: |
| Title: | | Percentage Of Ownership: | |
| Veteran or First Responder (Police/Fire/EMT)? | Yes ☐ No ☐ | Veteran ☐  Police ☐  Fire ☐  EMT ☐ | |

#### CORPORATE ENTITY INFORMATION

| | |
|---|---|
| Name Of Corporate Entity: Blue Ridge Plumbing and Drain, LLC | |
| D/B/A: | |
| Form of Corporate Entity: LLC | |
| Corporate Entity Principal Address: 174 Bradley Branch Rd, Ste 3 | |
| City: Arden | State: NC    ZIP Code: 28704 |
| Phone: | E-mail:    Fax: |
| EIN Number: | |
| State In Which Entity Is Organized: North Carolina | Date Formed: 12/29/22 |

| TERRITORY |
|---|

Describe Territory (Address, Zip Codes, Metes & Bounds, etc.):

See attached map and zip codes for :   Asheville, NC

| Population Total:   635,543 | Population Fee:   $ 450 per month |
|---|---|

Special Notes/Addendum:

- Franchise Fees   $40,000
- Population fee to begin 1 year after opening
- 

I _Josh Warren_ (please print) verify that the above information provided on this form is true to the best of my knowledge.

| Signature _(signature)_ | Date  12/28/22 |
|---|---|

I _Toni Warren_ (please print) verify that the above information provided on this form is true to the best of my knowledge.

| Signature _Jtwarren_ | Date  12/28/22 |
|---|---|

I _____ (please print) verify that the above information provided on this form is true to the best of my knowledge.

| Signature | Date |
|---|---|

I _____ (please print) verify that the above information provided on this form is true to the best of my knowledge.

| Signature | Date |
|---|---|



| Y | X | zip_code | tot_pop | tot_hh | med_incom | zip_type |
|---|---|---|---|---|---|---|
| 35.70782 | -82.6393 | 28701 | 3295 | 1505 | 51979 | |
| 35.39048 | -83.628 | 28702 | 600 | 194 | 54196 | |
| 35.46127 | -82.562 | 28704 | 19630 | 8227 | 63559 | |
| 35.39526 | -83.0628 | 28707 | 155 | 75 | 0 | |
| 35.24499 | -82.8838 | 28708 | 532 | 225 | 0 | |
| 35.76356 | -82.4053 | 28709 | 2403 | 874 | 45655 | |
| 35.6018 | -82.2976 | 28711 | 13591 | 5705 | 43899 | |
| 35.20456 | -82.7726 | 28712 | 19344 | 8348 | 42591 | |
| 35.45394 | -83.5732 | 28713 | 8432 | 3425 | 34854 | |
| 35.51468 | -82.7162 | 28715 | 26317 | 10058 | 50925 | |
| 35.43581 | -82.8606 | 28716 | 17638 | 7183 | 46768 | |
| 35.03175 | -83.0716 | 28717 | 1767 | 731 | 45174 | |
| 35.15278 | -82.635 | 28718 | 452 | 204 | 43929 | |
| 35.60834 | -83.2166 | 28719 | 8127 | 2843 | 34713 | |
| 35.6579 | -82.9478 | 28721 | 9721 | 4181 | 43843 | |
| 35.23717 | -82.1266 | 28722 | 6809 | 2952 | 46552 | |
| 35.33089 | -83.0691 | 28723 | 10682 | 3326 | 33623 | |
| 35.28244 | -82.4186 | 28726 | 2723 | 1307 | 32820 | |
| 35.31931 | -82.6036 | 28729 | 3534 | 1503 | 49089 | |
| 35.52815 | -82.3776 | 28730 | 9553 | 3548 | 56630 | |
| 35.28874 | -82.3918 | 28731 | 8843 | 3781 | 51365 | |
| 35.44817 | -82.4632 | 28732 | 17533 | 7272 | 57298 | |
| 35.43392 | -83.8031 | 28733 | 9 | 7 | 0 | |
| 35.17546 | -83.4279 | 28734 | 26544 | 11942 | 37759 | |
| 35.47498 | -82.3423 | 28735 | 302 | 163 | 27386 | |
| 35.17722 | -83.0942 | 28736 | 873 | 413 | 41372 | |
| 35.26604 | -82.5447 | 28739 | 20900 | 9369 | 51738 | |
| 35.06444 | -83.2092 | 28741 | 3746 | 1849 | 62072 | |
| 35.39489 | -82.6514 | 28742 | 2912 | 1137 | 60583 | |
| 35.82677 | -82.868 | 28743 | 2033 | 888 | 29804 | |
| 35.52517 | -82.9716 | 28745 | 702 | 307 | 68359 | |
| 35.14035 | -82.928 | 28747 | 2222 | 952 | 35288 | |
| 35.65533 | -82.7594 | 28748 | 12474 | 4625 | 47693 | |
| 35.50553 | -83.1197 | 28751 | 3298 | 1718 | 43510 | |
| 35.87188 | -82.6941 | 28753 | 10492 | 4321 | 37510 | |
| 35.87807 | -82.5122 | 28754 | 9516 | 3316 | 44159 | |
| 35.3441 | -82.1711 | 28756 | 4308 | 1726 | 48147 | |
| 35.38297 | -82.5895 | 28759 | 7377 | 2899 | 63173 | |
| 35.0381 | -83.409 | 28763 | 2807 | 1285 | 65559 | |
| 35.24928 | -82.619 | 28766 | 1346 | 505 | 63092 | |
| 35.29115 | -82.6874 | 28768 | 7401 | 3020 | 50741 | |
| 35.34242 | -83.8565 | 28771 | 8110 | 3140 | 34767 | |
| 35.08841 | -82.8874 | 28772 | 1313 | 524 | 57951 | |

| Y | X | zip_code | tot_pop | tot_hh | med_incom | zip_type |
|---|---|---|---|---|---|---|
| 35.25999 | -82.3122 | 28773 | 3210 | 1249 | 51368 | |
| 35.09412 | -83.0092 | 28774 | 1106 | 569 | 58966 | |
| 35.01913 | -83.3211 | 28775 | 296 | 136 | 0 | |
| 35.6164 | -82.4064 | 28778 | 10633 | 4058 | 43089 | |
| 35.35712 | -83.21 | 28779 | 17367 | 7323 | 51769 | |
| 35.21403 | -83.6416 | 28781 | 1003 | 413 | 34821 | |
| 35.25041 | -82.0691 | 28782 | 6370 | 3090 | 50191 | |
| 35.24249 | -83.0213 | 28783 | 1722 | 692 | 30250 | |
| 35.59278 | -83.0164 | 28785 | 7814 | 3249 | 53341 | |
| 35.46252 | -82.9909 | 28786 | 20704 | 9662 | 42500 | |
| 35.72883 | -82.5233 | 28787 | 20897 | 8411 | 54072 | |
| 35.41123 | -83.3161 | 28789 | 5654 | 2305 | 46386 | |
| 35.20059 | -82.4879 | 28790 | 3178 | 1238 | 61837 | |
| 35.35714 | -82.5081 | 28791 | 14903 | 6626 | 50456 | |
| 35.39031 | -82.3692 | 28792 | 33643 | 13924 | 43896 | |
| 35.59444 | -82.5577 | 28801 | 14211 | 6637 | 34035 | |
| 35.52979 | -82.5213 | 28803 | 32613 | 15156 | 50805 | |
| 35.64837 | -82.5623 | 28804 | 21569 | 8381 | 55125 | |
| 35.61872 | -82.4761 | 28805 | 18467 | 9033 | 46345 | |
| 35.55397 | -82.6181 | 28806 | 41601 | 17359 | 43311 | |
| 35.20313 | -83.8078 | 28901 | 5370 | 2090 | 32364 | |
| 35.02488 | -83.9579 | 28902 | 1344 | 594 | 32857 | |
| 35.06263 | -83.7271 | 28904 | 8387 | 4047 | 36294 | |
| 35.15936 | -83.9418 | 28905 | 2723 | 1204 | 37866 | |
| 35.11887 | -84.1336 | 28906 | 19088 | 7787 | 39216 | |
| 35.00338 | -83.9022 | 28909 | 1304 | 533 | 45380 | |
| 35.45198 | -82.2869 | | 0 | 0 | 0 | |
| 35.3294 | -82.3753 | | 0 | 0 | 0 | |
| 35.37036 | -83.2495 | | 0 | 0 | 0 | |
| 35.39387 | -82.3428 | | 0 | 0 | 0 | |
| 35.53921 | -82.6517 | | 0 | 0 | 0 | |
| 35.47819 | -83.0018 | | 0 | 0 | 0 | |
| 35.17877 | -83.3737 | | 0 | 0 | 0 | |
| 35.2246 | -82.2404 | | 0 | 0 | 0 | |
| 35.64504 | -82.3021 | | 0 | 0 | 0 | |
| 35.37505 | -82.4963 | | 0 | 0 | 0 | |
| 35.39247 | -82.5022 | | 0 | 0 | 0 | |
| 35.61731 | -82.2816 | | 0 | 0 | 0 | |
| 35.48382 | -82.525 | | 0 | 0 | 0 | |
| 35.24398 | -82.4193 | | 0 | 0 | 0 | |
| 35.34565 | -83.22 | | 0 | 0 | 0 | |
| 35.31798 | -82.4638 | | 0 | 0 | 0 | |
| 35.59331 | -82.5552 | | 0 | 0 | 0 | |

| Y | X | zip_code | tot_pop | tot_hh | med_incom | zip_type |
|---|---|---|---|---|---|---|
| 35.55304 | -82.6003 | | 0 | 0 | 0 | |
| 35.54477 | -82.5336 | | 0 | 0 | 0 | |
| 35.62377 | -82.5545 | | 0 | 0 | 0 | |
| 35.5874 | -82.4878 | | 0 | 0 | 0 | |
| 35.58543 | -82.6018 | | 0 | 0 | 0 | |
| 34.99026 | -84.1664 | | 0 | 0 | 0 | |

# EXHIBIT 4



# MANAGEMENT CONFIDENTIALITY AND NON-COMPETITION AGREEMENT

The undersigned 1-Tom-Plumber Unit on-premises manager ("Manager"), in consideration of the access to training and confidential information he or she has received or will receive from 1 Tom Plumber Global Inc., an Ohio corporation, and/or its affiliates (collectively, the "Company") in connection with Manager's employment with the Company's franchisee named below (the "Franchisee"), hereby covenants and agrees as follows:

1.  <u>Definitions</u>. Capitalized terms not otherwise defined in this Release shall have the meaning assigned to that term in the Franchise Agreement, including its addenda and amendments, between the Company and Franchisee, dated <u>June 6th</u>, 20<u>23</u>.

2.  <u>Confidentiality Agreement</u>. Manager acknowledges that, while employed by the Franchisee, Manager has and will receive certain confidential information and knowledge concerning business of the Company which the Company wishes to protect, including (without limitation) information, knowledge, know-how, product and service instructions, product and service preparation instructions, formulae, materials, equipment, techniques, systems, and other data relating to or comprising 1-Tom-Plumber franchise system. Confidential information includes the Operations Manual and other materials and information supplied by Company to the Franchisee that is identified as confidential at the time of disclosure or before. Manager shall not reveal that confidential information to any other party, except the Company's or the Franchisee's independent public accountants, Manager's legal counsel (if that counsel also agrees to maintain the confidentiality of the confidential information), or as otherwise required by law. Manager shall not use or disclose the confidential information at any time for the purpose of competition with the Company, its successors and assigns, or Franchisee. When Manager's employment with Franchisee terminates for any reason, the Manager promptly shall surrender to Franchisee all papers, documents, writings and other property, electronic or otherwise, produced by Manager or coming into Manager's possession by or through Manager's employment with the Franchisee containing confidential information or related in any way to confidential information. All of the foregoing materials shall remain the property of the Company, its successors, or its assigns.

3.  <u>Covenant Not to Compete</u>. During the term of Manager's employment with the Franchisee and for a period of 24 months after the end of Manager's employment with the Franchisee regardless of which party ends the employment relationship and regardless of the reason why the employment relationship ends, Manager shall not engage in, directly or indirectly as a principal, agent, trustee, employee, consultant, independent contractor or through any corporation, partnership, association, or other entity, a Competing Business at any location within a 10-mile radius of any 1-Tom-Plumber Unit location at which Manager worked or within a 10-mile radius of any then-existing 1-Tom-Plumber Unit location.



# MANAGEMENT CONFIDENTIALITY AND
# NON-COMPETITION AGREEMENT

4. <u>Indemnification and Injunctive Relief.</u>  Manager shall indemnify and hold the Company and the Franchisee harmless against any losses, damages, costs, expenses, claims or actions, including attorneys' fees and costs, proximately caused by any breach of this Agreement by Manager. Manager shall pay to the Company any compensation, profits or economic benefits realized by the Manager resulting from any breach of this Agreement. The Company shall have the right to injunctive and other equitable relief prohibiting the Manager from any violation or threatened violation of this Agreement, without posting any bond or security. Manager acknowledges that the restrictions in this Agreement are reasonable and necessary to protect the legitimate business interests of the Franchisee, and that the violation of the foregoing restrictions will lead to immediate and irreparable harm, for which injunctive relief is necessary.

5. <u>Governing Law</u>. The laws of Tennessee shall govern this Agreement.

6. <u>Entire Agreement</u>. This Agreement constitutes the entire agreement of the parties with regard to the subject matter of this Agreement and replaces and supersedes all other written and oral agreements and statements of the parties relating to the subject matter of this Agreement.

7. <u>Limitations</u>. This is not a contract of employment and this creates no employment relationship between Manager and the Company. Manager is not a third party beneficiary of any contract between the Company and the Franchisee. Franchisee remains the sole employer of Manager and is solely responsible for the recruitment, selection, training, supervision, compensation, benefits, insurance, worker's compensation, discipline and termination of Manager. During any period of on the job training of Manager by the Company, Franchisee shall remain the sole employer of Manager and shall be responsible for controlling all aspects of Manager's employment.

 # MANAGEMENT CONFIDENTIALITY AND NON-COMPETITION AGREEMENT

Executed and delivered this 6 th day of June, 20 2 3.

**Manager:**

*[signature]*

Signature

*Michael Perdue*

Printed Name

**Franchisee:** _____

By: _____

Title: _____

# EXHIBIT 5

**DAVID L. PREM**

ATTORNEY AT LAW

———————

1019 MAIN STREET
CINCINNATI, OHIO 45202
(513) 381-1234 TELEPHONE
(513) 381-1255 FACSIMILE

CALVIN W. PREM
1924-1992

CELLULAR (513) 378-9257
EMAIL: attorney21@fuse.net

September 13, 2024

**HAND DELIVERED**
**PERSONAL AND CONFIDENTIAL**
Blue Ridge Plumbing and Drain, LLC
Attention: Josh and Toni Warren
174 Bradley Branch Road, Ste 3
Arden, North Carolina 28704

    re:    **NOTIFICATION OF IMMEDIATE TERMINATION OF YOUR
1 TOM PLUMBER FRANCHISE/DEMAND TO CEASE AND
DESIST IN OPERATION OF PLUMBING BUSINESS/DEMAND TO
REMOVE AND SURRENDER 1 TOM PLUMBING
MATERIALS/DEMAND FOR RECORDS**

        **My Clients: 1 Tom Plumber Global Inc.
Larry D. Hensley/Kameron J. Hensley**

Dear Mr. and Mrs. Warren and Blue Ridge Plumbing and Drain, LLC:

    I represent the interests of 1 Tom Plumber Global Inc. ("**1 Tom Plumber**") and its owners, Larry D. Hensley and Kameron J. Hensley (the "**Hensleys**").

    As set forth more fully herein, you are hereby given written notice that due to incurable, material breaches of your duties and obligations as a 1 Tom Plumber franchisee under the terms of the franchise agreements entered into by you with **1 Tom Plumber**, your rights to operate a 1 Tom Plumber Franchise in Asheville, North Carolina and its surrounding areas and in Winston-Salem, North Carolina and its surrounding areas are hereby immediately terminated.

    Further, because of the egregious acts committed by you and/or your employees, agents, or representatives to deliberately divert 1 Tom Plumber revenues into accounts belonging to one or more of your other businesses instead of your 1 Tom Plumber franchise, **1 Tom Plumber** demands immediate payment of all monies owed and due to it, including but not limited to all improperly diverted revenue and all royalties, commissions and other fees and charges. **1 Tom Plumber** will pursue legal action against you and any entities or persons with whom you conspired, seeking redress to the fullest extent permitted by law, including but not limited to actual damages, liquidated damages, treble damages for willful trademark infringement pursuant to 15 U.S.C. § 1114, interest, attorneys' fees and costs.

Blue Ridge Plumbing and Drain, LLC
Attention: Josh and Toni Warren
September 13, 2024
Page 2

Reference is hereby directed to the Franchise Agreement made and entered into by and between Blue Ridge Plumbing and Drain, LLC ("**Blue Ridge**"), and **1 Tom Plumber**, dated January 27, 2023, and as amended (the "**Franchise Agreement**"), wherein **Blue Ridge** acquired the right to operate a 1 Tom Plumber Franchise in the "Asheville" area of North Carolina. You also are directed to the separate franchise agreement that you entered into for the operation of a 1 Tom Plumber Franchise in the "Winston-Salem" area of North Carolina ("**Winston-Salem Agreement**"). As you are also aware, Joshua Warren and Toni Warren (collectively, the "**Warrens**") personally guaranteed the performance of **Blue Ridge** pursuant to the terms of the **Franchise Agreement** and **Winston-Salem Agreement**. Therefore, Joshua Warren and Toni Warren are personally and jointly and severally liable for the amounts that **Blue Ridge** owes to **1 Tom Plumber**. To the extent **Blue Ridge** does not have the actual "cash-on-hand" to meet these liabilities, **1 Tom Plumber** will pursue its rights to damages under any judgment that it receives against the **Warrens'** personal assets, including their respective interests in all other businesses, real estate, personal investments, bank accounts, chattels and any other personal property subject to attachment and seizure.

Be advised that pursuant to Section 15 of the **Franchise Agreement, 1 Tom Plumber** has conducted an audit and investigation of your 1 Tom Plumber franchised business operations in Asheville, which has revealed an orchestrated scheme to use 1 Tom Plumber's trademarks in willful violation of 15 U.S.C. § 1114, and to use your 1 Tom Plumber franchise as a "store front" to surreptitiously solicit, divert, covert, accept, intercept, and route customer leads, 1 Tom Plumber estimates, other plumbing-related business opportunities, and sales receipts belonging to **1 Tom Plumber**, to other business entities owned by you to avoid the payment of royalties, commissions and other fees and charges owed to **1 Tom Plumber** by you. **1 Tom Plumber** has been made aware that you have been collectively acting in complicity with yourselves, your general manager and fiscal officer, and with several other third-parties, including but not limited to the businesses you operate using the names "Warren Restoration, LLC", "TLC Properties LLC", "TLC Service Group, LLC", "Blue Ridge Service Group LLC" and/or "Blue Ridge Plumbing and Drain, LLC", to carry out this scheme, by intentionally placing 1 Tom Plumber revenues into accounts belonging to one or more of these businesses instead of your 1 Tom Plumber franchise.

The audit and investigation also revealed that you have failed, refused and/or otherwise neglected to properly log your plumbing business jobs into the "Service Titan" system as required; that you have permitted others to collect monies due to your 1 Tom Plumber franchised business; and that you have wrongfully intermingled your other business operations with the operation of your 1 Tom Plumber franchised business. The audit and investigation further revealed that you have failed to maintain records to properly pay commission to your employees; failed to follow **1 Tom Plumber** protocols in the manner in which you have provided services to customers; failed to accurately report gross sales; and failed to abide by the terms of the non-competition obligations under the **Franchise Agreement**. You should not consider this list as a limitation on other violations that you have committed which have not so otherwise been identified above, or which we are, at this time, unaware. The magnitude of your dishonesty has been punctuated by your attempts to make it appear as if "all is well" with the operation of your franchise when contacted

Blue Ridge Plumbing and Drain, LLC
Attention: Josh and Toni Warren
September 13, 2024
Page 3

by management. Obviously, these statements were false and were intended to further mislead and conceal your true conspiratorial actions toward **1 Tom Plumber** and the **Hensleys**.

*The above-described misconduct constitutes incurable, material breaches of the Franchise Agreement*. Therefore, as the direct and proximate result of your actions and misconduct, and pursuant to Section 29(f), (g), (h) and (k) of the Franchise Agreement, you are hereby notified that the **Franchise Agreement** is hereby terminated with immediate effect. Further, as a direct and proximate result of the incurable, material breaches, and pursuant to Section 30(A) of the **Winston-Salem Agreement**, you are hereby notified that the **Winston-Salem Agreement** is hereby terminated with immediate effect.

**Blue Ridge** and the **Warrens** are hereby directed to immediately cease the operation of your 1 Tom Plumber franchised business in Asheville. You no longer are permitted to start a franchise in the Winston-Salem area. Neither **Blue Ridge** nor the **Warrens** may hold themselves out as in any way being affiliated with, entitled to operate and/or directly operating a 1 Tom Plumber franchise anywhere. You are further reminded of your agreed-to and reasonable non-competition obligations, and you therefore are directed, for the next two (2) years, not to engage and/or attempt to engage in the operation of any plumbing business and/or assist any other party in engaging in a plumbing business in competition with **1 Tom Plumber** within the areas set forth in the **Franchise Agreement** and **Winston-Salem Agreement**. Obviously, this includes providing any plumbing services by your other businesses, directly and/or indirectly.

Furthermore, you are directed to comply with all post-termination provisions set forth in the **Franchise Agreement** and the **Winston-Salem Agreement**, including, without limitation, the removal of all trademark logos and identifications from your trucks. **1 Tom Plumber** literature, likenesses, protected intellectual property, etc. may no longer be used and must be surrendered to **1 Tom Plumber**.

The **Franchise Agreement** also requires you to pay to **1 Tom Plumber**, within thirty (30) Days of the date of this letter, all amounts that you are then obligated to pay to it. Although determining the true nature and extent of the amount of money that you owe to **1 Tom Plumber** might be difficult to determine (in large part, due to your deceptive conduct and concealment), **1 Tom Plumber** has calculated that you will owe it in excess of One Million Dollars ($1,000,000.00). Obviously, this number will likely increase after the full nature and scope of your deceptive misconduct, diversion of assets and concealment has been accurately determined. The amounts that you will have to pay **1 Tom Plumber** will also include a liquidated damages amount based on your past payment of royalties.

To that end, **1 Tom Plumber** anticipates your full compliance with your "post franchise" obligations as you "wind-down" your 1 Tom Plumber Franchises during this period. **1 Tom Plumber** reserves the right to conduct "on-site" audits of your books and records, which will include all records from your other companies that relate to plumbing transactions and the collection of money for same. To that end, you should treat this portion of this letter as a "demand

Blue Ridge Plumbing and Drain, LLC
Attention: Josh and Toni Warren
September 13, 2024
Page 4

to preserve evidence" and any act or failure to act which might cause these records to be unavailable or otherwise not preserved shall be addressed accordingly.

Concomitantly, with the service of this letter upon you, **1 Tom Plumber** is also serving "cease and desist" letters to "Warren Restoration, LLC" and "TLC Service Group, LLC" with whom you have conspired to cheat **1 Tom Plumber** out of the royalties, commissions and other fees that you owe to it.

Notwithstanding the tenor of this letter, and notwithstanding the gravamen of your misconduct, the **Hensleys** and **1 Tom Plumber** are desirous of attempting to resolve the matter quickly, efficiently and amicably. You may contact me, or have your agent or attorney contact me, if you would like to discuss this matter in more detail. If you do not contact me or my colleague, Christopher A. Kuhnhein, Esq. (CAK2@corsbassett.com; (513) 852-8227), within 10 days to demonstrate compliance with the demands set forth in this letter, **1 Tom Plumber** will pursue legal action against you and any entities or persons with whom you conspired, seeking redress to the fullest extent permitted by law, including but not limited to actual damages, liquidated damages, treble damages, interest, attorneys' fees and costs. In addition to these legal claims, should you continue to operate a 1 Tom Plumber Franchise and/or provide plumbing services through your other business, thereby competing with **1 Tom Plumber** in contravention of the **Franchise Agreement** and **Winston-Salem Agreement**, **1 Tom Plumber** will seek court intervention via temporary restraining order(s) and/or permanent and/or temporary injunction(s).

Thank you for your prompt attention to these matters.

Sincerely,

DAVID LAWRENCE PREM

DLP:sec
Cc:     1 Tom Plumber, Inc.
        Larry D. Hensley
        Kameron J. Hensley
        Christopher A. Kuhnhein, Esq.
        Melissa A. Springer, Esq.

# EXHIBIT 6



Angie Honeycutt <angie@1tomplumber.com>

## Fwd: 9 Legend Drive
1 message

**Mike Wilson** <mwilson@1tomplumber.com>
To: Angie Honeycutt <angie@1tomplumber.com>

---------- Forwarded message ---------
From: **Josh Warren** <josh@warrenrestoration.com>
Date: Wed, Jan 15, 2025 at 3:48 PM
Subject: Fwd: 9 Legend Drive
To: Accounting <accounting@warrenrestoration.com>
Cc: <mwilson@1tomplumber.com>

Forwarded them to accounting

Sent from my iPhone

Begin forwarded message:

> **From:** Mike Wilson <mwilson@1tomplumber.com>
> **Date:** January 15, 2025 at 3:03:34 PM EST
> **To:** josh@warrenrestoration.com
> **Subject: Fwd: 9 Legend Drive**

Here is another check that you guys deposited.

---------- Forwarded message ---------
From: **Adison Markley** <amarkley@1tomplumber.com>
Date: Wed, Jan 15, 2025 at 3:01 PM
Subject: 9 Legend Drive
To: Mike Wilson <mwilson@1tomplumber.com>

Another check of ours that old Asheville deposited

--
Kind Regards,

**Adison Markley**
Accounts Receivable
*1-Tom-Plumber*
1-866-758-6237



--



## Mike Wilson

## 1 Tom Plumber

mwilson@1tomplumber.com

1-866-Plumber

864-364-0132 cell

   





Angie Honeycutt <angie@1tomplumber.com>

---

## Fwd: Partnership Property Checks Cleared

1 message

---

**Mike Wilson** <mwilson@1tomplumber.com>
To: Angie Honeycutt <angie@1tomplumber.com>

Thu, Jan 30, 2025 at 5:00 PM

---

---------- Forwarded message ---------
From: **Mike Wilson** <mwilson@1tomplumber.com>
Date: Thu, Jan 30, 2025 at 4:58 PM
Subject: Fwd: Partnership Property Checks Cleared
To: Rocky Hensley <rocky@1tomplumber.com>

---------- Forwarded message ---------
From: **Mike Wilson** <mwilson@1tomplumber.com>
Date: Tue, Jan 14, 2025 at 4:50 PM
Subject: Partnership Property Checks Cleared
To: <josh@warrenrestoration.com>

Here is another check that was paid for our invoices that show you guys accidentally cashed it.

thanks,

Mike

--



## Mike Wilson

## 1 Tom Plumber

mwilson@1tomplumber.com

1-866-Plumber



**Statement**

Date: 1/9/2025

*Please remit to:*
1 Tom Plumber Asheville
PO BOX 2066
Anderson SC, 29622
(828) 630-7453

Bill to:
Partnership Property
4600 Dundas Drive
Greensboro, NC 27407 USA

**PAST DUE – PLEASE REMIT**

| Invoice # | Type | Customer PO | Project Invoice # | Invoiced On | Technicians | Location | Due Date | Total | Payments | Balance | Subtotal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 52770593 | | | | 11/7/24 | Mike Williams | 301 4th Ave E | 12/7/24 | $212.43 | $0.00 | $212.43 | $212.43 |
| 53141017 | | | | 11/19/24 | Mike Williams | 27 Hope Clr | 12/19/24 | $84.33 | $0.00 | $84.33 | $296.76 |
| 53665863 | | | | 12/5/24 | Spencer Jackson | 10 Hope Circle | 1/4/25 | $787.82 | $0.00 | $787.82 | $1,084.58 |
| 53890243 | | | | 12/14/24 | Will Fowler | 301 4th Ave E | 1/13/25 | $373.61 | $0.00 | $373.61 | $1,458.19 |
| 53978389 | | | | 12/17/24 | Spencer Jackson | Hillside Commons Drive #B | 1/16/25 | $2,816.07 | $0.00 | $2,816.07 | $4,274.26 |

*[handwritten annotations:]*
Pd to 9 Legends – cleared (52770593)
Pd to 9 Legends – cleared (53141017)
Pd to 9 Legends (NOT cleared - Reissuing) (53665863)
Pd to 9 Legends 12/26 (53890243)
Per Supt Awaiting Pymt (53978389)

| $872.15 | $212.43 | $0.00 | $0.00 |
|---|---|---|---|
| <= 30 | 30 - 60 | 60 - 90 | > 90 |

| $4,274.26 | $0.00 | $4,274.26 |
|---|---|---|
| Total Invoices | Total Payments | Balance |

1/9/25, 2:37 PM                                     about:blank

Date: **11/25/2024**
Amount: **212.43**
Serial Number: **2053**
Account Number: ███████████





1/9/25, 2:52 PM                                          about:blank

Date: **12/02/2024**
Amount: **84.33**
Serial Number: **2433**
Account Number: ████████████







Angie Honeycutt <angie@1tomplumber.com>

## Fwd: Checks Accidentally Deposited to your account
1 message

**Mike Wilson** <mwilson@1tomplumber.com>                    Thu, Jan 30, 2025 at 5:02 PM
To: Angie Honeycutt <angie@1tomplumber.com>

---------- Forwarded message ---------
From: **Mike Wilson** <mwilson@1tomplumber.com>
Date: Thu, Jan 30, 2025 at 4:58 PM
Subject: Fwd: Checks Accidentally Deposited to your account
To: Rocky Hensley <rocky@1tomplumber.com>

---------- Forwarded message ---------
From: **Mike Wilson** <mwilson@1tomplumber.com>
Date: Thu, Jan 9, 2025 at 4:15 PM
Subject: Checks Accidentally Deposited to your account
To: <josh@warrenrestoration.com>

Josh,

Per our conversation - here are the details.

Asheville Phoenix shows two checks that were deposited in your account. I have attached those
checks for your records.

Partnership property is confirming the dollar amount, but they stated they sent you at least 2 of
our checks. I will get you details as soon as I get them.

I also wanted to make sure you knew that I am not accusing you guys of anything. I 100%
understand that we all have different processes for depositing and accounting for the funds that
come to us and this was sent directly to you guys.

Thanks for your help!

Mike

--



**Mike Wilson**

**1 Tom Plumber**

mwilson@1tomplumber.com

1-866-Plumber

864-364-0132 cell

   

--



**Mike Wilson**

**1 Tom Plumber**

mwilson@1tomplumber.com

1-866-Plumber

864-364-0132 cell

   

--

1/8/25, 3:49 PM                                                    about:blank

60029

**ASHEVILLE PHOENIX PROPERTIES**
PROPERTY MANAGEMENT TRUST ACCOUNT
P.O. BOX 5423
ASHEVILLE, NC 28813

**TRUIST**

66-46/531
DATE

PAY                                                                    $

——————FOUR HUNDRED THIRTY SEVEN 63/100——————————— DOLLARS

11/04/2024          $437.63

TO THE        1 Tom Plumber of Asheville
ORDER         9 Legend Drive
OF            Arden, NC 28704

AUTHORIZED SIGNATURE

SCW   47255312



**1 Tom Plumber Asheville**
PO BOX 2066
Anderson SC, 29622
(828) 630-7453

| | |
|---|---|
| **Invoice** | 47255312 |
| **Invoice Date** | 10/31/2024 |
| **Completed Date** | 10/31/2024 |
| **Customer PO** | 27821 |
| **Payment Term** | Net30 |
| **Due Date** | 11/30/2024 |

**Billing Address**
Asheville Phoenix Management Properties
55 Sweeten Creek Road
Asheville, NC 28803 USA

**Job Address**
Tenant
401 Carrington Place
Arden, NC 28704 USA

### Description of Work

Upon arrival at the residence, the shower faucet was found to be leaking. After diagnosing the issue, it was determined that the Moen cartridge was the source of the leak. The cartridge was replaced, and after testing the faucet, no leaks occurred. The dripping has been successfully stopped.

| Task # | Description | Quantity | Your Price | Your Total |
|---|---|---|---|---|
| FAR-009 (1) (1) | | 1.00 | $409.00 | $409.00 |
| | • Install to code | | | |
| | • Includes Moen 1222 cartridge | | | |
| | • Installation of Moen 1222 cartridge replacement (0.75) | | | |

| | |
|---|---|
| **Sub-Total** | $409.00 |
| **Tax** | $28.63 |
| **Total Due** | $437.63 |
| **Balance Due** | $437.63 |

Thank you for choosing 1 Tom Plumber! We look forward to being your #1 choice for all of your plumbing needs. Remember, we're already on the way! Call the plumber whose name is his number - 1-TOM-PLUMBER (1-866-758-6237)

This invoice is agreed and acknowledged. Payment is due upon receipt. A service fee will be charged for any returned checks, and a financing charge of 1% per month shall be applied for overdue amounts.



10/31/2024
I have inspected all of the work done by 1 Tom Plumber pursuant to the contract terms agreed by me at this location. I find that all work has been completed in a satisfactory and workmanlike manner. I have been given the opportunity to address concerns and/or discrepancies in the work provided, and I either have no such concerns or have found no discrepancies or they have been addressed by 1 Tom Plumber to my satisfaction. My signature here signifies my full and final acceptance of all work performed by the contractor pursuant to the contract as agreed.



10/31/2024

1/8/25, 3:48 PM          about:blank

60016

**ASHEVILLE PHOENIX PROPERTIES**
PROPERTY MANAGEMENT TRUST ACCOUNT
P.O. BOX 5423
ASHEVILLE, NC 28813

**TRUIST** ⊞

66-46/531
DATE

PAY           $

———— EIGHTY FOUR 53/100 ———————————— DOLLARS

10/31/2024      $84.53

TO THE
ORDER
OF

1 Tom Plumber of Asheville
9 Legend Drive
Arden, NC 28704

_Pat Quckridge_
AUTHORIZED SIGNATURE

SCW   #o 47020202

PAY TO THE ORDER OF
FIRST BANK
ARDEN, NC 28704
FOR DEPOSIT ONLY
BLUE RIDGE PLUMBING
AND PAINT
CHECK, NOTE OR DEPOSIT

about:blank                                            1/1



**1 Tom Plumber Asheville**
PO BOX 2066
Anderson SC, 29622
(828) 630-7453

**Invoice** 47020202
**Invoice Date** 10/28/2024
**Completed Date** 10/28/2024
**Customer PO**
**Payment Term** Net30
**Due Date** 11/27/2024

**Billing Address**
Asheville Phoenix Management Properties
55 Sweeten Creek Road
Asheville, NC 28803 USA

**Job Address**
Tenant - Vacant
2 Evergreen Avenue #B
Asheville, NC 28806 USA

**Description of Work**

Arrived at the house to measure the distance for the pipe and assess the best way to re-route the sump pump line to fit with the cabinet. An estimate was prepared and sent to property management for approval.

| Task # | Description | Quantity | Your Price | Your Total |
|--------|-------------|----------|------------|------------|
| DF-002 | | 1.00 | $79.00 | $79.00 |
| | • Dispatch Fee to get a qualified technician on site. | | | |

| | | |
|---|---|---|
| **Sub-Total** | | $79.00 |
| **Tax** | | $5.53 |
| **Total Due** | | $84.53 |
| **Balance Due** | | $84.53 |

Thank you for choosing 1 Tom Plumber! We look forward to being your #1 choice for all of your plumbing needs. Remember, we're already on the way! Call the plumber whose name is his number - 1-TOM-PLUMBER (1-866-758-6237)

This invoice is agreed and acknowledged. Payment is due upon receipt. A service fee will be charged for any returned checks, and a financing charge of 1% per month shall be applied for overdue amounts.



10/28/2024
I have inspected all of the work done by 1 Tom Plumber pursuant to the contract terms agreed by me at this location. I find that all work has been completed in a satisfactory and workmanlike manner. I have been given the opportunity to address concerns and/or discrepancies in the work provided, and I either have no such concerns or have found no discrepancies or they have been addressed by 1 Tom Plumber to my satisfaction. My signature here signifies my full and final acceptance of all work performed by the contractor pursuant to the contract as agreed.



Check # 60016

10/28/2024



**Angie Honeycutt <angie@1tomplumber.com>**

# Fwd: Warren Rest. Checks

1 message

[redacted]

---------- Forwarded message ---------
From: **Adison Markley** <amarkley@1tomplumber.com>
Date: Tue, Feb 18, 2025 at 10:57AM
Subject: Warren Rest. Checks
To: Mike Wilson <mwilson@1tomplumber.com>

This thread should be back at the top of your inbox, but just to recap -

This was Feb 12th her saying anything they received they just applied to their balance

**Jackie Higgs** <jackie@warrenrestoration.com> — Wed, Feb 12, 10:50 AM (6 days ago)
to me

If you can send me those invoices & customers that would help out

Thanks
Best Regards,
Jackie Higgs
Accounting

WARREN
Restoration

9 Legend Drive
Arden, North Carolina [illegible]
Office: (828) [illegible]
jackie@warrenrestoration.com
Follow us on social media
Instagram: @warrenrestoration
Facebook: https://www.facebook.com/warrenrestorationnc/

...

**Jackie Higgs** <jackie@warrenrestoration.com> — Wed, Feb 12, 10:51 AM (6 days ago)
to me

Also, as far as Asheville Phoenix Properties go, they still had outstanding invoices with us that needed to be paid for the work that was performed, that I applied that payment towards

Best Regards,
Jackie Higgs
Accounting

This was the email I just sent to her now -

**Adison Markley** <amarkley@1tomplumber.com> — Wed, Feb 12, 12:44 PM (6 days ago)
to Jackie, Mike, accounting, josh@warrenrestoration.com

We have updated all of them that we know of. It is just the ones I included in the previous email that have already been cleared

...

**Adison Markley** <amarkley@1tomplumber.com> — 12:44 PM (10 minutes ago)
to Jackie, Mike, accounting, josh@warrenrestoration.com

Hi Jackie!

I am following up on the above email. As stated before - we have contacted all of these clients and had them update their records. We have done work for all of these clients since then and received payment for work done. It is the outstanding invoices we sent earlier - and the proof of them being cashed - that we need an update on.

I look forward to hearing from you. Thank you!

...

--



Kind Regards,

**Adison Markley**
Accounts Receivable
*1-Tom-Plumber*
1-866-758-6237



--



**Mike Wilson**

**1 Tom Plumber**

**mwilson@1tomplumber.com**

**1-866-Plumber**

**864-364-0132 cell**

   



Angie Honeycutt <angie@1tomplumber.com>

## Fwd: 1TP Asheville Checks

1 message



---------- Forwarded message ---------
From: **Adison Markley** <amarkley@1tomplumber.com>
Date: Tue, Feb 18, 2025 at 10:44 AM
Subject: Re: 1TP Asheville Checks
To: Jackie Higgs <jackie@warrenrestoration.com>
Cc: Mike Wilson <mwilson@1tomplumber.com>, <accounting@warrenrestoration.com>,
josh@warrenrestoration.com <josh@warrenrestoration.com>


Hi Jackie!

I am following up on the above email. As stated before - we have contacted all of these clients
and had them update their records. We have done work for all of these clients since then and
received payment for work done. It is the outstanding invoices we sent earlier - and the proof of
them being cashed - that we need an update on.

I look forward to hearing from you. Thank you!

On Wed, Feb 12, 2025 at 12:44 PM Adison Markley <amarkley@1tomplumber.com> wrote:
We have updated all of them that we know of. It is just the ones I included in the previous
email that have already been cleared.

On Wed, Feb 12, 2025 at 12:40 PM Jackie Higgs <jackie@warrenrestoration.com> wrote:
Please have your clients update their records so the checks aren't mailed to us. Any checks
that are mailed here, have been shredded.

**Best Regards,**
**Jackie Higgs**
**Accounting**



**WARREN**
Restoration
Water | Fire | Mold
**9 Legend Drive**
**Arden, North Carolina 28704**
**Office: (828) 595-4776**
Jackie@warrenrestoration.com
Follow us on social media:
Instagram: @warrenrestoration

Facebook: https://www.facebook.com/warrenrestorationnc/

On Wed, Feb 12, 2025 at 12:22 PM Mike Wilson <mwilson@1tomplumber.com> wrote:
Adison,

Can you send an updated list of all checks that we know were accidentally sent to their team?

Thanks,

Mike

On Wed, Feb 12, 2025 at 10:49 AM Adison Markley <amarkley@1tomplumber.com> wrote:
Hi Jackie!

I am reaching out as I know Mike and Josh have been in communication about some checks that have been sent to you guys that were meant for us.

I was hoping to get an update on if/when those payments were sent to us. I am able to send you what invoices were meant to go to us if you do not have them.

Thank you so much and I look forward to hearing from you!

--
Kind Regards,

**Adison Markley**
Accounts Receivable
*1-Tom-Plumber*
1-866-758-6237



--



# Mike Wilson

# 1 Tom Plumber

**mwilson@1tomplumber.com**



Angie Honeycutt <angie@1tomplumber.com>

## Fwd: Warren Rest. Checks
1 message



---------- Forwarded message ---------
From: **Adison Markley** <amarkley@1tomplumber.com>
Date: Mon, Mar 17, 2025 at 4:30 PM
Subject: Re: Warren Rest. Checks
To: Mike Wilson <mwilson@1tomplumber.com>


I have 2 more invoices that got paid to the previous branch.

On Tue, Feb 18, 2025 at 12:57 PM Adison Markley <amarkley@1tomplumber.com> wrote:
This thread should be back at the top of your inbox, but just to recap -

This was Feb 12th her saying anything they received they just applied to their balance



--
Kind Regards,

**Adison Markley**
Accounts Receivable
*1-Tom-Plumber*
1-866-758-6237



--
Kind Regards,

**Adison Markley**
Accounts Receivable
*1-Tom-Plumber*
1-866-758-6237



--



# Mike Wilson

# 1 Tom Plumber

**mwilson@1tomplumber.com**

**1-866-Plumber**

**864-364-0132 cell**

   

**2 attachments**



**1 Tom Plumber Asheville**
PO BOX 2066
Anderson SC, 29622
(828) 630-7453

| | |
|---|---|
| **Invoice** | 54148896 |
| **Invoice Date** | 12/23/2024 |
| **Completed Date** | 12/23/2024 |
| **Customer PO** | 987377-02 |
| **Payment Term** | Net30 |
| **Due Date** | 1/22/2025 |

**Billing Address**
Global Facility Management
525 Broadhollow Road #100
Melville, NY 11747 USA

**Job Address**
LuluLemon
8 Town Square Blvd #STE 170
Asheville, NC 28803 USA

---

### Description of Work

The client had a leak on the toilet coming from the spud, and to resolve this issue, the spud needed to be replaced. Upon removing the spud, a hairline crack was found, which turned out to be a significant crack that compromised the toilet's integrity. As a result, replacing the toilet became necessary.

Upon arrival, the technician examined the toilet in the back and identified the hairline fracture. The old toilet was removed, and a new American Standard toilet was installed. The flush valve was reconnected, and the water was turned back on to check for leaks, with none present. A new wax ring and toilet bolts were also installed to ensure proper sealing and secure installation.

| Task # | Description | Quantity | Your Price | Your Total |
|---|---|---|---|---|
| TAI-023 | • Install to code<br>• Company Supplied Toilet<br>• Installation of company supplied toilet | 1.00 | $825.79 | $825.79 |

| | |
|---|---|
| **Sub-Total** | $825.79 |
| **Tax** | $57.81 |
| **Total Due** | $883.60 |
| **Balance Due** | $883.60 |

Thank you for choosing 1 Tom Plumber! We look forward to being your #1 choice for all of your plumbing needs. Remember, we're already on the way! Call the plumber whose name is his number - 1-TOM-PLUMBER (1-866-758-6237)

---

This invoice is agreed and acknowledged. Payment is due upon receipt. A service fee will be charged for any returned checks, and a financing charge of 1% per month shall be applied for overdue amounts.

12/23/2024

I have inspected all of the work done by 1 Tom Plumber pursuant to the contract terms agreed by me at this location. I find that all work has been completed in a satisfactory and workmanlike manner. I have been given the opportunity to address concerns and/or discrepancies in the work provided, and I either have no such concerns or have found no discrepancies or they have been addressed by 1 Tom Plumber to my satisfaction. My signature here signifies my full and final acceptance of all work performed by the contractor pursuant to the contract as agreed.

12/23/2024



**1 Tom Plumber Asheville**
PO BOX 2066
Anderson SC, 29622
(828) 630-7453

| | |
|---|---|
| **Invoice** | 53884886 |
| **Invoice Date** | 12/15/2024 |
| **Completed Date** | 12/15/2024 |
| **Customer PO** | 987377-02 |
| **Payment Term** | Net30 |
| **Due Date** | 1/14/2025 |

**Billing Address**
Global Facility Management
525 Broadhollow Road #100
Melville, NY 11747 USA

**Job Address**
LuluLemon
8 Town Square Blvd #STE 170
Asheville, NC 28803 USA

**Description of Work**

A leak was identified on the toilet coming from the spud. Upon removal of the spud, it was discovered that the porcelain had a hairline crack, which compromises the toilet's integrity. To resolve this, the toilet will need to be replaced. A separate estimate for the toilet replacement has been provided.

As the company is tax-exempt, taxes will be removed from the total job cost.

| Task # | Description | Quantity | Your Price | Your Total |
|---|---|---|---|---|
| DF-001 | • After hours emergency fee | 1.00 | $150.00 | $150.00 |
| RFD | Refund | 1.00 | $-10.50 | $-10.50 |

| | |
|---|---|
| **Sub-Total** | $139.50 |
| **Tax** | $9.77 |
| **Total Due** | $149.27 |
| **Balance Due** | $149.27 |

Thank you for choosing 1 Tom Plumber! We look forward to being your #1 choice for all of your plumbing needs. Remember, we're already on the way! Call the plumber whose name is his number - 1-TOM-PLUMBER (1-866-758-6237)

This invoice is agreed and acknowledged. Payment is due upon receipt. A service fee will be charged for any returned checks, and a financing charge of 1% per month shall be applied for overdue amounts.

12/15/2024

I have inspected all of the work done by 1 Tom Plumber pursuant to the contract terms agreed by me at this location. I find that all work has been completed in a satisfactory and workmanlike manner. I have been given the opportunity to address concerns and/or discrepancies in the work provided, and I either have no such concerns or have found no discrepancies or they have been addressed by 1 Tom Plumber to my satisfaction. My signature here signifies my full and final acceptance of all work performed by the contractor pursuant to the contract as agreed.

12/15/2024